## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JESSICA TAPIA,
VANESSA ARAGON, and
NEW MEXICO TRANSPORTATION UNION,
ERNEST LUCERO, Chairman,

        Plaintiffs,

vs.                              No. CIV 13-0206 JB/GBW

CITY OF ALBUQUERQUE,
RICHARD BERRY, Mayor,
ROBERT J. PERRY, Chief
Administrative Officer, BRUCE
RIZZIERI, Transit Dept. Director,
CITY PERSONNEL BOARD,
PAULA FORNEY, and
CARMEN WAGNER-MOGLE, M.D.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Stay of Proceedings and Memorandum in Support, filed March 29, 2013 (Doc. 28)("Motion to Stay"). The Court held a hearing on November 1, 2013. The primary issue is whether the Court should stay proceedings pending the Court's decision on the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment Dismissing Complaint in its Entirety, filed March 29, 2013 (Doc. 26)("MTD & MSJ"). The Court will grant the Motion to Stay.

## FACTUAL BACKGROUND

To provide background for the Motion to Stay, the Court takes the following facts from the Complaint for Violation of Statutory and Constitutional Rights, Breach of Contract, and Unfair and Prohibited Labor Practices, filed in state court January 15, 2013, filed in federal court

March 4, 2013 (Doc. 1-1)("Complaint").    The Complaint is organizationally unclear. Accordingly, the Court has reorganized the factual material in the Complaint to explain the facts clearly.

     1.      **<u>The Parties</u>**.

     Plaintiff "Jessica Tapia was a full-time, classified City employee, employed as a City para-transit van driver when she was injured on-the-job while operating a wheel-chair lift on a City van."  Complaint ¶ 1, at 1 (emphasis omitted).  Plaintiff "Vanessa Aragon was employed as a City bus driver until the City terminated her employment in July, 2011."  Complaint ¶ 2, at 2 (emphasis omitted).  Plaintiff "[t]he New Mexico Transportation Union ('NMT[U]'), is the labor union that has represented City bus and van drivers since 1965; [Plaintiff] Ernest Lucero is the current NMTU Chairman."    Complaint ¶ 3, at 2 (emphasis omitted).    "Defendant City of Albuquerque is the largest city in New Mexico; Albuquerque is in Bernalillo County, New Mexico."    Complaint ¶ 4, at 2 (emphasis omitted).  Defendant "Richard Berry is the Mayor of Albuquerque; [Defendant] Robert J. Perry is the Chief Administrative Officer (CAO) of the City."    Complaint ¶ 5, at 2 (emphasis omitted).    Defendant "[t]he City Personnel Board is supposed to be a neutral quasi-judicial hearing panel;" according to the Plaintiffs, "the current Personnel Board operates unlawfully under the control and direction of" Perry.  Complaint ¶ 6, at 2.  Non-party "[t]he City Labor-Management Relations Board is supposed to be a neutral quasi-judicial hearing panel;" the current Labor Board operates under the control and direction of the City of Albuquerque," Berry, and Perry.  Complaint ¶ 7, at 2.  Defendant Bruce Rizzieri is "Director of the City's Transit Department."  Complaint ¶ 8, at 2.  Defendant "Paula Forney is a former assistant City attorney."  Complaint ¶ 9, at 2.  Defendant "Carmen Wagner-Mogel was Jessica Tapia's physician."  Complaint ¶ 10, at 2.

2.      **Facts Related to the NMTU and City Government Actors**.

The Plaintiffs assert that the NMTU "petitioned with the support of a majority of employees in the bargaining unit for recognition as the union for the bus and van drivers in March, 2011," but "the City would not formally recognize its majority status until October 5, 2011, when it was forced to recognize NMTU after NMTU prevailed in the City-run election against AFSCME, Local 624."  Complaint ¶ 10, at 3.  Although the City Labor Board conducted that election, neither the City nor its labor board supported "the NMTU in either its grievance or bargaining representation."  Complaint ¶ 11, at 3.  "On October 5, 2011, Mayor Richard Berry de-certified AFSCME as bargaining representative and certified NMTU."  Complaint ¶ 12, at 3.  "However, the City Defendants subsequently refused to bargain with NMTU[,] refused to deduct union dues from paychecks, and refused to allow union leaders the same accommodations and privileges concerning union business, negotiations, and grievances that the AFSCME union was afforded."  Complaint ¶ 13, at 3.

> As a direct result of the City's failure to acknowledge and support NMTU as the collective bargaining and grievance representative, NMTU and its officials were untrained, inexperienced, and without any office, staff, or operating funds.  At the same time the union officers were attempting to represent drivers, the Transit Department unreasonably required them to fully perform their driving schedules.

Complaint ¶ 14, at 3-4.  Tapia's and Aragon's grievances "were the first two grievances ever handled by NMTU's new Chairman."  Complaint ¶ 15, at 4.

