## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JESSICA TAPIA,
VANESSA ARAGON, and
NEW MEXICO TRANSPORTATION UNION,
ERNEST LUCERO, Chairman,

        Plaintiffs,

vs.                                                                    No. CIV 13-0206 JB/GBW

CITY OF ALBUQUERQUE,
RICHARD BERRY, Mayor,
ROBERT J. PERRY, Chief
Administrative Officer, BRUCE
RIZZIERI, Transit Dept. Director,
CITY PERSONNEL BOARD,
PAULA FORNEY, and
CARMEN WAGNER-MOGLE, M.D.,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Carmen Wagner-Mogle, M.D.'s

Motion to Dismiss, filed March 11, 2013 (Doc. 14)("MTD").  The Court held a hearing on

November 1, 2013.  The primary issue is whether the Court should dismiss Plaintiff Jessica Tapia's

claims against Dr. Carmen Wagner-Mogle, M.D.  The Court will grant the MTD in part and deny it

in part.  Under the local rules, because the Plaintiffs did not file a response, they have consented that

the Court should grant the MTD.  <u>See</u> D.N.M. LR-Civ. 7.1(a)("The failure of a party to file and serve

a response in opposition to a motion within the time prescribed for doing so constitutes consent to

grant the motion.").  Moreover, the Court, on the merits, concludes that the MTD should be, in large

part, granted.  The Complaint for Violation of Statutory and Constitutional Rights, Breach of

Contract, and Unfair and Prohibited Labor Practices, filed in state court January 15, 2013, filed in

federal court March 4, 2013 (Doc. 1-1)("Complaint"), is unclear.  Dr. Wagner-Mogle's MTD focused on a purported claim under the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191, 110 Stat. 1936 ("HIPAA").  At the hearing, Tapia clarified that she did not bring a HIPAA claim against Dr. Wagner-Mogle; accordingly, to the extent that she intended to bring a HIPAA claim, she abandoned it at the hearing.  To ensure a clean record, the Court will dismiss any purported HIPAA claim with prejudice.  At the hearing, Tapia asserted that Dr. Wagner-Mogle violated an unidentified provision of the Constitution of the United States of America.  The Court will dismiss any purported constitutional claim against Dr. Wagner-Mogle, because the Complaint does not state a constitutional claim against her.  The Court will do so without prejudice to Tapia amending her Complaint to properly state a constitutional claim.

## FACTUAL BACKGROUND

The Court takes the facts from the Complaint as true, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Complaint is unclear.  Accordingly, the Court has reorganized the factual material in the Complaint to explain the facts clearly.

### 1.    The Parties.

Plaintiff "Jessica Tapia was a full-time, classified City employee, employed as a City para-transit van driver when she was injured on-the-job while operating a wheel-chair lift on a City van."  Complaint ¶ 1, at 1 (emphasis omitted).  Plaintiff "Vanessa Aragon was employed as a City bus driver until the City terminated her employment in July, 2011."  Complaint ¶ 2, at 2 (emphasis omitted).  Plaintiff "[t]he New Mexico Transportation Union ('NMT[U]'), is the labor union that has represented City bus and van drivers since 1965; [Plaintiff] Ernest Lucero is the current NMTU

Chairman."  Complaint ¶ 3, at 2 (emphasis omitted).  "Defendant City of Albuquerque is the largest city in New Mexico; Albuquerque is in Bernalillo County, New Mexico."   Complaint ¶ 4, at 2 (emphasis omitted).  Defendant "Richard Berry is the Mayor of Albuquerque; [Defendant] Robert J. Perry is the Chief Administrative Officer (CAO) of the City."   Complaint ¶ 5, at 2 (emphasis omitted).  Defendant "[t]he City Personnel Board is supposed to be a neutral quasi-judicial hearing panel;" according to the Plaintiffs, "the current Personnel Board operates unlawfully under the control and direction of" Perry.  Complaint ¶ 6, at 2.  Non-party "[t]he City Labor-Management Relations Board is supposed to be a neutral quasi-judicial hearing panel;" the current Labor Board operates under the control and direction of the City of Albuquerque," Berry, and Perry.  Complaint ¶ 7, at 2.  Defendant Bruce Rizzieri is "Director of the City's Transit Department."  Complaint ¶ 8, at 2.  Defendant "Paula Forney is a former assistant City attorney."  Complaint ¶ 9, at 2.  Defendant "Carmen Wagner-Mogel was Jessica Tapia's physician."  Complaint ¶ 10, at 2.

### 2.   **Facts Related to the NMTU and City Government Actors**.

The Plaintiffs assert that the NMTU "petitioned with the support of a majority of employees in the bargaining unit for recognition as the union for the bus and van drivers in March, 2011," but "the City would not formally recognize its majority status until October 5, 2011, when it was forced to recognize NMTU after NMTU prevailed in the City-run election against AFSCME, Local 624." Complaint ¶ 10, at 3.  Although the City Labor Board conducted that election, neither the City nor its labor board supported "the NMTU in either its grievance or bargaining representation."  Complaint ¶ 11, at 3.  "On October 5, 2011, Mayor Richard Berry de-certified AFSCME as bargaining representative and certified NMTU."  Complaint ¶ 12, at 3.  "However, the City Defendants subsequently refused to bargain with NMTU[,] refused to deduct union dues from paychecks, and

- 3 -

refused to allow union leaders the same accommodations and privileges concerning union business, negotiations, and grievances that the AFSCME union was afforded."  Complaint ¶ 13, at 3.

> As a direct result of the City's failure to acknowledge and support NMTU as the collective bargaining and grievance representative, NMTU and its officials were untrained, inexperienced, and without any office, staff, or operating funds.  At the same time the union officers were attempting to represent drivers, the Transit Department unreasonably required them to fully perform their driving schedules.

Complaint ¶ 14, at 3-4.  Tapia's and Aragon's grievances "were the first two grievances ever handled by NMTU's new Chairman."  Complaint ¶ 15, at 4.

According to the Plaintiffs, the City Charter requires the mayor to administer and protect "the merit system," and to appoint "an officer to administer the merit system."  Complaint ¶ 16, at 4.[1] According to the Plaintiffs, "[t]he City has not appointed or hired" such an officer.  Complaint ¶ 17, at 4.  "[M]oreover, the Merit System Ordinance states that the Mayor" shall designate the CAO -- "the City's highest appointed official and the person authorized to 'reprimand, suspend, demote or discharge employees'" -- to administer that system.  Complaint ¶ 18, at 4 (quoting Albuquerque, N.M., Ordinances § 3-1-2(C)(3)).  "The City Personnel Board is neither fair nor neutral," but instead, "whenever possible[, it] upholds and advances management policies and interests over the rights of City employees.  In this case the City dictated the actions of the Personnel Board."  Complaint ¶ 19, at 4.

> [U]nder the administration of Mayor Richard Berry the Current Personnel Board and its Personnel Hearing Officers and the Labor Board all act under the direction of Mayor Berry and Robert Perry, without oversight from the City Council, collusively,

---

[1] Although the Complaint does not explain what it means by "merit system," from what information the Complaint provides, the Court infers that the Complaint refers to the merit system for employment matters that Article X of the Charter of the City of Albuquerque contains. Albuquerque City Charter, art. X.  The Merit System Ordinance is found in Albuquerque, N.M. Ordinances, §§ 3-1-1 to -28 ("MSO").

and in violation of the City Charter and the rights of Plaintiffs and other City employees.

Complaint ¶ 20, at 5.

### 3.   Conflict Between Tapia and the City of Albuquerque .

Tapia's wrist was injured on the job.  See Complaint ¶ 21, at 5.   The Complaint does not relay the circumstances of that injury.  "Since Ms. Tapia had been injured at work the City claimed it had the right to assign her to any position, without regard for whether the position had any relation to her work as a van driver."  Complaint ¶ 22, at 5.  "Following her on-the-job wrist injury the Transit Department assigned Ms. Tapia to 'monitor' the public restrooms at the City's Alvarado Transit Center.  While 'monitoring' at the ATC, in November, 2010, Ms. Tapia was attacked by a homeless man who injured her shoulder."  Complaint ¶ 21, at 5.  "By early December, 2010, Transit officials had placed Ms. Tapia in the poorly heated Guard Shack at the entrance to the Daytona Transit facility and left her to stay there all day with nothing to do."  Complaint ¶ 23, at 5.

> On December 27, 2010, counsel wrote to Transit Director Bruce Rizzieri and the Human Resources manager, to inquire about the City's justification for putting Ms. Tapia in the cold Guard Shack with nothing to do.  They did not respond.  On January 21, 2011, counsel wrote again to further question and object to the City's mistreatment of Ms. Tapia and to give notice of her tort claims.

Complaint ¶ 24, at 5.

> On February 15, 2011, the Transit Department scheduled a Pre-Determination Hearing (PDH) for February 24, 2011, charging that Ms. Tapia 'submitted a P-30 Request for Leave form with 68.270 hours of Absent Without Leave.'  Mr. Bird cancelled that 'hearing' after Ms. Tapia and her attorney appeared because, he said, he had forgotten to refer the case to the mediation office.

Complaint ¶ 25, at 4.  The hearing was rescheduled for March 10, 2010.  See Complaint ¶ 26, at 6.

When Tapia's attorney asked for documents to support the charges, no documents were provided.

<u>See</u> Complaint ¶ 26, at 6.  The Transit Department asserted that Tapia "submitted a P-30 Request for Leave form with 68.270 hours of Absent Without Leave.  This type of leave is unauthorized leave and considered absent from work without authorization.  Your AW absences totaling 68.270 hours have placed you in violation of City Rules and Regulations."  Complaint ¶ 26, at 6 (source of quotation unidentified).  "Ms. Tapia had submitted the form on the instructions of Transit's Personnel Manager.  Nonetheless, on March 18, 2011, [t]he Transit Department gave Tapia a 3-day suspension."  Complaint ¶ 27, at 6.

> On April 18, 2011, the Transit Department gave [Tapia] another Notice, scheduling a pre-determination hearing for May 9, 2011.  Included in the allegations was the contention that on "April 11, 2011 Clarence Decker 'witnessed you in the Security Building at approx. 12:30 p.m.  At 3:00 p.m., '(y)ou were not at your assigned work area.'"

Complaint ¶ 27, at 6 (source of quotation unidentified).

> On April 21, 2011, another Notice scheduled a hearing for June 3, 2011.  Among the allegations were that "On April 18-20, 2011 you did not show up for work or call in to be absent from work . . . [sic] Your AW absences totaling 24 hours have placed you in violation of City Rules and Regs."  This was apparently also based on a complaint by Clarence Decker about Jessica Tapia's 'absents [sic] and failure to call in.'"

Complaint ¶ 28, at 6-7 (source of quotation unidentified).  On May 18, 2011, in response to the hearing held on May 9, 2011, the Transit Department suspended Tapia without pay for eight work days, or sixty-four work hours, to be served from May 20, 2011 to May 31, 2011.  <u>See</u> Complaint ¶ 29, at 7. :On May 31, 2011, Maintenance Manager Dennis Stump gave Ms. Tapia notice of another Pre-determination Hearing scheduled for Thursday June 9, 2011.  According to the City's untrue account, Ms. Tapia had requested accommodation in October, 2010 'citing that you are unable to drive at night due to your medical condition.'"  Complaint ¶ 30, at 31.  "Without her knowledge the

City had apparently paid a private investigator to follow her outside of work hours, with the result that she was accused of 'driving at night' and 'purchasing liquor at a Walgreens establishment then attending what appeared to be a party.'"  Complaint ¶ 31, at 7 (source of quotation unidentified).

> Also, according to the Plaintiffs' account, the City's

> > FMLA Coordinator *contacted your physician* to inquire if your medical condition had changed . . . physician stated you had not been under her care since the first part of April when she certified your FMLA for intermittent leave and that she did not have a medical explanation for why you have not been to work.

> (Emphasis added). [sic]

Complaint ¶ 32, at 7 (omission in Complaint).

"On June 8, 2011, Jessica Tapia received the 'results of predetermination hearing' that 'on April 18-20, 2011, you did not show up for work or call in to be absent from work.'  The Transit department imposed a 15-workday, 120 hour suspension without pay."  Complaint ¶ 33, at 7.  "Without further notice to Ms. Tapia or NMTU, the City terminated Ms. Tapia's employment." Complaint ¶ 34, at 8.