According to the Plaintiffs, the City Charter requires the mayor to administer and protect "the merit system," and to appoint "an officer to administer the merit system."  Complaint ¶ 16, at 4.[1]  According to the Plaintiffs, "[t]he City has not appointed or hired" such an officer.

---

[1] Although the Complaint does not explain what it means by "merit system," from what information the Complaint provides, the Court infers that the Complaint refers to the merit system for employment matters that Article X of the Charter of the City of Albuquerque

Complaint ¶ 17, at 4.  "[M]oreover, the Merit System Ordinance states that the Mayor" shall designate the CAO -- "the City's highest appointed official and the person authorized to 'reprimand, suspend, demote or discharge employees'" -- to administer that system.  Complaint ¶ 18, at 4 (quoting Albuquerque, N.M., Ordinances § 3-1-2(C)(3)).  "The City Personnel Board is neither fair nor neutral," but instead, "whenever possible[, it] upholds and advances management policies and interests over the rights of City employees.  In this case the City dictated the actions of the Personnel Board."  Complaint ¶ 19, at 4.

> [U]nder the administration of Mayor Richard Berry the Current Personnel Board and its Personnel Hearing Officers and the Labor Board all act under the direction of Mayor Berry and Robert Perry, without oversight from the City Council, collusively, and in violation of the City Charter and the rights of Plaintiffs and other City employees.

Complaint ¶ 20, at 5.

### 3. Conflict Between Tapia and the City of Albuquerque .

Tapia's wrist was injured on the job.  See Complaint ¶ 21, at 5.  The Complaint does not relay the circumstances of that injury.  "Since Ms. Tapia had been injured at work the City claimed it had the right to assign her to any position, without regard for whether the position had any relation to her work as a van driver."  Complaint ¶ 22, at 5.  "Following her on-the-job wrist injury the Transit Department assigned Ms. Tapia to 'monitor' the public restrooms at the City's Alvarado Transit Center.  While 'monitoring' at the ATC, in November, 2010, Ms. Tapia was attacked by a homeless man who injured her shoulder."  Complaint ¶ 21, at 5.  "By early December, 2010, Transit officials had placed Ms. Tapia in the poorly heated Guard Shack at the entrance to the Daytona Transit facility and left her to stay there all day with nothing to do."  Complaint ¶ 23, at 5.

---

contains.  Albuquerque City Charter, art. X.  By "Merit System Ordinance," the Plaintiffs refer to Albuquerque, N.M., Ordinances §§ 3-1-1 to -27.

On December 27, 2010, counsel wrote to Transit Director Bruce Rizzieri and the
Human Resources manager, to inquire about the City's justification for putting
Ms. Tapia in the cold Guard Shack with nothing to do.  They did not respond.  On
January 21, 2011, counsel wrote again to further question and object to the City's
mistreatment of Ms. Tapia and to give notice of her tort claims.

Complaint ¶ 24, at 5.

On February 15, 2011, the Transit Department scheduled a Pre-
Determination Hearing (PDH) for February 24, 2011, charging that Ms. Tapia
'submitted a P-30 Request for Leave form with 68.270 hours of Absent Without
Leave.'  Mr. Bird cancelled that 'hearing' after Ms. Tapia and her attorney
appeared because, he said, he had forgotten to refer the case to the mediation
office.

Complaint ¶ 25, at 4.  The hearing was rescheduled for March 10, 2010.  See Complaint ¶ 26, at

6.  When Tapia's attorney asked for documents to support the charges, no documents were

provided.  See Complaint ¶ 26, at 6.  The Transit Department asserted that Tapia "submitted a P-

30 Request for Leave form with 68.270 hours of Absent Without Leave.  This type of leave is

unauthorized leave and considered absent from work without authorization.  Your AW absences

totaling 68.270 hours have placed you in violation of City Rules and Regulations."  Complaint

¶ 26, at 6 (source of quotation unidentified).  "Ms. Tapia had submitted the form on the

instructions of Transit's Personnel Manager.  Nonetheless, on March 18, 2011, [t]he Transit

Department gave Tapia a 3-day suspension."  Complaint ¶ 27, at 6.

On April 18, 2011, the Transit Department gave [Tapia] another Notice,
scheduling a pre-determination hearing for May 9, 2011.  Included in the
allegations was the contention that on "April 11, 2011 Clarence Decker
'witnessed you in the Security Building at approx. 12:30 p.m.  At 3:00 p.m.,
'(y)ou were not at your assigned work area.'"

Complaint ¶ 27, at 6 (source of quotation unidentified).

On April 21, 2011, another Notice scheduled a hearing for June 3, 2011.
Among the allegations were that "On April 1-20, 2011 you did not show up for
work or call in to be absent from work . . . [sic]  Your AW absences totaling 24
hours have placed you in violation of City Rules and Regs."  This was apparently
also based on a complaint by Clarence Decker about Jessica Tapia's 'absents [sic]

and failure to call in.'"