"On August 2, 2011, the City's attorney, Paula Forney, drafted and issued a subpoena for Ms. Tapia's medical records.  Ms. Forney did that without informing Ms. Tapia or her attorney.  Ms. Forney did not seek or secure a release."  Complaint ¶ 40, at 9.  The subpoena, which Forney evidently issued to Dr. Wagner-Mogle, and stated "that it was: '[f]or the medical records of patient, Jessica Tapia [and] requires you to appear for a deposition on August 10, 2011 at 10:00 a.m. . . . and bring with you: Any and all documents in your possession regarding Jessica Tapia . . . beginning 01/01/2010 to the present."  Complaint ¶ 41, at 9.  "In a letter accompanying the Subpoena and deposition notice, Ms. Forney stated that: 'You can avoid the deposition by copying and forwarding

to this office all records requested prior to the deposition.  If we do not receive the records prior to the date of deposition, we will expect your appearance.'"  Complaint ¶ 42, at 9 (source of quotation not provided).  On August 4, 2011, Dr. Wagner-Mogle sent Tapia's records to Forney by facsimile transmission, without requesting or securing a release or other authorization, and without notifying Tapia.  See Complaint ¶ 43, at 9.  "On August 8, 2011, Ms. Forney wrote to counsel that she had received 'A phone call from Ms. Tapia's doctor acknowledging that she should not have sent Ms. Tapia's records without a release.'"  Complaint ¶ 44, at 10.  "Ms. Tapia objected to the unauthorized release of her medical records, but on September 9, 2011, Personnel Hearing Officer Patrick Bingham issued the subpoena for medical records requested by Ms. Forney and granted the City attorney permission to serve discovery on Ms. Tapia."  Complaint ¶ 45, at 10.

After the hearing officer allowed "the City unlimited 'discovery' (including Ms. Tapia's medical records), Ms. Forney propounded burdensome and offensive 'discovery requests' designed to embarrass Ms. Tapia and place pressure on the inexperienced NMTU officers who were attempting to represent her, rather than produce any actually useful information."  Complaint ¶ 46, at 10.  "The Hearing Officer signed an order dismissing Ms. Tapia's case, but the Personnel Board objected that Mr. Bingham's order did not give any reasons or include any 'findings.'  The Personnel Board remanded the case to the Personnel Hearing Officer to make findings and issue a 'correct' order."  Complaint ¶ 47, at 10.  "Instead of the Hearing Officer making findings and issuing a correct corder [sic], Paula Forney wrote a set of 'findings and conclusions' dismissing Ms. Tapia's case."  Complaint ¶ 48, at 10.  "The Hearing Officer merely changed the title of the document prepared by Ms. Forney and signed the 'Order' drafted by Ms. Forney, dismissing Ms. Tapia's Personnel Board case without a hearing.'"  Complaint ¶ 49, at 10.  "At its December 14, 2011, meeting the Personnel

Board gave its rubber-stamp 'approval' of Ms. Forney's findings and conclusions." Complaint ¶ 50, at 11.

> Counsel for Ms. Tapia subsequently filed a motion for sanctions against the City, Ms. Forney and the Personnel Hearing Officer for their violations of Ms. Tapia's right to privacy. The Board members denounced Tapia's counsel for bringing the charges before the Personnel Board and the Board unanimously refused to consider the issue.

Complaint ¶ 51, at 11.

### 4.   Conflict Between Aragon and the City of Albuquerque.

"The City has held an extraordinary number of pre-disciplinary hearings in this case, spanning the time between the first such action on December 26, 2006, and the last on June 1, 2011." Complaint ¶ 35, at 8 (footnote omitted). The Complaint lists, without further explanation, a number of "Results of Pre-Disciplinary He[ar]ings" and states that "in addition the City has held two investigations . . . and issued at least seven letters of investigation." Complaint ¶ 35 n.1, at 8.

> The City has charged Ms. Aragon with very many infractions. On March 16, 2008, for example, the City charged Ms. Aragon with violating section 300, 301.1, 301.9, 302, 301.13, 401.11 (D1, E), 402.5(C), 902, 902.1 (C, D, G, J. [sic] L, M1, 2, 3) and Sec. 12.34 (Major Policy Violations/Gross Misconduct, Transit SOP). Plaintiffs do not know what those charges are for or what happened to those charges.

Complaint ¶ 36, at 8. "On May 17, 2011, Deputy Operations Manager Annette Paez ordered Ms. Aragon to return to work, but Ms. Aragon was unable to comply because of her medical condition." Complaint ¶ 37, at 8. "On June 1, 2011, Ms. Paez charged Ms. Aragon with violations of Section 300, 302, 402.5(c) and 902.1 (E. [sic] J, and M-3)." Complaint ¶ 38, at 8. "Although the record indicates an increasing concern over attendance and use of sick leave, the City has never explained the reasons for its disciplinary actions against Ms. Aragon." Complaint ¶ 39, at 9.

"On October 17, 2011, Mr. Lucero wrote to Ms. Wardlaw to request Vanessa Aragon's case

and all other NMTU cases be stayed until the Union achieved the ability to represent the bargaining unit employees."  Complaint ¶ 52, at 11.  "The City refused to agree to a continuance, claiming that Mr. Lucero had waited too long to request it."  Complaint ¶ 53, at 11.  "Without any attempt to contact Ms. Aragon, the City's Personnel Hearing Officer wrongly concluded that: '. . . it is more likely than not that Employee was aware of the hearing and did not appear so as to support the request for a continuance.'"  Complaint ¶ 54, at 11 (omission in Complaint)(source of quotation not provided).

> According to the City's Personnel Hearing Officer, "Employee failed to establish good and sufficient cause for her untimely request for a continuance."
>
> The Hearing Officer therefore recommends that the Personnel Board deny Employee's request for a continuance.  The Employee having failed to appear or to otherwise prosecute her appeal, it is further recommended that the Personnel Board dismiss the appeal of Employee's termination.

Complaint ¶ 55, at 12 (source of block quotation not provided).

> Not knowing about the status of NMTU and its representational abilities and without inquiring or even asking Mr. Lucero, the Hearing Officer erroneously found that the request for a continuance was made because of "problems associated with the fact that NMTU was moving into new facilities."  In fact, there were no "new facilities" and Ms. Aragon was unaware of what was happening, but the Hearing Officer, acting in collusion with the City, recommended termination without a hearing anyway."

Complaint ¶ 56, at 12.

## PROCEDURAL BACKGROUND

The Court will discuss the procedural background in two parts.  First, the Court will discuss the Plaintiffs' Complaint, the Defendants' removal to federal court, and the Defendants' counterclaims.  Second, the Court will discuss the proceedings that relate to the MTD.

1.      **The Plaintiffs File their Complaint; the Defendants Remove to Federal Court.**

The Plaintiffs filed their Complaint in state court, stating that they "bring their claims under 42 U.S.C. [§] 1983, and the laws and Constitutions of the United States and the State of New Mexico."  Complaint ¶ 11, at 2-3.  The Plaintiffs allege six causes of action.  See Complaint ¶¶ 57-84, at 12-16.  Under "Count 1 Due Process and Equal Protection," the Plaintiffs assert that Tapia and Aragon, "[a]s classified, full-time, City employees . . . had legitimate expectations of continued employment absent just cause for disciplinary action.  They had the right to a full and fair hearing to challenge their termination."  Complaint ¶ 57, at 12.  "Similarly," the Plaintiffs allege, "NMTU and its leadership had a due process right and an obligation to represent employees in the bargaining unit at post-termination grievance hearings that are fundamentally fair and procedurally correct."  Complaint ¶ 58, at 12.  According to the Plaintiffs, the "Defendants denied the employees' rights and hearings and dismissed their cases on pretextual grounds," and, thereby, "the City Defendants have violated Plaintiffs' rights to due process and equal protection of the laws."  Complaint ¶¶ 59-60, at 13.

Under "Count  2 Breach of Employment Contracts," the Plaintiffs allege that, "[a]s tenured public employees, Plaintiffs Tapia and Aragon were covered by a contract of employment that consisted of the Merit System Ordinance, the Personnel Rules and Regulations and applicable collective bargaining agreements."  Complaint ¶ 62, at 13.  The Plaintiffs contend that they "were contractually entitled to notice and an opportunity to be heard, and to be disciplined only for just cause."  Complaint ¶ 62, at 13.  The Plaintiffs submit that, thereby, the Defendants "have violated their contractual obligations and are liable for damages to be determined at trial."  Complaint ¶ 64, at 13.

- 11 -

Under "Count 3 Violation of Right to Privacy," the Plaintiffs contend that "Forney used a misleading letter and an illegitimate subpoena that she issued herself to secure Jessica Tapia's medical records from Dr. Carmen Wagner-Mogle," and that Dr. "Wagner-Mogle sent Ms. Tapia's medical records to Ms. Forney without any knowledge or authorization by Ms. Tapia."  Complaint ¶¶ 66-67, at 13-14.  The Plaintiffs assert that "Dr. Wagner-Mogle communicated with Ms. Forney and other City representatives about Jessica Tapia and her medical condition and records on at least several occasions," but "never contacted or attempted to contact Ms. Tapia or her attorney." Complaint ¶ 68, at 14.  The Plaintiffs state that "[t]he acts of Defendants, specifically Paula Forney, Dr. Carmen Wagner-Mogle and the Transit Department deliberately and willfully violated Jessica Tapia's right to privacy in her medical records."  Complaint ¶ 69, at 14.  The Plaintiffs contend that the "Defendants also hired a private investigator and followed Ms. Tapia, seeking and securing information about her personal life and activities entirely unconnected with her work."  Complaint ¶ 70, at 14.  The Plaintiffs assert that the "Defendants are liable for their violations of Ms. Tapia's right to privacy."  Complaint ¶ 71, at 14.

Under "Count 4 Negligence," the Plaintiffs assert that, "[a]s described herein, Defendants have treated Jessica Tapia and Vanessa Aragon negligently and with deliberate indifference with respect to their employment."  Complaint ¶ 73, at 14.  "In addition," the Plaintiffs state, "Ms. Tapia sustained two injuries, the first resulting from operation of a wheelchair lift while on duty; the second of which was a result of her assignment to monitor the restroom facilities at the Alvarado Transit Center, a building managed and maintained by the City Transit Department."  Complaint ¶ 74, at 15.  The Plaintiffs assert that "Tapia has given notice of her tort claim to the City of Albuquerque."  Complaint ¶ 75, at 15.  The Plaintiffs maintain that "[t]he city and its Transit

Department, as well as its Director, are liable for the damages proximately caused by their negligence in an amount to be determined at trial."  Complaint ¶ 76, at 15.

Under "Count 5 Conspiracy to Deny Constitutional Rights," the Plaintiffs assert that "[t]he City Defendants, aware of Plaintiffs' rights to due process and equal protection, acted deliberately to deny the right to a hearing, one of the most fundamental rights of public employees subjected to wrongful disciplinary actions."  Complaint ¶ 78, at 15.  "In particular," according to the Plaintiffs, "Paula Forney, the Personnel Hearing Officers, the Personnel Board, and Bruce Rizzieri and other City officials met, discussed, and arranged for the denial of Plaintiffs' due process and equal protection rights."  Complaint ¶ 79, at 15.

Under "Count 6 Unfair Labor Practices," the Plaintiffs state that, "[l]ong after the submission of NMTU's majority petition for representation of the Transit drivers' bargaining unit in March, 2011, and the expiration of the Collective Bargaining Agreement on June 30, 2011, the City and Transit Department continued recognizing AFSCME as the exclusive bargaining and grievance representative."  Complaint ¶ 81, at 15-16.  According to the Plaintiffs,

> [t]he City and its Labor Board have ignored and opposed the legitimate representational interests of NMTU, discarded NMTU's prohibited practice complaints without hearings, insisted on an election when none was needed, and then did nothing to support or enable NMTU to represent employees after it prevailed in the election.

Complaint ¶ 82, at 16.  The Plaintiffs maintain that "[t]he City's misconduct and the Hearing Officers' and Personnel Board's lack of concern over -- and engagement in -- collusive tactics in this case, including biased hearing officers eager to dismiss rather than hear employee cases, and unethical and illegal conduct, clearly demonstrated the City's policy and practice with respect to the rights of its employees and the obligations of City management towards those employees."

Complaint ¶ 83, at 16.  The Plaintiffs assert that they "are entitled to compensatory, declaratory, and injunctive relief for the City's failure to comply with its laws, failure to recognize and hear employee grievances, and collusive and conspiratorial conduct with respect to these and other employees' rights and grievances."  Complaint ¶ 84, at 16.