Complaint ¶ 28, at 6-7 (source of quotation unidentified).  On May 18, 2011, in response to the

hearing held on May 9, 2011, the Transit Department suspended Tapia without pay for eight

work days, or sixty-four work hours, to be served from May 20, 2011 to May 31, 2011.  See

Complaint ¶ 29, at 7.  :On May 31, 2011, Maintenance Manager Dennis Stump gave Ms. Tapia

notice of another Pre-determination Hearing scheduled for Thursday June 9, 2011.  According to

the City's untrue account, Ms. Tapia had requested accommodation in October, 2010 'citing that

you are unable to drive at night due to your medical condition.'"  Complaint ¶ 30, at 31.

"Without her knowledge the City had apparently paid a private investigator to follow her outside

of work hours, with the result that she was accused of 'driving at night' and 'purchasing liquor at

a Walgreens establishment then attending what appeared to be a party.'"  Complaint ¶ 31, at 7

(source of quotation unidentified).

> Also, according to the Plaintiffs' account, the City's

>> FMLA Coordinator *contacted your physician* to inquire if your medical
>> condition had changed . . . physician stated you had not been under her
>> care since the first part of April when she certified your FMLA for
>> intermittent leave and that she did not have a medical explanation for why
>> you have not been to work.

> (Emphasis added). [sic]

Complaint ¶ 32, at 7 (omission in Complaint).

"On June 8, 2011, Jessica Tapia received the 'results of predetermination hearing' that

'on April 18-20, 2011, you did not show up for work or call in to be absent from work.'  The

Transit department imposed a 15-workday, 120 hour suspension without pay."  Complaint ¶ 33,

at 7.  "Without further notice to Ms. Tapia or NMTU, the City terminated Ms. Tapia's

employment."  Complaint ¶ 34, at 8.

- 6 -

"On August 2, 2011, the City's attorney, Paula Forney, drafted and issued a subpoena for Ms. Tapia's medical records.  Ms. Forney did that without informing Ms. Tapia or her attorney. Ms. Forney did not seek or secure a release."  Complaint ¶ 40, at 9.  The subpoena, which Forney evidently issued to Dr. Wagner-Mogle, and stated "that it was: '[f]or the medical records of patient, Jessica Tapia [and] requires you to appear for a deposition on August 10, 2011 at 10:00 a.m. . . . and bring with you: Any and all documents in your possession regarding Jessica Tapia . . . beginning 01/01/2010 to the present."  Complaint ¶ 41, at 9.  "In a letter accompanying the Subpoena and deposition notice, Ms. Forney stated that: 'You can avoid the deposition by copying and forwarding to this office all records requested prior to the deposition.  If we do not receive the records prior to the date of deposition, we will expect your appearance.'"  Complaint ¶ 42, at 9 (source of quotation not provided).  On August 4, 2011, Dr. Wagner-Mogle sent Tapia's records to Forney by facsimile transmission, without requesting or securing a release or other authorization, and without notifying Tapia.  See Complaint ¶ 43, at 9.  "On August 8, 2011, Ms. Forney wrote to counsel that she had received 'A phone call from Ms. Tapia's doctor acknowledging that she should not have sent Ms. Tapia's records without a release.'"  Complaint ¶ 44, at 10.  "Ms. Tapia objected to the unauthorized release of her medical records, but on September 9, 2011, Personnel Hearing Officer Patrick Bingham issued the subpoena for medical records requested by Ms. Forney and granted the City attorney permission to serve discovery on Ms. Tapia."  Complaint ¶ 45, at 10.

After the hearing officer allowed "the City unlimited 'discovery' (including Ms. Tapia's medical records), Ms. Forney propounded burdensome and offensive 'discovery requests' designed to embarrass Ms. Tapia and place pressure on the inexperienced NMTU officers who were attempting to represent her, rather than produce any actually useful information."

Complaint ¶ 46, at 10.  "The Hearing Officer signed an order dismissing Ms. Tapia's case, but the Personnel Board objected that Mr. Bingham's order did not give any reasons or include any 'findings.'  The Personnel Board remanded the case to the Personnel Hearing Officer to make findings and issue a 'correct' order."  Complaint ¶ 47, at 10.  "Instead of the Hearing Officer making findings and issuing a correct corder [sic], Paula Forney wrote a set of 'findings and conclusions' dismissing Ms. Tapia's case."  Complaint ¶ 48, at 10.  "The Hearing Officer merely changed the title of the document prepared by Ms. Forney and signed the 'Order' drafted by Ms. Forney, dismissing Ms. Tapia's Personnel Board case without a hearing.'"  Complaint ¶ 49, at 10.  "At its December 14, 2011, meeting the Personnel Board gave its rubber-stamp 'approval' of Ms. Forney's findings and conclusions."  Complaint ¶ 50, at 11.

> Counsel for Ms. Tapia subsequently filed a motion for sanctions against the City, Ms. Forney and the Personnel Hearing Officer for their violations of Ms. Tapia's right to privacy.  The Board members denounced Tapia's counsel for bringing the charges before the Personnel Board and the Board unanimously refused to consider the issue.