The Plaintiffs ask for the following forms of relief:

A.   Declaratory, injunctive and compensatory relief for denial of fair hearings and the rights to due process and equal protection of law;

B.   Damages for breaches of contract;

C.   Declaratory, injunctive, and compensatory relief and exemplary and punitive damages for violation of Jessica Tapia's right to privacy.

D.   Damages for negligence with respect to Ms. Tapia's injuries;

E.   Declaratory, injunctive, and compensatory relief for unfair labor practices and collusive misconduct between and among City officials and attorneys, the Personnel Board and its Personnel Hearing Officers and the Labor Board.

F.   Declaratory and injunctive relief requiring the City to hire or appoint a person to oversee, administer, and protect the Merit System and ensure a fair, neutral and effective personnel hearing process for City employees.

G.   Costs and attorneys' fees; and

H.   Such other and further relief as the Court deems just and proper.

Complaint ¶¶ A-H, at 16-17.

On March 4, 2013, the Defendants filed their Notice of Removal.  See Doc. 1.

On March 8, 2013, the City Defendants filed their Answer to Complaint for Violation of Statutory and Constitutional Rights, Breach of Contract, and Unfair and Prohibited Labor Practices, Affirmative Defenses and Counterclaim.  See Doc. 13 ("City Defendants' Answer").  The City Defendants raise two counterclaims: (i) malicious abuse of process, contending, in essence, that the

- 14 -

Plaintiffs' claims are meritless and that they are abusing the legal process, see City Defendants' Answer ¶¶ 48-56, at 16-17; and (ii) prima facie tort, contending that the Plaintiffs have intentionally brought a meritless claim to harm the City of Albuquerque, see City Defendants' Answer ¶¶ 57-64, at 18-19.

On March 2013, Forney filed her Answer to Complaint for Violation of Statutory and Constitutional Rights, Breach of Contract, and Unfair and Prohibited Labor Practices by Defendant Paula Forney and Counterclaim. See Doc. 15 ("Forney's Answer"). Forney raises counterclaims for malicious abuse of process and prima facie tort, largely for the same reasons that the City Defendants give. See Forney's Answer ¶¶ 1-13, at 19-21.

### 2.   Dr. Wagner-Mogle's MTD.

Dr. Wagner-Mogle moves the Court to dismiss Tapia's Complaint. See MTD at 1. In what she labels as the "factual background," MTD at 1, Dr. Wagner-Mogle expresses confusion about the Plaintiffs' claims: she acknowledges that the Plaintiffs "believe [she] violated the Right to Privacy of Plaintiff Tapia, under 42 U.S.C. § 1983 and under the U.S. Constitution, concerning an issue in front of the City of Albuquerque's Personnel Board," but asserts that Tapia, "at any point in her Complaint, failed to state how her privacy rights were violated in terms of 42 U.S.C. § 1983; Plaintiff Tapia also failed to state, in any meaningful fashion, how her privacy rights were injured at any point, much less in terms of 42 U.S.C. § 1983." MTD ¶¶ 4-5, at 2. Dr. Wagner-Mogle asserts that the

> Plaintiffs' factual basis for their claim that Dr. Wagner-Mogle violated the privacy rights of Plaintiff Tapia concerns Dr. Wagner-Mogle's release of Plaintiff Tapia's medical records pursuant to a subpoena from the City of Albuquerque and a subpoena from City of Albuquerque's Personnel Board hearing officer Patrick Bingham, again concerning the City's Personnel Board[.]

MTD ¶ 6, at 2.  According to Dr. Wagner-Mogle, the City of Albuquerque issued her the subpoena on August 2, 2011, complete with a cover letter, and that it sent the same materials to the Plaintiffs' counsel; Dr. Wagner-Mogle attaches these materials to her MTD.  See MTD ¶ 7, at 2; Letter from Constance L. Zamora to Medical Records Custodian, executed August 2, 2011, filed March 11, 2013 (Doc. 14).  Dr. Wagner-Mogle asserts that a second subpoena was issued to her "on or about September 8, 2011, this one by the Personnel Board hearing officer Patrick Bingham, and pursuant to the Personnel Board's Order Granting Discovery."  MTD ¶ 8, at 3; Subpoena, executed September 12, 2011, filed March 11, 2013 (Doc. 14).  Dr. Wagner-Mogle states that the City "received, from ABQ Healthcare Partners, LLC, Dr. Wagner-Mogle's employer at the time of the alleged events at issue, a copy of Plaintiff Tapia's medical records, pursuant to the original t[w]o subpoenas . . . . [She] is seeking additional records on this specific issue and will supplement them once received." MTD ¶ 9, at 3.  According to Dr. Wagner-Mogle,

> [o]n August 9, 2011, the City of Albuquerque sent back to Dr. Wagner-Mogle a complete package of all medical records for Plaintiff Tapia sent to the City by ABQ Health Partners, LLC, in response to the City's subpoena.  The City made clear that Plaintiff Tapia's medical records had not been reviewed and were being returned as received with the expectation that, eventually, they would be produced to the City.

MTD ¶ 10, at 3 (citing Letter from Constance L. Zamora to Honora Persson, Medical Records Custodian, executed August 9, 2011, filed March 11, 2013 (Doc. 1)).  Dr. Wagner-Mogle asserts that, before the Personnel Board issued the subpoena to her, Tapia objected to it, and Bingham overruled her objection.  See MTD ¶ 11, at 11.  According to Dr. Wagner-Mogle, "Tapia's objection to the original subpoena to Dr. Wagner-Mogle from the City contained no mention, as far as Defendants are aware, of any issue with the form of the City's subpoena."  MTD ¶ 12, at 3.

Therefore, according to Dr. Wagner-Mogle, "Tapia and her Counsel had notice of both the original subpoena, issued by the City of Albuquerque, and the second subpoena, issued by the Personnel Board and backed by an Order from hearing officer Patrick Bingham."  MTD ¶ 13, at 4.

Dr. Wagner-Mogle concedes that subject-matter jurisdiction and venue are proper.  See MTD at 4.

Dr. Wagner-Mogle first argues that the subpoena was enforceable and valid.  See MTD at 4. Dr. Wagner-Mogle states that, "[t]o the best of [his] knowledge, the City of Albuquerque's Personnel Board is an administrative entity that does not employ either the New Mexico Rules of Civil Procedure, or the Federal Rules of Civil Procedure," but instead "runs matters based on the rulings from respective hearing officers."  MTD at 4.  Accordingly, she states, "there are no hard-and-fast rules as to the form and application of subpoena power when appearing in front of the Personnel Board."  MTD at 4-5.  Dr. Wagner-Mogle argues that rule 45 of the Federal Rules of Civil Procedure "is informative, and applicable, due to Plaintiffs' reference to 42 U.S.C. § 1983 as the basis for their suit."  MTD at 5. Dr. Wagner-Mogle quotes rule 45(a)(1)(A) and portions of rule 45(d), which provide:

(a) In General.

(1) *Form and Contents.*

(A) *Requirements -- In General.*  Every subpoena must:

(i) state the court from which it issued;

(ii) state the title of the action and its civil-action number;

(iii) command each person to whom it is directed to do the following at a specified time and place: attend and testify; produce designated documents, electronically stored

> information, or tangible things in that person's possession, custody, or control; or permit the inspection of premises; and
>
> (iv) set out the text of Rule 45(d) and (e).
>
> \* \* \* \*
>
> (d) Protecting a Person Subject to a Subpoena; Enforcement.
>
> \* \* \* \*
>
> > (3) *Quashing or Modifying a Subpoena.*
> >
> > > (A) *When Required.*   On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
> >
> > \*\*\*\*
> >
> > > (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
> > >
> > > (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45.  See MTD at 5 (quoting selected portions of Fed. R. Civ. P. 45).  According to Dr. Wagner-Mogle, this rule is nearly identical to the corresponding New Mexico rule of civil procedure.   See MTD at 5.   Dr. Wagner-Mogle asserts that the subpoenas that the City of Albuquerque and the Personnel Board issued "are, in terms of form, identical and contain all elements" that either the federal rule of civil procedure or the New Mexico rule of civil procedure would provide.  MTD at 5.  They are, in her view, "completely effective and defect-free, thus validating them in light of Rule 45(a)'s requirements."  MTD at 5-6.

> Dr. Wagner-Mogle also notes that, insofar as the City of Albuquerque's August 2, 2011 subpoena, the cover letter issued with the subpoena *specifically notes* that Plaintiffs' Counsel was sent a copy of the subpoena for his review, thereby conferring notice upon him and his client of the existence of the City's subpoena.

MTD at 6 (emphasis in original).

- 18 -

"Turning to the Personnel Board's August 8, 2011 subpoena," Dr. Wagner-Mogle asserts that, in her Complaint, Tapia admitted "that both she and her Counsel knew of both the City's subpoena and the possibility that the City's subpoena might be validated by the Personnel Board by issuing some form of an objection to the City's subpoena." MTD at 6 (citing Complaint ¶ 45, at 9). Wagner-Mogle asserts that "Tapia's objection to the City's subpoena was apparently overruled, resulting in the Personnel Board itself issuing the second subpoena." MTD at 6. Dr. Wagner-Mogle asserts that, under rule 45(c)(3), a party must make a timely motion "when a subpoena may require disclosure of privileged or otherwise protected information." MTD at 6. According to Dr. Wagner-Mogle,

> Tapia had to know of the City's original subpoena in order to make an objection to said subpoena, which she did on September 9, 2011. Even if Plaintiff Tapia did not know of the subpoena issued by the City prior to August 8, 2011, she certainly did after that date, which le[d] to her objection to the Personnel Board.

MTD at 6. In light of Tapia's knowledge of the City's subpoena and of her objection to the subpoena's substance, Dr. Wagner-Mogle asserts that "Tapia cannot now claim that the subpoenas used to collect her medical records were flawed, or that she was denied the right to object. Thus, the subpoenas . . . were valid and proper." MTD at 6-7.

Dr. Wagner-Mogle argues that her disclosure of Tapia's medical records was appropriate under HIPAA; she cites regulations that allow healthcare providers to comply with subpoenas in certain circumstances. See MTD at 7-8 (citing 45 C.F.R. § 164.512(e)). Dr. Wagner-Mogle asserts that, because her response to the August 2, 2011, subpoena was proper under HIPAA, and because all the materials that she received were valid under 45 C.F.R. § 164.512, "as this Court can see from the attached exhibits," the Complaint "offers her no succor, as Dr. Wagner-Mogle followed the

major medical records regulation's requirements, rendering [Tapia] unable to recover for any alleged

violations of HIPPA [sic] or her privacy." MTD at 8.   Moreover, citing case law interpreting rule

12(b)(6), Dr. Wagner-Mogle argues that Tapia's Complaint fails to state a claim.  See MTD at 8-10.

She asserts that "[t]he demise of Plaintiff Tapia's claims against Dr. Wagner-Mogle begins with her

Complaint."   MTD at 10.   She asserts that "[p]aragraphs 40 through 42 of Plaintiff Tapia's

Complaint outline exactly how matters unfolded concerning the August 2, 2011 subpoena issued to

Dr. Wagner-Mogle by the City of Albuquerque."  MTD at 10.  She argues that, in the next paragraph,

"Tapia states that Dr. Wagner-Mogle 'did not notify Ms. Tapia that she was providing Ms. Tapia's

medical records to the City's attorney.'" MTD at 10 (citing Complaint ¶ 43, at 9).  She contends that

"[t]his allegation is also true, but is somewhat misleading. . . .  HIPPA [sic] and the Federal Rules of

Civil Procedure do not require a physician to contact the patient about a medical records request,

provided that the requirements of 45 C.F.R. § 164.512(e) are met."  MTD at 10.   Moreover, Dr.

Wagner-Mogle states that the law did not require her to contact Tapia, "because the HIPPA [sic]

requirements were met, specifically that Dr. Wagner-Mogle had assurances that Plaintiff Tapia's

counsel would be apprised of the subpoena's existence *via* [sic] the cover letter that accompanied the

subpoena."  MTD at 10.  Accordingly, Dr. Wagner-Mogle asserts that "Tapia's claim that she was

without notice is inapt and misdirects attention from the actual law, versus what Plaintiff Tapia

believes she was entitled to."  MTD at 10.

According to Dr. Wagner-Mogle,

[p]aragraph 33 of Plaintiff Tapia's Complaint, which concerns an alleged call from
Dr. Wagner-Mogle to Defendant Forney[,] offers nothing of value to a Rule 12(b)(6)
analysis because, if the conversation occurred at all, it does not change the legal
requirements for disclosing medical records absent an authorization and, if anything,
merely reflects a wrote [sic] understanding by Dr. Wagner-Mogle as to how medical

records may be released.