Complaint ¶ 51, at 11.

### 4.   Conflict Between Aragon and the City of Albuquerque.

"The City has held an extraordinary number of pre-disciplinary hearings in this case, spanning the time between the first such action on December 26, 2006, and the last on June 1, 2011."  Complaint ¶ 35, at 8 (footnote omitted).  The Complaint lists, without further explanation, a number of "Results of Pre-Disciplinary He[ar]ings" and states that "in addition the City has held two investigations . . . and issued at least seven letters of investigation."  Complaint ¶ 35 n.1, at 8.

> The City has charged Ms. Aragon with very many infractions. On March 16, 2008, for example, the City charged Ms. Aragon with violating section 300, 301.1, 301.9, 302, 301.13, 401.11 (D1, E), 402.5(C), 902, 902.1 (C, D, G, J. [sic] L, M1, 2, 3) and Sec. 12.34 (Major Policy Violations/Gross Misconduct, Transit

SOP).  Plaintiffs do not know what those charges are for or what happened to
those charges.

Complaint ¶ 36, at 8.  "On May 17, 2011, Deputy Operations Manager Annette Paez ordered
Ms. Aragon to return to work, but Ms. Aragon was unable to comply because of her medical
condition."  Complaint ¶ 37, at 8.  "On June 1, 2011, Ms. Paez charged Ms. Aragon with
violations of Section 300, 302, 402.5(c) and 902.1 (E. [sic] J, and M-3)."  Complaint ¶ 38, at 8.
"Although the record indicates an increasing concern over attendance and use of sick leave, the
City has never explained the reasons for its disciplinary actions against Ms. Aragon."  Complaint
¶ 39, at 9.

On October 17, 2011, Mr. Lucero wrote to Ms. Wardlaw to request Vanessa Aragon's
case and all other NMTU cases be stayed until the Union achieved the ability to represent the
bargaining unit employees."  Complaint ¶ 52, at 11.  "The City refused to agree to a continuance,
claiming that Mr. Lucero had waited too long to request it."  Complaint ¶ 53, at 11.  "Without
any attempt to contact Ms. Aragon, the City's Personnel Hearing Officer wrongly concluded
that: '. . . it is more likely than not that Employee was aware of the hearing and did not appear so
as to support the request for a continuance.'"  Complaint ¶ 54, at 11 (omission in
Complaint)(source of quotation not provided).

According to the City's Personnel Hearing Officer, "Employee failed to
establish good and sufficient cause for her untimely request for a continuance."

The Hearing Officer therefore recommends that the Personnel Board
deny Employee's request for a continuance.  The Employee having failed
to appear or to otherwise prosecute her appeal, it is further recommended
that the Personnel Board dismiss the appeal of Employee's termination.

Complaint ¶ 55, at 12 (source of block quotation not provided).

Not knowing about the status of NMTU and its representational abilities and
without inquiring or even asking Mr. Lucero, the Hearing Officer erroneously
found that the request for a continuance was made because of "problems

associated with the fact that NMTU was moving into new facilities."  In fact, there were no "new facilities" and Ms. Aragon was unaware of what was happening, but the Hearing Officer, acting in collusion with the City, recommended termination without a hearing anyway."

Complaint ¶ 56, at 12.

## PROCEDURAL BACKGROUND

The Court will discuss the procedural background in two parts.  First, the Court will discuss the Plaintiffs' Complaint and the Defendants' removal to federal court.  Second, the Court will discuss the proceedings that relate to the Motion to Stay.

### 1.    The Plaintiffs File their Complaint; the Defendants Remove to Federal Court.

The Plaintiffs filed their Complaint in state court, stating that they "bring their claims under 42 U.S.C. [§] 1983, and the laws and Constitutions of the United States and the State of New Mexico."  Complaint ¶ 11, at 2-3.  The Plaintiffs allege six causes of action.  See Complaint ¶¶ 57-84, at 12-16.  Under "Count 1 Due Process and Equal Protection," the Plaintiffs assert that Tapia and Aragon, "[a]s classified, full-time, City employees . . . had legitimate expectations of continued employment absent just cause for disciplinary action.  They had the right to a full and fair hearing to challenge their termination."  Complaint ¶ 57, at 12.  "Similarly," the Plaintiffs allege, "NMTU and its leadership had a due process right and an obligation to represent employees in the bargaining unit at post-termination grievance hearings that are fundamentally fair and procedurally correct."  Complaint ¶ 58, at 12.  According to the Plaintiffs, the "Defendants denied the employees' rights and hearings and dismissed their cases on pretextual grounds," and, thereby, "the City Defendants have violated Plaintiffs' rights to due process and equal protection of the laws."  Complaint ¶¶ 59-60, at 13.