MTD at 10-11. "Finally," according to Dr. Wagner-Mogle,

> in Paragraph 45, Plaintiff Tapia admits that she was aware of the City's subpoena, that she objected on the rather nebulous grounds of an unauthorized release of medical records (reflecting that Plaintiff Tapia, or perhaps her counsel, do not understand the laws governing the release of medical records absent a HIPPA [sic] authorization), that she had ample time in which to voice her objection to the subpoena, and that said subpoena was validated by the Personnel Board hearing.

MTD at 11. In sum, then, Dr. Wagner-Mogle argues that she "acted in accordance with governing law . . . , specifically HIPPA [sic], which renders Plaintiff Tapia unable to acquire any relief from Dr. Wagner-Mogle." MTD at 11. She asserts that Tapia has not alleged "facts showing that Dr. Wagner-Mogle deviated from what was required of her" and that the Court should, therefore, dismiss her claims with prejudice. MTD at 11.

Further, Dr. Wagner-Mogle asserts that her response to the subpoenas was proper, and that the Complaint "openly confesses that Dr. Wagner-Mogle's response to the City of Albuquerque's subpoena was proper, such that Plaintiff Tapia has no grounds on which to demand relief." MTD at 11-12. She asserts that Tapia "admitted that she was aware of the City's August 2, 2011 subpoena because she objected to the Personnel Board that such a subpoena was an unauthorized release of medical records." MTD at 12. According to Dr. Wagner-Mogle, "[t]he above analysis of HIPPA [sic] shows that, based on Plaintiff Tapia's Complaint and the attached exhibits, the release was proper under the law, as was the subpoena used to acquire Tapia's records, and that Plaintiff Tapia simply lacks any grounds upon which she could be granted relief." MTD at 12. Accordingly, Dr. Wagner-Mogle asks the Court to dismiss the "Plaintiffs' claims against her, in full and with prejudice," and to grant her the costs of preparing the MTD. MTD at 12.

The Plaintiffs did not file a response.

The City Personnel Board joins in the MTD.  See Defendant City Personnel Board's Consent to Defendant Carmen Wagner-Mogle, M.D.'s Motion to Dismiss, filed March 18, 2013 (Doc. 16).

The Court held a hearing on November 1, 2013.  See Transcript of Hearing, taken November 1, 2013, filed November 7, 2013 (Doc. 63)("Tr.").  Dr. Wagner-Mogle asserted that the MTD was "difficult to write because there may have been some basis to file a motion for more definite statement.  But I went ahead and moved forward with something a bit more aggressive simply because it . . . needs to be addressed directly."  Tr. at 30:25-31:4 (Moander).  Dr. Wagner-Mogle maintained that the Complaint does not "make a connection between [§ 1983] and the complaint against my client for a violation of privacy."  Tr. at 31:5-12 (Moander).  Dr. Wagner-Mogle stated that, "without that nexus, we don't have an actual cause of action here.  What we have is a statute combined with a vague allegation with no real specificity as to how that cause of action relates to the facts or the statute."  Tr. at 31:13-17 (Moander).  Dr. Wagner-Mogle also asserted that the Complaint suffers from a second problem with respect to its discussion of the subpoenas:

> The second one is there's some discussion in plaintiffs' complaint about the issue of the subpoena, and there's allegations of impropriety and illegitimacy and so on, but plaintiff then goes on to point out that there were subpoenas issued by the Personnel Board judge . . . in this matter with Ms. Tapia.  Now, what I did to help the Court out is, when it comes to subpoenas, particularly for medical records, there are some issues that are in play, because subpoenas in and of themselves don't cut it.  And that's been acknowledged in this motion.

See Tr. at 31:18- 32:2 (Moander).  Dr. Wagner-Mogle nonetheless contended that, under HIPAA, the Court should ask whether, "if these records are turned over," they were "improper[ly] disclos[ed.]"  Tr. at 32:3-6 (Moander).  Dr. Wagner-Mogle maintained that, pursuant to the letter that she attached to her MTD stating "that the records were not reviewed . . . [,] these records simply were transmitted

- 22 -

and returned, and then . . . were ultimately turned over a second time through a court order through the Personnel Board, which is sufficient under the cited portions of HIPAA." Tr. at 32:7-14 (Moander). Accordingly, Dr. Wagner-Mogle stated that "there's no damages here, and there's not even a cognizable cause of action set forth by the plaintiff." Tr. at 32:15-17 (Moander). She asserts that no nexus connects "the 1983 statute with this nebulous -- nebulous allegation of a violation of privacy that references a few facts, but none of it's tied together." Tr. at 32:15-20 (Moander). She reasserted that there would have been a basis for a motion for a more definite statement, but argued that "the absence of a nexus with the cause of action and without the cause of action being tied to facts, there's no -- there's no relief. The emperor wears no clothes here, Judge." Tr. at 32:20-24 (Moander). She maintained that, under rule 12(b)(6) and related case law, "[c]iting the statute isn't enough, and notice pleading does not allow a party to just make blanket statements or blanket allegations. It's close, but it's not quite there at this point." Tr. at 32:25-33:15 (Moander). She argued that Tapia has not asserted a plausible claim for relief, because "[t]he records were tendered properly. HIPAA was complied with. Privacy was not invaded. There is nothing here." Tr. at 33:10-17 (Moander). Dr. Wagner-Mogle stated that she would be glad to answer the Court's questions, but that she otherwise asked that the Court dismiss the Complaint against her. See Tr. at 33:18-21 (Moander). The Court did not have any questions for her, and, after no other Defendant accepted the Court's invitation to speak on the MTD, the Court invited the Plaintiffs to speak. See Tr. at 33:22-25 (Court).

Before the Plaintiffs could respond, Dr. Wagner-Mogle rose again to state that the Personnel Board supported the MTD and to note that she did not file a notice of completion of briefing with respect to the MTD. See Tr. at 34:2-8 (Moander). Pointing out that the Plaintiffs did not file a

response, her counsel asserted that he "was curious, admittedly, to see how long this would go, and it actually came all the way to a hearing here." Tr. at 34:7-13 (Moander). Dr. Wagner-Mogle's counsel asserted that he had "never actually seen in either state or federal court a motion go without a response like this"; although, in some cases, individuals might have forgotten to file a notice of completion of briefing, "even in those instances, within a month or so, you'd get a response because somebody would figure out an error was made; in this instance, seven months, over half a year" elapsed between the time Dr. Wagner-Mogle filed her MTD and the hearing. Tr. at 34:11-17. (Moander). In Dr. Wagner-Mogle's counsel's view, "by any measure, that's consent to this motion, and I also . . . think that if plaintiff's got an argument, it should have come in some sort of responsive pleading." Tr. at 34:18-21 (Moander). Dr. Wagner-Mogle's counsel asserted that "[t]here is some merit to the idea that, if there was something to be said, it should have been . . . addressed already in a writing. I don't see the value of hearing plaintiff or plaintiff's counsel speak today." Tr. at 34:22-25 (Moander).

The Court asked whether any other Defendant wished to speak; none took its invitation. See Tr. at 35:8-9 (Court). The Court stated that it would allow the Plaintiffs' counsel to speak, because it might be possible to "clear out some of the issues here." Tr. at 35:10-12 (Court). The Court asked what Dr. Wagner-Mogle had done wrong; the Plaintiffs responded that she sent Tapia's medical records to Ms. Forney. See Tr. at 35:12-17 (Court, Livingston). The Court asked if that production was pursuant to a subpoena; the Plaintiffs asserted that it was not. See Tr. at 35:20-21 (Livingston). The Plaintiffs' counsel asserted that he should not testify to the case's facts, given that he had put them into the pleadings in "the best form I know how to do," but he nonetheless asserted

that Ms. Forney knowingly issued an illegal subpoena and accompanied that with a

- 24 -

> letter on French & Associates stationery that said, if you wish to avoid the deposition in this case . . . you should send me the medical records that we've requested.  And the doctor responded a day or two later by faxing . . . my client's entire medical records to Ms. Forney.

Tr. at 35:21-36:7 (Livingston).  The Court asked why the subpoena was invalid; the Plaintiffs asserted that the Personnel Board's rules

> do not allow an attorney to issue a subpoena. They require that the subpoena be issued by the hearing officer of the City of Albuquerque, the personnel hearing officer, if there is a subpoena.  Ms. Forney knew that.  She had had experience with that in the past, but she did it anyway . . . .

Tr. at 36:9-15 (Livingston).  The Court pointed out that "subpoenas are actually issued by the court, but of course every . . . lawyer has a stack of them at their office  . . . that they issue.  I mean, how is that practice any different  . . . than the practice in federal court, for example?"  Tr. at 36:16-20 (Court).  The Plaintiffs stated that they had filed a motion to sanction Ms. Forney, and that "[w]e've already had rulings on it";[2] they asserted that federal procedure differs from City of Albuquerque Procedure, because different rules "apply to issuing certain administrative subpoenas, and there's no doubt that they were violated by Ms. Forney.  But here again, we're getting into other issues."  Tr. at 36:21-37:3 (Livingston).  The Court asked, assuming that the Plaintiff's allegations were true, what the federal claim was -- that is, how Dr. Wagner-Mogle violated the Constitution.  See Tr. at 37:9-11 (Court).  The Plaintiffs asserted that "[t]he federal claim is a breach of the privacy of my client . . . in her medical records."  Tr. at 37:12-14 (Livingston). The Court asked the Plaintiffs to clarify their

---

[2] Mr. Livingston was referring to a motion to disqualify Ms. Forney in a different case, see Motion to Disqualify Attorney Paula Forney and Memorandum in Support, filed in Salazar v. City of Albuquerque et al., No. CIV 13-0041 JCH/RHS (Doc. 28), which the Honorable Robert H. Scott, United States Magistrate Judge, denied, see Order Denying Motion to Disqualify, filed in Salazar v. City of Albuquerque et al., No. CIV 13-0041 JCH/RHS (Doc. 38).  Mr. Livingston filed a Motion to Disqualify Attorney Paula Forney, filed July 17, 2013 (Doc. 46), in this case, but the Court has not

claims' nature:

> THE COURT: Are you alleging a HIPAA violation or is it --
>
> MR. LIVINGSTON: No.
>
> THE COURT: -- is it a constitutional violation?
>
> MR. LIVINGSTON: No, it's a constitutional.  We brought it under -- under the --
>
> THE COURT: Just strictly 1983.
>
> MR. LIVINGSTON: -- cloak of Section 1983.
>
> THE COURT: For the Constitution but not HIPAA.
>
> MR. LIVINGSTON: No, we didn't make a specific HIPAA.
>
> THE COURT: I can -- I can ignore all the discussion and the briefing about HIPAA?
>
> MR. LIVINGSTON: We didn't make any specific HIPAA claims, Your Honor, and I'm not making any at this point.

Tr. at 37:15-38:2 (Court, Livingston).

> The Plaintiffs' counsel then turned to his failure to respond and stated:
>
> I'm sorry, but we've been over this.  I've been over this for a period of 15 to 18 years over whether it is required to respond to a motion, whether the motion can be properly granted for not responding to a motion, and at this point, the issue of pleading in this case is paramount. We have to address the issues of what we're doing when we're pleading and how we're pleading and what the pleadings say.

Tr. at 38:4-12 (Livingston).  In his view, even if the Court dismisses the claim against Dr. Wagner-Mogle, they will ask to amend the Complaint.  See Tr. at 38:13-20 (Livingston).  The Plaintiffs contended that, under commentary to rule 15 of the Federal Rules of Civil Procedure, "[r]ule 15 provides an escape hatch for plaintiffs who are dismissed out of the case by pleading in the initial

---

ruled on that motion.

pleadings stage." Tr. at 38:23-25 (Livingston).  The Plaintiffs further asserted that there is no basis

to deny a motion to amend "when there's never been a start of the case."  Tr. at 39:1-3 (Livingston).

The Plaintiffs maintained that the Court should delay ruling on dispositive motions until after it

holds an initial scheduling conference "and after the Court has complied with the rules of civil

procedure."  Tr. at 39:4-8 (Livingston).[3]  In their view, there is no reason to rule on these issues now:

> Why should we have had to wait eight -- seven months and -- and everyone be in this
> doubt about what is happening with -- with the motion of the doctor when all of this
> should be resolved at the very beginning of the case with a conference?  And that, I
> think what's going on here now, Judge, only highlights the need for that initial
> conference and for some resolution of the issues so the Court knows what the position
> of the parties are, the Court has some sense of what facts are needed before
> the Court can decide the case, and so we can get a timely resolution of the case.