Under "Count  2 Breach of Employment Contracts," the Plaintiffs allege that, "[a]s

tenured public employees, Plaintiffs Tapia and Aragon were covered by a contract of employment that consisted of the Merit System Ordinance, the Personnel Rules and Regulations and applicable collective bargaining agreements."  Complaint ¶ 62, at 13.  The Plaintiffs contend that they "were contractually entitled to notice and an opportunity to be heard, and to be disciplined only for just cause."  Complaint ¶ 62, at 13.  The Plaintiffs submit that, thereby, the Defendants "have violated their contractual obligations and are liable for damages to be determined at trial."  Complaint ¶ 64, at 13.

Under "Count 3 Violation of Right to Privacy," the Plaintiffs contend that "Forney used a misleading letter and an illegitimate subpoena that she issued herself to secure Jessica Tapia's medical records from Dr. Carmen Wagner-Mogle," and that Dr. "Wagner-Mogle sent Ms. Tapia's medical records to Ms. Forney without any knowledge or authorization by Ms. Tapia."  Complaint ¶¶ 66-67, at 13-14.  The Plaintiffs assert that "Dr. Wagner-Mogle communicated with Ms. Forney and other City representatives about Jessica Tapia and her medical condition and records on at least several occasions," but "never contacted or attempted to contact Ms. Tapia or her attorney."  Complaint ¶ 68, at 14.  The Plaintiffs state that "[t]he acts of Defendants, specifically Paula Forney, Dr. Carmen Wagner-Mogle and the Transit Department deliberately and willfully violated Jessica Tapia's right to privacy in her medical records."  Complaint ¶ 69, at 14.  The Plaintiffs contend that the "Defendants also hired a private investigator and followed Ms. Tapia, seeking and securing information about her personal life and activities entirely unconnected with her work."  Complaint ¶ 70, at 14.  The Plaintiffs assert that the "Defendants are liable for their violations of Ms. Tapia's right to privacy."  Complaint ¶ 71, at 14.

Under "Count 4 Negligence," the Plaintiffs assert that, "[a]s described herein, Defendants

have treated Jessica Tapia and Vanessa Aragon negligently and with deliberate indifference with respect to their employment." Complaint ¶ 73, at 14. "In addition," the Plaintiffs state, "Ms. Tapia sustained two injuries, the first resulting from operation of a wheelchair lift while on duty; the second of which was a result of her assignment to monitor the restroom facilities at the Alvarado Transit Center, a building managed and maintained by the City Transit Department." Complaint ¶ 74, at 15. The Plaintiffs assert that "Tapia has given notice of her tort claim to the City of Albuquerque." Complaint ¶ 75, at 15. The Plaintiffs maintain that "[t]he city and its Transit Department, as well as its Director, are liable for the damages proximately caused by their negligence in an amount to be determined at trial." Complaint ¶ 76, at 15.

Under "Count 5 Conspiracy to Deny Constitutional Rights," the Plaintiffs assert that "[t]he City Defendants, aware of Plaintiffs' rights to due process and equal protection, acted deliberately to deny the right to a hearing, one of the most fundamental rights of public employees subjected to wrongful disciplinary actions." Complaint ¶ 78, at 15. "In particular," according to the Plaintiffs, "Paula Forney, the Personnel Hearing Officers, the Personnel Board, and Bruce Rizzieri and other City officials met, discussed, and arranged for the denial of Plaintiffs' due process and equal protection rights." Complaint ¶ 79, at 15.

Under "Count 6 Unfair Labor Practices," the Plaintiffs state that, "[l]ong after the submission of NMTU's majority petition for representation of the Transit drivers' bargaining unit in March, 2011, and the expiration of the Collective Bargaining Agreement on June 30, 2011, the City and Transit Department continued recognizing AFSCME as the exclusive bargaining and grievance representative." Complaint ¶ 81, at 15-16. According to the Plaintiffs,

> [t]he City and its Labor Board have ignored and opposed the legitimate representational interests of NMTU, discarded NMTU's prohibited practice complaints without hearings, insisted on an election when none was needed, and then did nothing to support or enable NMTU to represent employees after it

prevailed in the election.

Complaint ¶ 82, at 16.  The Plaintiffs maintain that "[t]he City's misconduct and the Hearing Officers' and Personnel Board's lack of concern over -- and engagement in -- collusive tactics in this case, including biased hearing officers eager to dismiss rather than hear employee cases, and unethical and illegal conduct, clearly demonstrated the City's policy and practice with respect to the rights of its employees and the obligations of City management towards those employees." Complaint ¶ 83, at 16.  The Plaintiffs assert that they "are entitled to compensatory, declaratory, and injunctive relief for the City's failure to comply with its laws, failure to recognize and hear employee grievances, and collusive and conspiratorial conduct with respect to these and other employees' rights and grievances."  Complaint ¶ 84, at 16.

The Plaintiffs ask for the following forms of relief:

A.    Declaratory, injunctive and compensatory relief for denial of fair hearings and the rights to due process and equal protection of law;

B.    Damages for breaches of contract;

C.    Declaratory, injunctive, and compensatory relief and exemplary and punitive damages for violation of Jessica Tapia's right to privacy.