Tr. at 39:9-18 (Livingston).  The Plaintiffs further noted that dispositive motions may take a year or

more to decide, and that parties are "in complete limbo at the same time we're doing that."  Tr. at

39:19-22 (Livingston).

The Plaintiffs' counsel also noted the Personnel Board's concurrence and stated:

> I'm constantly being called to appear before the Personnel Board, and they're making
> rulings on cases, yet they're represented by counsel who knows nothing about what is
> happening in the Personnel Board Members, and the Personnel Board members know
> nothing about what's happening in this court because there's no communication

---

[3]  The Plaintiffs' counsel had, earlier in the hearing, raised concerns about the Court's
compliance with rule 16 of the Federal Rules of Civil Procedure -- specifically, the requirement that
the Court hold a scheduling conference so that it may issue a scheduling order, which rule 16
requires the Court to issue "as soon as practicable, but in any event within the earlier of 120 days
after any defendant has been served with the complaint or 90 days after any defendant has appeared."
Fed. R. Civ. P. 16.  See Tr. at 6:12-20:2 (Court, Livingston).  While the Plaintiffs raised a proper
concern, that concern does not affect the Court's disposition of the MTD.  Accordingly, the Court
will not address the delayed setting of the scheduling conference in this Memorandum Opinion and
Order, except to the extent necessary to explain this exchange.  The Court notes, however, that,
promptly after the Plaintiffs sought a rule 16 scheduling conference, the Court set one: the Court held
a scheduling conference on December 3, 2013, see Clerks' Minutes, filed December 3, 2013 (Doc.
81), and issued a Scheduling Order, filed December 5, 2013 (Doc. 74).

whatsoever.

So what does the concurrence of the Personnel Board mean?  It doesn't mean they took a vote and decided to concur in something. It means their attorney agreed with their -- with the doctor's attorney, and then they file a motion, a notice of concurrence in the motion.  Well, this is something we need to discuss with the Court also, how the Personnel Board, the city, the Labor Board, and everyone else is all aligned on one page with one response.

Tr. at 39:22-40:13 (Livingston).

After the other Defendants again declined the Court's invitation to speak, Dr. Wagner-Mogle

briefly replied.  See Tr. at 17-20 (Court, Moander).  She said that,

sure as the sun rises in the east today, we didn't hear any actual substance as to plaintiffs' complaint.  We heard a lot about an issue that wasn't briefed before this Court.  Regarding the hearing officer issue regarding the subpoena, plaintiff has no record to back this up, so there's no documentation at all.  There are no witnesses, nothing.

They've got nothing, and in particular to support the not only just the Board's action, but even the interpretation of the rules, which leads to the dearth of case law here on behalf of plaintiff.

40:24-41:9 (Moander).  The Court asked what she did with the argument that the subpoena was

invalid -- particularly, it asked whether the practice with respect to a hearing officer is "the same as it

is in federal court, that the attorney, as an officer of the court, issues the subpoenas?"  Tr. at 41:10-14

(Court).  Before Dr. Wagner-Mogle answered that question, she pointed out that the Plaintiffs did not

brief this issue, and stated that "part of my concern today was that this would be done, that there

would be a springing of new and intriguing arguments that I couldn't prepare for properly, because

that's the whole point of the briefing cycle, is to prevent that."  Tr. at 41:15-21 (Moander).  With

respect to the subpoena's validity, she stated that,

[a]s I understand it, there isn't an actual direct prohibition that says counsel can never do this as far as I'm aware.  Now, when I make that representation to the Court, I'm

doing that without those policies and procedures in front of me because I did not anticipate that specific argument due to the lack of any responsive pleading from plaintiff.  But I don't believe that's a prohibition that is expressly stated to the best of my knowledge, and if -- could I have a moment to confer with counsel, Your Honor?

THE COURT: You may.

(Mr. Moander and Ms. Forney confer.)

MR. MOANDER: Well, Judge, it appears that I've actually got a minor error here. Those subpoenas, the ones that I've listed here, weren't actually -- one of them. Oh, well, ultimately, even if that subpoena was improper, and let's just assume arguendo that it was, that doesn't actually matter, because we've got, as I've shown this Court, if the Court will turn to Exhibit 2 and Exhibit 3 -- or no, my correction, Exhibit 2, and then we've got the subpoena signed by the Personnel Board a matter of days later after the records were returned without opening.  So even if that were true, in fact, we've got a six-day -- no, there's about a month between the subpoenas. Even if plaintiff's allegation is true in that regard, it's clearly been remedied, because we've got the Personnel Board signed by Mr. Bingham, the subpoena signed by the officer right there, and that's what ultimately triggered the real production of records for review by the other defendants in this case.

So what this is, is that's sort of those half-truth kind of argument where it only gives you 50 percent of what really went on.  But in any event, the fact of the matter is there's still no claim here.  If -- if that's -- if that subpoena was illegal, Your Honor, then why wasn't that specifically outlined in the complaint?  What we get is a reference to an illegitimate subpoena.  What does that mean?  You know, I -- I don't know what that means, and that's the problem, because there is no claim here.

Tr. at 41:22-43:8 (Moander, Court).  Moreover, she stated,

even assuming that the Board has some strict rule . . . a proper subpoena was issued from the Personnel Board.  The records were tendered, and that's the end of it.  So plaintiff doesn't have any ground to stand on here, and I would reiterate again that this whole theory that you can come to court without filing responsive paperwork and then spring new arguments on counsel as if they've been briefed, I think that ambush-style tactic is wholly inappropriate.  And if the Court's going to accept what Mr. Livingston said and -- I think there's some value in permitting some kind of additional pleading from Dr. Wagner-Mogle to address that issue, but Dr. Wagner-Mogle would much prefer the dismissal today, because plaintiffs' complaint simply doesn't connect the dots, and even if it does, there's no relief available to the doctor with that complaint.

- 29 -

Tr. at 43:9-24 (Moander).

The Court took the MTD under advisement.  See Tr. at 44:2-3 (Court).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) ("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(internal quotations omitted)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING FAILURE TO RESPOND TO A MOTION

"Failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ. 7.1(b). The court cannot, however, grant a motion to dismiss or a motion for summary judgment based solely on plaintiff's failure to respond and must consider the merits of the motion. See Issa v. Comp USA,

354 F.3d 1174, 1177-78 (10th Cir. 2003)("[E]ven if a plaintiff does not file a response to a motion to dismiss for failure to state a claim, the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted."); Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002)(holding that a district court cannot grant an unopposed motion for summary judgment unless the moving party has first met its burden of production and demonstrates it is legally entitled to judgment under rule 56).   The requirement that a court consider the merits before granting an unopposed motion to dismiss "consistent with the purpose of Rule 12(b)(6) motions as the purpose of such motions is to test 'the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.'"   Issa v. Comp USA, 354 F.3d at 1177-78 (quoting Mobley v. McCormick, 40 F.3d at 340). Similarly, when a party fails to respond to a motion for summary judgment, a district court can properly grant the motion only "if the motion demonstrates no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."   Reed v. Bennett, 312 F.3d at 1196. Failure to respond does "not relieve the court of its duty to make the specific determination required by Fed. R. Civ. P. 56(c)."   Reed v. Bennett, 312 F.3d at 1196.   Accordingly, although the local rules provide that a party's failure to respond to a motion for summary judgment or to a motion to dismiss for failure to state a claim is deemed consent to the Court granting the motion, the Court will nonetheless rule on such motions, and generally does not grant dispositive motions on procedural defaults alone.   See D.N.M.LR-Civ 7.1(b)("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."); Sawyer v. USAA Ins. Co., No. CIV 11-0523 JB/CG, 2012 WL 6005766, at *23 (D.N.M. Nov. 9, 2012)(Browning, J.)("It is important that Sawyer filed no written response to BCBSKC's

motions and, under the rules, is deemed to have consented to the Court granting the motion. . . .  The

Court nonetheless carefully considered the merits of this motion and held a hearing, at which Sawyer

presented no evidence.").

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper proceeding for redress,
> . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive

rights; substantive rights must come from the Constitution or federal statute.  See Spielman v.

Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if

federal law does not create enforceable rights.").  Rather, 42 U.S.C. § 1983 authorizes an injured

person to assert a claim for relief against a person who, acting under color of state law, violated the

claimant's federally protected rights.  To state a claim upon which relief can be granted under

§ 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who

deprived the plaintiff of that right acted under color of state law.  See West v. Aikins, 487 U.S. 42,

48 (1988).  Broken down differently, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or created
> by federal statute or regulation, (2) proximately caused (3) by the conduct of a
> "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or
> usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. Mar. 30,

2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).

Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to displace state law through the creation of a body of general federal tort law.  See Paul v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88, 101-102 (1971)(civil-rights statute).

The Supreme Court of the United States has made clear that there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 689 (1978).  It can be held liable only for its own unconstitutional or illegal policies, and not for the tortious acts of their employees.  See Monell v. New York City Dep't of Soc. Servs., 436 U.S. at 689.

Liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations and internal quotations omitted).  See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).  These standards apply for allegations of liability based on failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons.  Barney v. Pulsipher, 143 F.3d at 1367, 1309 n.8.  "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially

certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable.  Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.  Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations."  Barney v. Pulsipher, 143 F.3d at 1308.

### LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a judicial obligation to not only

> preserve an area of individual freedom by limiting the reach of federal law and avoid the imposition of responsibility on a State for conduct it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (internal quotations and citations omitted).  The Fifth and Fourteenth Amendment rights at issue secure protection only against infringement through state action.  See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments.").  Under some circumstances, however, the conduct of private parties may be deemed to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982).  Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry.  "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v.

Edmondson Oil Co., Inc., 457 U.S. 937.  "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937.  See West v. Atkins, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co., Inc. explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing the conduct of private parties.  457 U.S. at 937.  The first prong of the Lugar test -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]"  457 U.S. at 940.  The Supreme Court in Lugar v. Edmondson Oil Co., Inc. further instructed that the second prong, identification of a defendant as a state actor, may arise "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state."  457 U.S. at 937.

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court determined that the plaintiff's allegation that private conduct unlawful under state law deprived the plaintiff of his property without due process failed to state a claim under § 1983.  See 457 U.S. at 940.  The Supreme Court also held that the plaintiff's claim alleging that the private parties had invoked a state statute maliciously or without valid grounds did not give rise to state action.  See 457 U.S. at 940.  Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute.  See 457 U.S. at 940-41.

- 36 -

For a private individual to be acting under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar, 457 U.S. at 936. Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. See id. at 934. Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished).[4]

---

[4] How v. City of Baxter Springs is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that How v. City of Baxter Springs, Ortlieb v. Howery, 74 F. App'x 853, 854 (10th Cir. 2003)(unpublished) and United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished), have persuasive value with respect to material issues, and will assist the Court

1.     __Whether There is State Action by Private Actors is a Legal Determination Made by the Court.__

The Court of Appeals for the Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality." Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004).  According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, [see Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974),] requires the 'sifting [of] facts and weighing [of] evidence." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)).  In Gilmore v. City of Montgomery, 417 U.S. 556 (1974), the Supreme Court found that, although it was the Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds[,]" the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind."  417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies." Adams v. Vandermark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(unpublished).  In Adams v. Vandermark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction

_____

in its preparation of this Memorandum Opinion and Order.

from the United States District Court for the Eastern District of Michigan, instructing the jury on when to find state action. The Sixth Circuit found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief." 1986 WL 16606, at *2. The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined." 1986 WL 16606, at *2. The Sixth Circuit found that the defendants were entitled to a new trial because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action. 1986 WL 16606, at *2-*3.

### 2.   Tests for Determining State Action by a Private Party.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test. See Johnson v. Rodrigues (Orozco), 293 F.3d at 1202-1203 (reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation." (internal quotation marks omitted)).

### a.   Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S.

345, 352 (1974).  The public-function test is difficult to satisfy, because while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires. Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running a nursing facility.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.    Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457 U.S. 991, 993 (1982).  A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself."  Jackson v. Metro. Edison Co., 419 U.S. at 351.  "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . .  But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found."  Tulsa Professional Collection Servs, Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

### c.    Symbiotic-Relationship Test.

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity."  Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961).  "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state]

- 40 -

and a private [party] that is required for state action." <u>Gallagher v. Neil Young Freedom Concert</u>, 49

F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

<u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1452.