D.    Damages for negligence with respect to Ms. Tapia's injuries;

E.    Declaratory, injunctive, and compensatory relief for unfair labor practices and collusive misconduct between and among City officials and attorneys, the Personnel Board and its Personnel Hearing Officers and the Labor Board.

F.    Declaratory and injunctive relief requiring the City to hire or appoint a person to oversee, administer, and protect the Merit System and ensure a fair, neutral and effective personnel hearing process for City employees.

G.    Costs and attorneys' fees; and

H.    Such other and further relief as the Court deems just and proper.

Complaint ¶¶ A-H, at 16-17.

On March 4, 2013, the Defendants filed their Notice of Removal.  See Doc. 1.

## 2.        **The Motion to Stay.**

The City of Albuquerque, Richard Berry, Robert J. Perry, and Bruce Rizzieri (referred to jointly as "the City Defendants") move the Court to stay the proceedings.  Motion to Stay at 1. The City Defendants point out that they have filed their MTD & MSJ, in which they assert that they "are entitled to qualified immunity if the Court holds that the complaint states a claim or denies their motion for summary judgment."  Motion to Stay ¶ 1-2, at 1.  The City Defendants assert that they are presumed to be entitled to immunity and suggest that, given that they have asserted qualified immunity, the Plaintiffs now bear the burden to demonstrate that the City Defendants violated clearly established law.  See Motion to Stay ¶ 2, at 1-2.  The City Defendants point out that the Supreme Court of the United States has urged lower courts to resolve immunity claims early and that, "[b]ecause the doctrine of qualified immunity protects against the burdens of discovery as well as trial, the Supreme Court has emphasized that courts should remove the issue prior to discovery taking place."  Motion to Stay ¶ 3, at 2.  According to the City Defendants, they sought the concurrence of all counsel, and obtained concurrence from counsel for the City Personnel Board, Forney, and Dr. Wagner-Mogle, but did not obtain concurrence of the Plaintiffs' counsel.  See Motion to Stay ¶ 4, at 2.  The City Defendants ask the Court to grant the Motion to Stay, thereby staying the proceedings pending the Court's disposition of their MTD & MSJ.  See Motion to Stay ¶¶ A-C, at 2.

The Plaintiffs did not file a response.

The Court held a hearing on November 1, 2013.  See Transcript of Hearing, taken November 1, 2013, filed November 7, 2013 (Doc. 63)("Tr.").  The Court asked if the Plaintiffs objected to the Motion to Stay.  Tr. at 29:24-30:1 (Court).  The Plaintiffs indicated that they did

not object, so long as the Court adopted "a procedure to proceed with the case at some point in

time that's reasonable." Tr. at 30:2-4 (Livingston). The Court, therefore, indicated that it would

grant the Motion to Stay. See Tr. at 30:5-18 (Court).

> Later during the hearing, the Plaintiffs asked for a clarification:

> My understanding was, when I said I didn't oppose it, was that would be a motion
> to stay everything else that came after that, but now, I realize that that's probably
> going to stay any further pleadings in this case or any further motions in this case.
> So am I restrained from filing any further motions in this case by the motion to
> stay being granted, Your Honor? I tried asking opposing counsel what their view
> of that was, and they wouldn't tell me.

Tr. at 50:3-12 (Livingston). The Court indicated that it had granted "the relief that was

sought" -- that is, that it "would stay the proceedings until the Court's ruling on the city's motion

to dismiss or, in the alternative, motion for summary judgment." Tr. at 50:13-16 (Court). The

Court asked what motion the Plaintiffs were thinking of filing; the Plaintiffs indicated that they

had drafted a motion for judgment on the pleadings that they could file within three days. See

Tr. at 50:18-25 (Court, Livingston). The Court advised the Plaintiffs that they should not file it,

because, if the Court were to grant the City Defendants' MTD & MSJ, the Plaintiffs could not

win their proposed motion for judgment on the pleadings; the Court also noted that, if it denies

the City Defendants' MTD & MSJ, it will lift the stay, and the Plaintiffs may file their proposed

motion at that time. See Tr. at 51:1-11 (Court, Livingston). The Plaintiffs said that "this case is

out of control and that a case . . . like this needs to be managed from the very beginning," and

argued that the Court should manage the case to avoid significant delay. Tr. at 51:12-25

(Livingston).[2]

----

[2] The Plaintiffs' counsel also raised concerns about the Court's compliance with rule 16
of the Federal Rules of Civil Procedure -- specifically, the requirement that the Court hold a
scheduling conference so that it may issue a scheduling order, which rule 16 requires the Court
to issue "as soon as practicable, but in any event within the earlier of 120 days after any

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 818). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged that: (i)