### d.     <u>Joint-Action Test</u>.

State action exists under the joint-action test if the private party is a "willful participant in

joint action with the State or its agents." <u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980).  Courts look to

"whether state officials and private parties have acted in concert in effecting a particular deprivation

of constitutional rights." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1453.  "[I]f there is a

substantial degree of cooperative action between state and private officials . . . or if there is overt and

significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights,

state action is present." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1454 (internal

quotation marks and citations omitted).  Joint participation can also take the form of a conspiracy

between public and private actors; in such cases, the plaintiff must show that the public and private

actors shared a common, unconstitutional goal.  <u>See</u> <u>Sigmon v. CommunityCare HMO, Inc.</u>, 234

F.3d 1121, 1126 (10th Cir. 2000).  Even a conspiracy claim requires a sufficient level of state

involvement to constitute joint participation in the unconstitutional actions.  <u>See</u> <u>Soldal v. Cook</u>

<u>County</u>, 506 U.S. 56, 60 n.6 (1992).  The Tenth Circuit has previously dismissed constitutional

claims against a private individual where the plaintiff did not give specific facts showing a

conspiracy evidencing state action.  <u>See</u> <u>Martinez v. Winner</u>, 771 F.2d 424, 445 (10th Cir.

1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything . . .").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir 1987), and Lee v. Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." Carey, 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard. In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." Id. at 1345.

49 F.3d at 1453-56. The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." 49 F.3d at 1453. The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly

- 42 -

wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate unconstitutional acts by a private party through affirmative action. See Soldal v. Cook County, 506 U.S. 56, 60 n.4 (1992).

### 3.    The Influence of Police Involvement on Private Action as State Action.

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability. See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (6th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra County, 588 F.2d 1322, 1327 (10th Cir. 1978)). In Yanaki v. Iomed, Inc., the plaintiffs argued that the involvement of the police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes of § 1983 liability. See 415 F.3d at 1209-10. The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co., Inc.] color of law test because the conduct that Plaintiffs complain[ed] deprived them of their constitutional rights was caused by and [could] only be attributed to the private [d]efendants." 415 F.3d at 1210. The Tenth Circuit, therefore, found it unnecessary to address whether the private defendants were state actors. See 415 F.3d at 1210. Additionally, merely following a procedure established by state law does not transform a private party's activity into state action. See Scott v. Hern, 216 F.3d 897, 906-07 (10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that self-help repossession of an automobile by a private party is not action under color of state law).

- 43 -

**LAW REGARDING THE RIGHT TO PRIVACY IN MEDICAL RECORDS**

The Due Process Clause of the Fourteenth Amendment protects the right of privacy. See Flanagan v. Munger, 890 F.2d 1557, 1570 n.15 (10th Cir. 1989); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986).  The Tenth Circuit has recognized that the right to privacy protects government employees from their employers improperly attempting to obtain the private medical history or records.  See Lankford v. City of Hobart, 27 F.3d at 479.  Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss the manner in which a court should determine generally when a violation of the privacy right occurs.  See 27 F.3d at 479-80.  Flanagan v. Munger provides some instruction on this point.  In Flanagan v. Munger, the Tenth Circuit employed a balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy.  See Flanagan v. Munger, 890 F.2d at 1570.  Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling state interest; and (3) if disclosure can be made in the least intrusive manner."  Flanagan v. Munger, 890 F.2d at 1570.  The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personal information is protected."  Flanagan v. Munger, 890 F.2d at 1570.  See  Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material . . . .").  In Ortlieb v. Howery, 74 F. App'x 853, 854 (10th Cir. 2003)(unpublished), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her X-ray.  See 74 F. App'x at 857.  In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery

noted that the plaintiff's broken leg was not confidential information, because the plaintiff had contacted her employer seeking extended medical leave given the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs." 74 F. App'x at 857. The Tenth Circuit also observed that, because the plaintiff had "supported her request for an indefinite extension of medical benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview." 74 F. App'x at 857. Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits." 74 F. App'x at 857.

In Kerns v. Board of Commissioners, 707 F. Supp. 2d 1190 (D.N.M. 2010)(Browning, J.), rev'd in part, vacated in part sub nom. Kerns v. Bader, 663 F. 3d 1173 (10th Cir. 2011), the Court used the Tenth Circuit's balancing test from Flanagan v. Munger to determine whether a sheriff who obtained the plaintiff's medical records violated the plaintiff's privacy right under the Fourteenth Amendment, finding that (i) the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records, because he believed that the medical and mental health records were confidential and private; (ii) the sheriff's department had a compelling state interest in the records, because of its interest in enforcing 18 U.S.C. § 922(g)(4), which makes it unlawful for a person who has been "adjudicated as a mental defective" or who has been "committed to a mental institution" to possess firearms, and ensuring that the plaintiff did not fit that category; and (iii) the state could have achieved its objectives in a less intrusive manner by making a more particularized request for

records, rather than requesting to "review all records."  707 F. Supp. 2d at 1256-57.  Balancing these

factors, the Court concluded that the plaintiff met its burden on summary judgment to demonstrate

that the sheriff violated his constitutionally protected right to privacy.  See 707 F. Supp. 2d at 1257.

The Court noted that the sheriff had not relied on HIPAA when he requested the records; the law-

enforcement exception in HIPAA allows HIPAA-covered entities to disclose protected healthcare

information in six circumstances:

> (i) as required by law-court orders, subpoenas, warrants; (ii) to identify or locate a
> suspect, fugitive, material witness, or missing person; (iii) in response to a law-
> enforcement official's request for information about a victim or suspected victim of a
> crime; (iv) to alert law enforcement of a person's death, if the covered entity suspects
> that criminal activity caused the death; (v) when a covered entity believes that
> protected health information is evidence of a crime that occurred on its premises; and
> (vi) by a covered health-care provider in a medical emergency not occurring on its
> premises, when necessary to inform law enforcement about the commission and
> nature of a crime, the location of the crime or crime victims, and the perpetrator of
> the crime.

707 F. Supp. 2d at 1259 (citing 45 C.F.R. § 164.512).  The Court said that "HIPAA restrains the

'health plan, health care clearinghouse, or healthcare provider' from disclosing protected medical

information, and does not restrain law-enforcement directly."  707 F. Supp. 2d at 1259 (quoting 45

C.F.R. § 164.104).  The Court also concluded that the plaintiff established that his right to privacy in

his medical records was clearly established at the time, precluding the sheriff from qualified

immunity.  See 707 F. Supp. 2d at 1259-61.

The majority of the panel in the Tenth Circuit did not agree with the Court that the plaintiff's

Fourteenth Amendment rights were clearly established and reversed the Court without analyzing

whether the sheriff had violated the plaintiff's constitutional rights.  See Kerns v. Bader, 663 F.3d at

1183-84.  Although the plaintiff cited several cases in which the Tenth Circuit "held that government

officials violated plaintiffs' substantive due process privacy rights by accessing their records without

public disclosure," the Tenth Circuit explained that those cases "involved another element not

present here: the government officials involved accessed the plaintiffs' confidential information as

part of an unlawful campaign of sexual harassment." 663 F.3d at 1186. The Tenth Circuit ordered

the Court to enter summary judgment in favor of the sheriff, "only because [the plaintiff] has failed

to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful

as of 2005." 663 F.3d at 1187. Judge Holloway dissented, agreeing instead with the Court that the

officer violated the plaintiff's "clearly established right to have his highly personal medical

information protected from a law enforcement officer whose access to that information was

supported only by a generalized interest in whether a crime *might* have occurred." 663 F.3d at 1197-

98 (Holloway, J., dissenting)(emphasis in original).

### RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment to the Constitution of the United States of America protects "[t]he

right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but

upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a

Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of

privacy against government that existed when the Fourth Amendment was adopted." United States

v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States,

533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is

reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.     *United States v. Jones*.

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car.  See 132 S. Ct. at 948.  On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to

monitor the vehicle's movements, constitutes a 'search.'" 132 S. Ct. at 949. Justice Scalia reasoned

that the plaintiff United States of America's conduct was a Fourth Amendment search, because the

government trespassed on a constitutionally protected area. See 132 S. Ct. at 949 ("The Fourth

Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures, shall not be violated.' It is beyond dispute

that a vehicle is an 'effect' as that term is used in the Amendment."). Such a physical intrusion,

Justice Scalia opined, would have come within the Framers' intended definition of a "search": "It is

important to be clear about what occurred in this case: The Government physically occupied private

property for the purpose of obtaining information. We have no doubt that such a physical intrusion

would have been considered a 'search' within the meaning of the Fourth Amendment when it was

adopted." 132 S. Ct. at 949. Justice Scalia reconciled the Supreme Court's conclusion that attaching

a GPS device to track a jeep in plain view was a Fourth Amendment search with New York v. Class,

475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside

of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we

suggested that this [physical invasion] would make a difference, for we concluded that an officer's

momentary reaching into the interior of a vehicle did constitute a search." 132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law

based approach to determine whether there is a search, but did not shy away from the fact that, in

recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property,
> since otherwise it would have referred simply to "the right of the people to be secure
> against unreasonable searches and seizures"; the phrase "in their persons, houses,
> papers, and effects" would have been superfluous.

Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. <u>Kyllo v. United States</u>, 533 U.S. [at] 31 . . . . Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [<u>Katz v. United States</u>], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," <u>id.</u>, at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- <u>i.e.</u>, the <u>Katz v. United States</u> reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the jeep on the public roads, which were visible to all." 132 S. Ct. at 950.   Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the <u>Katz v. United States</u> reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

Jones's Fourth Amendment rights do not rise or fall with the <u>Katz</u> formulation.  At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." <u>Kyllo[ v. United States</u>, 533 U.S. at 34].  As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates.  <u>Katz</u> did not repudiate that understanding.  Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes.  The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." <u>Alderman v. United States</u>, 394 U.S. 165, 176 . . . (1969).  "[W]e [do not] believe that <u>Katz</u>, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ." <u>Id.</u>, at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs.  The reaffirmation of that principle suffices to decide this case."  132 S. Ct. at 955 (Sotomayor, J., concurring).  She continued:

> Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . . Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740-741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .  In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion, 132 S. Ct. at 953).

The Honorable Samuel A. Alito, Associate Justice, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment only, reasoning that, although he agreed with the result, given the use of twenty-first century technology, he would have analyzed whether the government's long-term monitoring of the defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS) device to monitor a vehicle's movements for an extended period of time.  Ironically, the Court has chosen to decide this case based on 18th-century tort law.  By attaching a small GPS device to the underside of the

vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels. And for this reason, the Court concludes, the installation and use of the GPS device constituted a search. [132 S. Ct.] at 948-949.

This holding, in my judgment, is unwise. It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment). Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes." 132 S. Ct. at 958. Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search." 132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect." 132 S. Ct at 958. Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment." 132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.  United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the government attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search. 132 S. Ct. at 960-61.  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the government's conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the government could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

**2.**     ***Florida v. Jardines*.**

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once

again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search. 133 S. Ct. at 1417-18. Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in <u>Florida v. Jardines</u>. Justice Kagan filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 133 S. Ct. at 1420 (Kagan, J., concurring). Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In <u>Florida v. Jardines</u>, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home. <u>See</u> 133 S. Ct. at 1413. Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes. <u>See</u> 133 S. Ct. at 1413. As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 133 S. Ct. at 1413. The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants. <u>See</u> 133 S. Ct. at 1413. Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search. <u>See</u> 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."  133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15.  Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas.  In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines'

> home, the only question is whether he had given his leave (even implicitly) for them
> to do so.  He had not.

133 S. Ct. at 1415.  Justice Scalia noted that, while society recognizes an implicit license which

"typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to

be received, and then (absent invitation to linger longer) leave," he concluded that "introducing a

trained police dog to explore the area around the home in hopes of discovering incriminating

evidence is something else. There is no customary invitation to do that."  133 S. Ct. at 1415-16

(emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in
> the very act of hanging a knocker.  To find a visitor knocking on the door is routine
> (even if sometimes unwelcome); to spot that same visitor exploring the front path
> with a metal detector, or marching his bloodhound into the garden before saying hello
> and asking permission, would inspire most of us to -- well, call the police.  The scope
> of a license -- express or implied -- is limited not only to a particular area but also to
> a specific purpose.  Consent at a traffic stop to an officer's checking out an
> anonymous tip that there is a body in the trunk does not permit the officer to
> rummage through the trunk for narcotics.  Here, the background social norms that
> invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition

cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited to

United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and

Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage

in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine

inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of

privacy' described in Katz."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in United States v.

Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-expectations test 'has

- 56 -

been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth

Amendment, and so it is unnecessary to consider [the test under <u>Katz v. United States</u>] when the

government gains evidence by physically intruding on constitutionally protected areas." 133 S. Ct. at

1417 (quoting <u>United States v. Jones</u>, 132 S. Ct. at 951-52). Because the Supreme Court had already

concluded that the conduct was a Fourth Amendment search under the trespass-based analysis,

therefore, it held that it was unnecessary to consider whether the conduct amounts to a search under

the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home
> violated his expectation of privacy under <u>Katz</u>.   One virtue of the Fourth
> Amendment's property-rights baseline is that it keeps easy cases easy.  That the
> officers learned what they learned only by physically intruding on Jardines' property
> to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

The Honorable Elena Kagan, Associate Justice, wrote a concurring opinion, noting: "The

Court today treats this case under a property rubric; I write separately to note that I could just as

happily have decided it by looking to Jardines' privacy interests." 133 S. Ct. at 1418 (Kagan, J.,

concurring). Justice Kagan analogized the government's conduct in using a drug sniffing dog on

Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead,

peers through the windows "into your home's furthest corners" with "super-high-powered

binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of

your life you disclose to no one." 133 S. Ct. at 1418 (Kagan, J., concurring). This conduct, she

posited, is a trespass which exceeds any implied license and is also an invasion of reasonable

expectations of privacy; she argued that, like her analogy, the facts in <u>Florida v. Jardines</u> likewise

involved a trespass and a violation of privacy expectations:

- 57 -

That case is this case in every way that matters.  Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted.  The equipment they used was animal, not mineral.  But contra the dissent, <u>see</u> [133 S. Ct.] at 1420 (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).  According to Justice Kagan, had she written the majority opinion based on the <u>Katz v. United States</u> reasonable-expectations-of-privacy search test,

[a] decision along those lines would have looked . . . well, much like this one.  It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414 (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 . . . (1961)).  It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area.  [133 S. Ct.] at 1414-15 (quoting <u>California v. Ciraolo</u>, 476 U.S. [at] 213 . . . ).  And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there.  <u>See</u> [133 S. Ct.] at 1415-16, and n. 2-3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment case is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence."  133 S. Ct. at 1420 (Alito, J., dissenting).  Justice Alito noted that general trespass law permits a license to public members to use a walkway to approach a house's door, including strangers such as mailmen and solicitors, and the majority's conclusion that "the police officer in this case, Detective Bartelt, committed a trespass because he was accompanied during his otherwise lawful visit to the front door of respondent's house by his dog, Franky," is without a sound basis in trespass law.  133 S. Ct. at 1420-21 (Alito, J., dissenting).  Justice Alito also asserted that decision is

inconsistent with the <u>Katz v. United States</u>' reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." <u>Florida v. Jardines</u>, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is unfounded." 133 S. Ct. at 1421 (Alito, J., dissenting). Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door. <u>See</u> 133 S. Ct. at 1421-22 (Alito, J., dissenting). He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a visitor. 133 S. Ct. at 1423 (Alito, J., dissenting). Justice Alito pointed out that the implied license also applies to law enforcement and cites to <u>Kentucky v. King</u>, 131 S. Ct. 1849 (2011), in which the Supreme Court held that law enforcement officers approaching the front door of a residence to conduct a "knock and talk" is not a Fourth Amendment search. <u>Florida v. Jardines</u>, 133 S. Ct. at 1423 (Alito, J., concurring). Given that "Detective Bartelt did not exceed the scope of the license to approach respondent's front door," Justice Alito took issue with the majority's conclusion "that Detective Bartelt went too far because he had the '*objectiv[e]* . . . *purpose* to conduct a search.'" 133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original). According to Justice Alito, because approaching a house to conduct a knock and talk is not a search,

[w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash. On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.

The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog." But where is the support in the law of trespass for this proposition? Dogs' keen sense of smell has been used in law enforcement for centuries. The antiquity of this practice is evidenced by a Scottish law from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors." If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years. But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted). Justice Alito thus concluded: "For these reasons, the real law of trespass provides no support for the Court's holding today. While the Court claims that its reasoning has 'ancient and durable roots,' its trespass rule is really a newly struck counterfeit." 133 S. Ct. at 1424 (Alito, J., dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

[W]e have already rejected a very similar, if not identical argument, see *Illinois v. Caballes*, . . . and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting). Justice Kagan asserted that Bartelt's use of Franky the drug-sniffing dog was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.

Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device.  The very argument now advanced by the concurrence appears in Justice Souter's Caballes dissent.  But the Court was not persuaded."  133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing Illinois v. Caballes, 543 U.S. at 409-10 and 413 n.3).  Justice Alito contended that "Kyllo is best understood as a decision about the use of new technology. . . .  A dog, however, is not a new form of 'technology' or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."  133 S. Ct. at 1425 (Alito, J., dissenting).  Justice Alito therefore concluded that the government's conduct in Florida v. Jardines "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.  I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

3.      **Standing.**

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  E.g., United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").  Accordingly, the Court, tracing

the Tenth Circuit's language has also referred to this test as one of standing.  See, e.g., United States

v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a

subjective expectation of privacy in the premises searched and that society is prepared to recognize

that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme

Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has

now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-

based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

        In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the

inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of

standing, rather than simply recognizing it as one involving the substantive question of whether or

not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the

search and seizure which he seeks to challenge."  439 U.S. at 133.  Dispensing with this label, the

Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose
> own Fourth Amendment rights were violated by a challenged search and seizure to
> suppress evidence obtained in the course of such police activity, it would be
> appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by
> United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth
> Amendment analysis.  Under petitioners' target theory, a court could determine that a
> defendant had standing to invoke the exclusionary rule without having to inquire into
> the substantive question of whether the challenged search or seizure violated the
> Fourth Amendment rights of that particular defendant.  However, having rejected
> petitioners' target theory and reaffirmed the principle that the "rights assured by the
> Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of
> evidence only at the instance of one whose own protection was infringed by the
> search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question
> necessarily arises whether it serves any useful analytical purpose to consider this
> principle a matter of standing, distinct from the merits of a defendant's Fourth
> Amendment claim.  We can think of no decided cases of this Court that would have
> come out differently had we concluded, as we do now, that the type of standing

requirement discussed in <u>Jones</u> and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.  Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  The inquiry under either approach is the same.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in <u>Jones</u> also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.  362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . .  But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In <u>Minnesota v. Carter</u>, the Supreme Court recognized that <u>Rakas v. Illinois</u> put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in <u>Rakas</u> . . . .  Central to our analysis [in <u>Rakas v. Illinois</u>] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  <u>Id.</u>, at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that <u>Katz v. United States</u>' reasonable-

expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as

opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are
> personal, in place of a notion of "standing," will produce no additional situations in
> which evidence must be excluded.  But we think the better analysis forthrightly
> focuses on the extent of a particular defendant's rights under the Fourth Amendment,
> rather than on any theoretically separate, but invariably intertwined concept of
> standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme

Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment

doctrine."  Rakas v. Illinois, 439 U.S. at 139.

### 4.  Whether a Fourth Amendment Search Occurred.

A Fourth Amendment search occurs either where the government, to obtain information,

trespasses on a person's property or where the government violates a person's subjective expectation

of privacy that society recognizes as reasonable to collect information.  See United States v. Jones,

132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not

substituted for, the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947

(emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook

Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by physically

intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the

Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting

United States v. Jones, 132 S. Ct. at 950 n.3).

### a.  Trespass-Based Analysis.

The Fourth Amendment "establishes a simple baseline, one that for much of our history

- 64 -

formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court analyzed whether the Secret Service's digital scan of electronic information contained in the

defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space.  See 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

### b.   *Katz v. United States*' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the

trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law." United States v. Alabi, 943 F. Supp. 2d 1201 (D.N..M. 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)). Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in Katz . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has occurred (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the Constitution would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[5] In both United States v. Jones and Florida v. Jardines, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for Katz v. United States' reasonable-expectation-of-privacy analysis. Rather, his majority opinions asserted that the Katz v. United States reasonable-expectation-of-privacy analysis added to the trespass-based analysis. See Florida v. Jardines, 133 S. Ct. at 1417 ("The Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting United States v. Jones,

---

[5] The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's Minnesota v. Carter concurrence.

132 S. Ct. at 952).  The Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  2013 WL 1876791, at *35.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia J., dissenting). The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

      **c.**    ***Katz v. United States'* Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. at 174). "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'" United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[6] The Tenth Circuit has thus noted that "[a]n illegal search or

---

[6] The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351). In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls. The petitioner has strenuously argued that the booth was a "constitutionally protected area." The Government has maintained with equal vigor that it was not. But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem

seizure only harms those with legitimate expectations of privacy in the premises searched." United

States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir.

1990)).  Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth

Amendment interests still depends, after conducting a trespass-based analysis, on "whether the

defendant had an expectation of privacy in the place searched and whether that expectation was

objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219

(D.N.M. 2012).

      "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search

subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v.

---

presented by this case.  For the Fourth Amendment protects people, not places.  What
a person knowingly exposes to the public, even in his own home or office, is not a
subject of Fourth Amendment protection.  See Lewis v. United States, 385 U.S. 206,
210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).  But what he seeks to
preserve as private, even in an area accessible to the public, may be constitutionally
protected.  See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96
U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.  The Supreme Court appears to have changed course in its
two most recent opinions on Fourth Amendment searches.  In Florida v. Jardines, the particular place
at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he
[Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does
engage in a physical intrusion of a constitutionally protected area.'"  133 S. Ct. at 1414 (original
alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460
U.S. 276, 286 (1983)(Brennan, J., concurring)).  See United States v. Jones, 132 S. Ct. at 951 ("Katz
did not erode the principle 'that, when the Government does engage in physical intrusion of a
constitutionally protected area in order to obtain information, that intrusion may constitute a
violation of the Fourth Amendment. . . .  Katz did not narrow the Fourth Amendment's scope.'"
(emphasis added)).  The Court thus concludes that, while it may be true that the analysis does not
turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted
that the proper analysis under the Fourth Amendment is not whether the place searched is a
'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at
1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based
analysis as a Fourth Amendment analysis baseline.

Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States.  Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches.  We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"  Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to

- 71 -

understandings that are recognized and permitted by society.'"  United States v. Jones, 132 S. Ct. at

951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable

expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In

analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based

on property law, "arcane distinctions developed in property and tort law between guests, licensees,

invitees, and the like, ought not to control."  Rakas v. Illinois, 439 U.S. at 143 & n.12.  While

ownership or lawful possession is not determinative under the Katz v. United States reasonable-

expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a

personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area

searched] from the owner or someone with the authority to grant possession."  United States v.

Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.      Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown

that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal

alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no

reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he

Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . .

is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The

Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the
> obtaining of information revealed to a third party and conveyed by him to
> Government authorities, even if the information is revealed on the assumption that it
> will be used only for a limited purpose and the confidence placed in the third party
> will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.  In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in Jones v. United States, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and

medications they purchase to online retailers.[7]  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.   I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).   Regardless what the

Supreme Court decides to do with social media on the internet, only the most ignorant or gullible

think what they post on the internet is or remains private.  See United States v. Meregildo, 883 F.

Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook profile

had "no justifiable expectation that his 'friends' would keep his profile private").

### ii.    Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach,

courts must determine "whether society is prepared to recognize that [subjective privacy] expectation

as objectively reasonable."  United States v. Ruiz, 664 F.3d at 838 (United States v. Allen, 235 F.3d

at 489).  The Supreme Court has cautioned: "The concept of an interest in privacy that society is

prepared to recognize as reasonable is, by its very nature, critically different from the mere

expectation, however well justified, that certain facts will not come to the attention of the

authorities."  United States v. Jacobsen, 466 U.S. 109, 122 (1984).  Determining whether society

---

[7] URL is the abbreviation for a "uniform resource locator, . . . also known as web address, [which] is a specific character string that constitutes a reference to a[n internet] resource."  Uniform Resource Locator, Wikipedia.org, http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited Apr. 23, 2013).

would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects.  See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, supra, §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any

legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment." United States v. Place, 462 U.S. at 707. The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it. See 462 U.S. at 699. The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine. See 462 U.S. at 699. While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

> In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a

> public place, to a trained canine -- did not constitute a "search" within the meaning of
> the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. They then called the DEA and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of
> their contents enabled the agent to learn nothing that had not previously been learned
> during the private search. It infringed no legitimate expectation of privacy and hence
> was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." United States v. Jacobsen, 466 U.S. at 122. The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder.  We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?