---

defendant has been served with the complaint or 90 days after any defendant has appeared." Fed. R. Civ. P. 16. See Tr. at 6:12-20:2 (Court, Livingston). While the Plaintiffs raise a proper concern, that concern does not affect the Court's disposition of the Motion to Stay. Accordingly, the Court will not address the delayed setting of the scheduling conference in this Memorandum Opinion and Order. The Court notes, however, that, promptly after the Plaintiffs sought a rule 16 scheduling conference during the November 1, 2013, hearing, the Court set one: the Court issued an Initial Scheduling Order, filed November 1, 2013 (Doc. 58), in which the Court set a scheduling conference for December 3, 2013. The Court held that scheduling conference, see Clerk's Minutes, filed December 3, 2013 (Doc. 81), and shortly thereafter issued a Scheduling Order, filed December 5, 2013 (Doc. 74).

the defendant's actions violated his or her constitutional or statutory rights; and (ii) the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In determining whether the plaintiff has met his or her burden, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378 (2007).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted in Pearson v. Callahan that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial.  See 555 U.S. at 241.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court has suggested that, to avoid unnecessary exposure to burdensome discovery, the preferred practice is for the government officials to move to dismiss the action based on qualified immunity before discovery is ordered.  See Crawford-El v. Britton 523 U.S. 574, 598 (1998).  There are, however, exceptions to the rule that no discovery be allowed when government officials claim qualified immunity.   The officials are not protected from all discovery, "'but only from discovery which is either avoidable or overly broad.'"   Garrett v. Stratman, 254 F.3d 946, 953 (10th Cir. 2001)(quoting Maxey v. Fulton, 890 F.2d 279, 282 (10th Cir. 1989)). In Todd v. Montoya, No. CIV 10-0106 JB/KBM, 2011 WL 5238900 (D.N.M. Oct. 4, 2011)(Browning, J.), the Court granted in part and denied in part motions to stay discovery, allowing the plaintiff to take the deposition of one of two inmates that beat him up in prison, the conduct underlying his case.  See 2011 WL 5238900, at *5.  The plaintiff brought a 42 U.S.C. § 1983 claim, based on the theory that one of the prison guards retaliated against the plaintiff for an argument the two of them had by allowing two inmates to view the plaintiff's offenses on a

computer screen, and that the two inmates subsequently beat up the plaintiff based on the offenses that they saw.  See  2011 WL 5238900, at *1.  The defendant prison guard filed his summary judgment motion a year and two months after the plaintiff filed the complaint.  See 2011 WL 5238900, at *1.  The Court limited the stay to allow the inmate's deposition, because the plaintiff's theory hinged upon the prison guard showing the inmates the computer screen, or telling them of the plaintiff's offenses, and the defendant denied ever doing either.  See  2011 WL 5238900, at *4.  The Court allowed the deposition to go forward, because it could be determinative of the case going forward, and did not burden any government employees or entities:

> This testimony is possib[ly] determinative of [the Plaintiff]'s case, and this limited amount of discovery is narrowly crafted to get to the heart of the motion for summary judgment without allowing a lot of potentially unnecessary discovery.  [The Defendant] has said he did not show [the inmate witness] or [the other inmate] his computer screen, or tell them [the plaintiff]'s crimes; if [the inmate witness] says otherwise, there will likely be a genuine issue of fact requiring the Court to deny the motions and allow the parties to proceed to trial. It seems fundamentally unfair to dismiss [the plaintiff]'s case when a deposition of [the inmate witness] may make his case.  Further, this deposition will not burden any government employees or entities.  Accordingly, the Court finds that this limited discovery falls within the exceptions to disallowing discovery once the defense of qualified immunity has been raised.  See Garrett v. [Stratmen], 254 F.3d at 953 (recognizing that a discovery order in the context of qualified immunity is not immediately appealable "when the defendant's immunity claim turns at least partially on a factual question; when the district court is unable to rule on the immunity defense without further clarification of the facts; and which are narrowly tailored to uncover only those facts needed to rule on the immunity claim are neither avoidable or overly broad.").

2011 WL 5238900, at *5.

In B.T. v. Davis, 557 F. Supp. 2d 1262 (D.N.M. 2007)(Browning, J.), however, the Court denied the plaintiff's request to be permitted more discovery after the defendant raised the qualified immunity defense.  557 F. Supp. 2d at 1287.  The Court refused to allow the plaintiff to depose witnesses that the plaintiff alleged would evidence the defendants' knowledge of their

- 19 -

alleged violation of the plaintiff's constitutional rights, because the defendant's depositions would not have affected the Court's conclusion that "the law regarding [the plaintiff]'s claims was not clearly established and that a reasonable person in the Defendants' position could have believed that their actions were lawful." 557 F. Supp. 2d at 1287.