. . . .

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.  This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."  Illinois v. Caballes, 543 U.S. at 409.[8]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell

---

[8] The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice

squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that <u>only</u> reveals the possession of contraband 'compromises no legitimate privacy interests.'"  543 U.S. at 408 (quoting <u>United States v. Jacobsen</u>, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable,'"  543 U.S. at 408-09 (quoting <u>United States v. Jacobsen</u>, 466 U.S. at 122).  The Supreme Court in <u>Illinois v. Caballes</u> noted that its decision was consistent with <u>Kyllo v. United States</u>, as the thermal imaging device in <u>Kyllo v. United States</u> could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search.  <u>Kyllo v. United States</u>, 533 U.S. 27 . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  <u>Id.</u>, at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.  A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

<u>Illinois v. Caballes</u>, 543 U.S. at 409-10.

In <u>United States v. Alabi</u>, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- <u>i.e.</u>, intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy

---

Ginsburg dissented.  <u>See</u> 543 U.S. at 405.

expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable."  943 F. Supp. 2d at 1280.  The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ." 943 F. Supp. 2d at 1281.  Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."  943 F. Supp. 2d at 1287.

> ### 5.      Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)).  The

Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'").

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for

initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course,

with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

###    6.    **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997])(citing and quoting

numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)

(Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th

Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining

whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one

factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's

failure to advise a defendant that he or she is free to leave might suggest that coercive law

enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that

officers do not need to advise an individual of his or her right to refuse to consent to a search for that

individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover,

the mere presence of officers by exits to a building, threatening no more than to question individuals

if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that

they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194,

205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute

to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to

contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United

States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an

individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this

careful sifting of the unique facts and circumstances of each case that is evidenced in our prior

decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

**7.    Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.**

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009). In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the

magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . .").  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."  United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The Court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the Court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

### 8.    The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are

- 86 -

conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant. See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))). "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal. 567 F.3d at 635. The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405). The Tenth Circuit explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the

warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," 567 F.3d at 643 (emphasis in original).

### 9.    Warrantless Searches of Homes.

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"  United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent."  United States v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480 U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).

### a.    Curtilage.

In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301.  Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).  Even partially enclosed backyards have

been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same).

### b.      Consent.

A warrantless search is constitutional if consent is given for the search.  Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."  United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).  In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key.  See 173 F.3d at 766.

One strategy to gain consent to a search is a knock and talk, and the knock and talk itself is not a search.  "[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' i.e., knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."  Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., dissenting).

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a

private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 131 S. Ct. 1849, 1862 (2011).      The Tenth Circuit has explained that reasonable

suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a

'knock and talk' is a consensual encounter and therefore does not contravene the Fourth

Amendment, even absent reasonable suspicion." United States v. Cruz-Mendez, 467 F.3d 1260,

1264 (10th Cir. 2006). Police officers may approach a home, entering the curtilage surrounding that

home that would be the normal route of access to the home, and knock, "precisely because that is 'no

more than any private citizen might do,'" United States v. Shuck, 713 F.3d 563, 568 (10th Cir.

2013)(quoting Florida v. Jardines, 133 S. Ct. at 1416)).

### c.    **Exigent Circumstances**.

A warrantless search of a home can also be constitutional when there are exigent

circumstances. For exigent circumstances regarding safety to justify a warrantless search of a home:

"(1) the officers [must have] had an objectively reasonable basis to believe that there was an

immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry

[must have been] reasonable." United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008). See

United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986). While officers do not need probable

cause to establish that exigent circumstances existed, "there must be some reasonable basis,

approaching probable cause," supporting the search of the area. United States v. Smith, 797 F.2d at

840 (internal quotation marks omitted).

### ANALYSIS

The Court will grant the MTD in part and deny it in part. Tapia has, by failing to respond,

consented that the Court should grant the MTD. See D.N.M.LR-Civ. 7.1(b)("Failure of a party to

file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.").  Moreover, because the Court cannot grant the MTD solely because Tapia has failed to respond, see Issa v. Comp USA, 354 F.3d at 1177-78 ("[E]ven if a plaintiff does not file a response to a motion to dismiss for failure to state a claim, the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted."), the Court has proceeded to the merits and concludes that the MTD should be, in large part, granted.  Tapia has abandoned any HIPAA claim that one could read into her Complaint.  Accordingly, the Court will dismiss the HIPAA claim with prejudice. Further, the Complaint does not state a constitutional claim.  Accordingly, the Court will dismiss the constitutional claim without prejudice.  The Court will, however, give Tapia an opportunity to move to amend her constitutional claim against Dr. Wagner-Mogle if, in light of the Court's disposition of the MTD, she concludes that she can amend her Complaint to state a claim.

The Complaint and the MTD largely passed in the night.  The Complaint's "right to privacy" claim reads as follows:

## COUNT 3

## VIOLATION OF RIGHT TO PRIVACY

65.     Each and every allegation in the preceding paragraphs is incorporated as if set out herein.

66.     Ms. Forney used a misleading letter and an illegitimate subpoena that she issued herself to secure Jessica Tapia's medical records from Dr. Carmen Wagner-Mogle.

67.     Dr. Carmen Wagner-Mogle sent Ms. Tapia's medical records to Ms. Forney without any knowledge or authorization by Ms. Tapia.

68.     Dr. Wagner-Mogle communicated with Ms. Forney and other City

representatives about Jessica Tapia and her medical condition and records on at least several occasions.  In contrast, she never contacted or attempted to contact Ms. Tapia or her attorney.

69.     The acts of Defendants, specifically Paula Forney, Dr. Carmen Wagner-Mogle and the Transit Department deliberately and willfully violated Jessica Tapia's right to privacy in her medical records.

70.     Defendants also hired a private investigator and followed Ms. Tapia, seeking and securing information about her personal life and activities entirely unconnected with her work.

71.     Defendants are liable for their violations of Ms. Tapia's right to privacy.

Complaint ¶¶ 65-71, at 13-14.

From the MTD and the oral argument at the hearing, it appears that Dr. Wagner-Mogle inferred from the Complaint's vague reference to the "right to privacy" that Tapia must have raised a HIPAA claim.  The MTD focuses on that purported HIPAA claim and includes only the following references to a possible constitutional dimension to Tapia's claim: in what Dr. Wagner-Mogle labels as the "factual background," MTD at 1, she acknowledges that the Plaintiffs "believe [she] violated the Right to Privacy of Plaintiff Tapia, under 42 U.S.C. § 1983 and under the U.S. Constitution, concerning an issue in front of the City of Albuquerque's Personnel Board," but asserts that Tapia, "at any point in her Complaint, failed to state how her privacy rights were violated in terms of 42 U.S.C. § 1983; Plaintiff Tapia also failed to state, in any meaningful fashion, how her privacy rights were injured at any point, much less in terms of 42 U.S.C. § 1983."  MTD ¶¶ 4-5, at 2.  That section is the last appearance of the Constitution in the MTD.  In other places, the MTD cites HIPAA as the "governing law" without citing the Constitution, MTD at 11, and argues that, because, in her view, the release was proper under HIPAA, "Tapia simply lacks any grounds on which she could be

granted relief, " MTD at 12. The remainder of the MTD and the oral argument focused on the HIPAA claim. In sum, the Complaint's invocation of the Constitution, such that it was, was so vague that Dr. Wagner-Mogle focused her fire entirely on the purported HIPAA claim, noting only in passing that the Complaint had failed to explain how she violated Tapia's constitutional rights.[9] At the hearing, Tapia stated that she has not brought a HIPAA claim, but only a constitutional claim; to the extent that one could read Tapia's Complaint to assert a HIPAA claim, she has, therefore, abandoned that claim. Accordingly, the Court will grant the MTD to the extent that it asks the Court to dismiss the HIPAA claim with prejudice.

The constitutional claim fares no better. Eliminating the conclusory allegations and adjectives, Tapia states that, without her knowledge, Dr. Wagner-Mogle -- Tapia's physician -- disclosed Tapia's medical records to Forney pursuant to a letter and a subpoena, and that Dr. Wagner-Mogle communicated with City of Albuquerque representatives about Tapia and her condition. The Court is not aware of any case that holds that a doctor violates the Constitution when he or she acts in that fashion. Moreover, Tapia nowhere alleges that Dr. Wagner-Mogle acted under color of state law, as West v. Aikins, 487 U.S. at 48, required her to do.

Tapia's counsel's posture toward the MTD presents problems for Dr. Wagner-Mogle and for the Court. His decision not to respond to the MTD in writing left Dr. Wagner-Mogle twisting in the wind: she confronted a vague cause of action that invokes a "right to privacy" untethered to any identified legal authority. The Complaint did not give Dr. Wagner-Mogle notice of the claim against

---

[9] The MTD, nonetheless, asks the Court to dismiss the "Plaintiffs' claims" against her, MTD at 12, indicating that Dr. Wagner-Mogle understood that there were multiple claims against her, but did not know how else to respond to the vaguely pled constitutional claim other than to point out that the Complaint does not tie its factual allegations to the elements of a constitutional cause of action.

her -- much less rise to the level of plausibility pleading that Twombly v. Bell Atlantic Corp. and Ashcroft v. Iqbal require.  Being a private physician, she figured that a HIPAA claim made the most sense out of the Complaint's allegations, so she filed a motion to dismiss that claim.  That motion languished without a response for seven months, leaving Dr. Wagner-Mogle to discover at the hearing that Tapia asserts a constitutional claim against her.  Even though, under Tenth Circuit precedent, the Court cannot grant the MTD solely because Tapia did not respond to it, see Issa v. Comp USA, 354 F.3d at 1177-78, the local rule that encourages written responses to motions exists to prevent such ambush tactics.  Because Tapia does not state a constitutional claim, the Court will dismiss that claim.  It will do so, however, without prejudice, and will allow Tapia to amend her constitutional claim against Dr. Wagner-Mogle.

If Tapia moves to amend her Complaint and adequately asserts a constitutional claim, and if Dr. Wagner-Mogle challenges the amended constitutional claim, the Court encourages the parties to brief the issue fully.  The Court has included legal sections on § 1983, state action, searches under the Fourth Amendment, and the right to privacy in medical records to assist the parties' determination whether there is any good claim against Dr. Wagner-Mogle.  In the end, our system of justice is adversarial.  The Court cannot do its work until the parties do theirs.[10]

**IT IS ORDERED** that Defendant Carmen Wagner-Mogle, M.D.'s Motion to Dismiss, filed March 11, 2013 (Doc. 14), is granted in part and denied in part.  The claims against her under the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936, are

---

[10] To the extent that Dr. Wagner-Mogle's arguments for dismissal depend on documents outside of the Complaint, the parties should recognize that the Court can consider such documents on a motion to dismiss for failure to state a claim only in limited circumstances.  See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1190-92 (D.N.M. 2013)(Browning, J.)(discussing the "limited exceptions to

dismissed with prejudice, and all constitutional claims are dismissed without prejudice.  Plaintiff

Jessica Tapia shall have ten days from the entry of this order to file a motion to amend, attaching a

copy of her proposed amended complaint.  Although the Court will not award costs at this time, Dr.

Wagner-Mogle may apply for costs, if any are available, under D.N.M.LR-Civ. 54.1.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Paul Livingston
Placitas, New Mexico

*Attorney for the Plaintiffs and Counter-Defendants Jessica Tapia, Vanessa Aragon, New
    Mexico Transportation Union, and Ernest Lucero*

Rebecca E. Wardlaw
   Managing Assistant City Attorney
Samantha M. Hults
Steve D. Nichols
   Assistant City Attorneys
Albuquerque, New Mexico

--and--

_____

[the] general principle" that "the sufficiency of a complaint must rest on its contents alone.").

- 95 -

Stephen G. French
Paula I. Forney
Erika E. Anderson
French & Associates, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendants and Counter-Claimants City of Albuquerque, Richard Berry, Robert J. Perry, and Bruce Rizzieri*

Deborah D. Wells
Debra J. Moulton
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant City Personnel Board*

Alfred L. Green, Jr.
Emily A. Franke
Neil R. Blake
Butt Thornton & Baehr, P. C.
Albuquerque, New Mexico

> *Attorneys for Defendant Paula Forney*

Lynn S. Sharp
Christopher Lee Moander
Charles P. List
Sharp Law Firm
Albuquerque, New Mexico

> *Attorneys for Defendant Carmen Wagner-Mogle M.D.*