In Herrera v. Santa Fe Public Schools, No. CIV 11-0422 JB/KBM, 2012 WL 6846393 (D.N.M. Dec. 20, 2012)(Browning, J.), the Court granted a motion to stay discovery pending its disposition of a summary judgment motion based on qualified immunity. See 2012 WL 6846393, at *1. In that case, students at a public high school in Santa Fe, New Mexico, sued school officials, challenging on constitutional grounds a search that the officials had authorized and conducted at a school prom. See 2012 WL 6846393, at *1-3. Eighteen months after the plaintiffs filed their complaint, one defendant, the school principal, moved for summary judgment on the basis of qualified immunity; shortly thereafter, all defendants moved for a stay pending the Court's qualified immunity decision. See 2012 WL 6846393, at *1-2. The Court granted a stay of discovery: the Court explained that, although much discovery had already taken place -- including a deposition of the school principal -- qualified immunity still entitled her to protection from the burdens of suit. See 2012 WL 6846393, at *7 ("If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." (alteration and internal quotation marks omitted)(quoting Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010)). The Court also denied the plaintiffs' request to depose the person who wrote the code of conduct governing searches at school events, explaining that the plaintiffs had not proven that the deposition was necessary to the Court's qualified immunity decision. See Herrera v. Santa Fe Pub. Schs., 2012 WL 6846393, at *1, *8-9.

Over the Plaintiffs' opposition, the Court also stayed the case as to the other defendants.

See 2012 WL 6846393, at *10.  The Court explained that it was

> not unsympathetic to the Plaintiffs' arguments.  There is a lot of fiction involved in the policies and the rhetoric used to support qualified immunity.  In modern litigation, attorneys do most of the work for litigation, and public officials often do not know that discovery and depositions are taking place -- except as to them -- until settlement negotiations or trial is near. Public officials rarely go to depositions or, in the Court's experience, hearings. Nevertheless, the law is well established that discovery should be stayed until the Court decides the qualified immunity issue. . . .  The Court cannot, without overriding the policies underlying the stay, say the case is stayed to [the school principal], but not anyone else.  In few cases does an attorney feel comfortable not going to deposition in the case in which the attorney's client is involved.  Also, a partial stay could drag the Court into endless disputes about to whom the discovery stay applies.   The policy underlying a discovery stay does not only protect the public official from being personally subjected to the burdens of litigation, but it protects the public official from the attendant burdens.  In Harlow v. Fitzgerald, the Supreme Court noted that the protection afforded by the discovery stay protects not only the public official being sued from being personally subjected to the burdens of the lawsuit, but also protects against broad-ranging discovery about the defendant that can result from judicial inquiry into a public official's subjective motivation for making the decision for which the official is being sued.  See 457 U.S. at 817 ("Judicial inquiry into subjective motivation [when a public official is sued] [ ] may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.").   The policies that underlie a discovery stay therefore do not support a partial stay only as to discovery directed against [the school principal].

Herrera v. Santa Fe Pub. Schs., 2012 WL 6846393, at *10 (alterations in original).

## ANALYSIS

The Court will grant the Motion to Stay.  The City Defendants have properly moved the Court to stay the proceedings, and the Plaintiffs did not file a written response.  Accordingly, the Plaintiffs are deemed to have consented to the motion.  See D.N.M. LR-Civ. 7.1(a) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.").  Moreover, at the hearing, the Plaintiffs did not, at least when the Court held argument on the Motion to Stay, oppose the Motion to Stay, and

even when they later vacillated on what the Court's ruling meant, they did not argue that they needed discovery to respond to the City Defendants' qualified immunity argument. In any case, the Court sees -- with its own independent review -- no need for such discovery. The Court will, therefore, grant the Motion to Stay pending the Court's decision on the Defendants' MTD & MSJ.

**IT IS ORDERED** that the Defendants City of Albuquerque, Richard Berry, Robert J. Perry, and Bruce Rizzieri's request for a stay pending the Court's ruling on the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment Dismissing Complaint in its Entirety, filed March 29, 2013 (Doc. 26), in the Motion for Stay of Proceedings and Memorandum in Support, filed March 29, 2013 (Doc. 28), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul Livingston
Placitas, New Mexico

> *Attorney for the Plaintiffs and Counter-Defendants Jessica Tapia, Vanessa Aragon, New Mexico Transportation Union, and Ernest Lucero*

Rebecca E. Wardlaw
    Managing Assistant City Attorney
Samantha M. Hults
Steve D. Nichols
    Assistant City Attorneys
Albuquerque, New Mexico

--and--

Stephen G. French
Paula I. Forney
Erika E. Anderson
French & Associates, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendants and Counter-Claimants City of Albuquerque, Richard Berry,*
> *Robert J. Perry, and Bruce Rizzieri*

Deborah D. Wells
Debra J. Moulton
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant City Personnel Board*

Alfred L. Green, Jr.
Emily A. Franke
Neil R. Blake
Butt Thornton & Baehr, P. C.
Albuquerque, New Mexico

> *Attorneys for Defendant Paula Forney*

Lynn S. Sharp
Christopher Lee Moander
Charles P. List
Sharp Law Firm
Albuquerque, New Mexico

> *Attorneys for Defendant Carmen Wagner-Mogle, M.D.*