IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JESSICA TAPIA,
VANESSA ARAGON, and
NEW MEXICO TRANSPORTATION UNION,
ERNEST LUCERO, Chairman,

        Plaintiffs,

vs.                                  No. CIV 13-0206 JB/ACT

CITY OF ALBUQUERQUE,
RICHARD BERRY, Mayor,
ROBERT J. PERRY, Chief
Administrative Officer, BRUCE
RIZZIERI, Transit Dept. Director,
CITY PERSONNEL BOARD,
PAULA FORNEY, and
CARMEN WAGNER-MOGLE, M.D.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Motion to Dismiss by Defendant Paula

Forney, filed May 3, 2013 (Doc. 43)("MTD").  The Court held a hearing on November 1, 2013.

The primary issue is whether the Court should dismiss the Plaintiffs' claims against Defendant

Paula Forney under rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court will grant

the MTD.  The Court concludes that the Plaintiffs do not assert Counts 2, 4, and 6 of the

Complaint for Violation of Statutory and Constitutional Rights, Breach of Contract, and Unfair

and Prohibited Labor Practices, filed in state court January 15, 2013, filed in federal court March

4, 2013 (Doc. 1-1)("Complaint"), against Ms. Forney; to the extent that the Plaintiffs assert those

claims against Ms. Forney, the Court will grant the MTD.  The Court will also grant the MTD as

to Counts 1, 3, and 5, because none of the Counts states a claim against Ms. Forney for violating

any provision of the Constitution of the United States of America.

**FACTUAL BACKGROUND**

To provide background for the MTD, the Court takes the following facts from the Complaint. The Complaint's organization is unclear. Accordingly, the Court has reorganized the factual material in the Complaint to explain the facts clearly.

1. **The Parties**.

Plaintiff "Jessica Tapia was a full-time, classified City employee, employed as a City para-transit van driver when she was injured on-the-job while operating a wheel-chair lift on a City van." Complaint ¶ 1, at 1 (emphasis omitted). Plaintiff "Vanessa Aragon was employed as a City bus driver until the City terminated her employment in July, 2011." Complaint ¶ 2, at 2 (emphasis omitted). Plaintiff "[t]he New Mexico Transportation Union ("NMT[U]"), [sic] is the labor union that has represented City bus and van drivers since 1965; [Plaintiff] Ernest Lucero is the current NMTU Chairman." Complaint ¶ 3, at 2 (emphasis omitted). "Defendant City of Albuquerque is the largest city in New Mexico; Albuquerque is in Bernalillo County, New Mexico." Complaint ¶ 4, at 2 (emphasis omitted). Defendant "Richard Berry is the Mayor of Albuquerque; [Defendant] Robert J. Perry is the Chief Administrative Officer (CAO) of the City." Complaint ¶ 5, at 2 (emphasis omitted). Defendant "[t]he City Personnel Board is supposed to be a neutral quasi-judicial hearing panel;" according to the Plaintiffs, "the current Personnel Board operates unlawfully under the control and direction of" Perry. Complaint ¶ 6, at 2. Non-party "[t]he City Labor-Management Relations Board is supposed to be a neutral quasi-judicial hearing panel;" the current Labor Board operates under the control and direction of the City of Albuquerque," Berry, and Perry. Complaint ¶ 7, at 2. Defendant Bruce Rizzieri is "Director of the City's Transit Department." Complaint ¶ 8, at 2. Defendant "Paula Forney is a

- 2 -

former assistant City attorney."  Complaint ¶ 9, at 2.  Defendant "Carmen Wagner-Mogel was Jessica Tapia's physician."  Complaint ¶ 10, at 2.

      2.     **Facts Related to the NMTU and City Government Actors**.

The Plaintiffs assert that NMTU "petitioned with the support of a majority of employees in the bargaining unit for recognition as the union for the bus and van drivers in March, 2011," but "the City would not formally recognize its majority status until October 5, 2011, when it was forced to recognized NMTU after NMTU prevailed in the City-run election against AFSCME, Local 624."  Complaint ¶ 10, at 3.  Although the City Labor Board conducted that election, neither the City nor its labor board supported "the NMTU in either its grievance or bargaining representation."  Complaint ¶ 11, at 3.  "On October 5, 2011, Mayor Richard Berry de-certified AFSCME as bargaining representative and certified NMTU."  Complaint ¶ 12, at 3.  "However, the City Defendants subsequently refused to bargain with NMTU[,] refused to deduct union dues from paychecks, and refused to allow union leaders the same accommodations and privileges concerning union business, negotiations, and grievances that the AFSCME union was afforded."  Complaint ¶ 13, at 3.

> As a direct result of the City's failure to acknowledge and support NMTU as the collective bargaining and grievance representative, NMTU and its officials were untrained, inexperienced, and without any office, staff, or operating funds.  At the same time the union officers were attempting to represent drivers, the Transit Department unreasonably required them to fully perform their driving schedules.

Complaint ¶ 14, at 3-4.  Tapia's and Aragon's grievances "were the first two grievances ever handled by NMTU's new Chairman."  Complaint ¶ 15, at 4.

According to the Plaintiffs, the City Charter requires the mayor to administer and protect "the merit system," and to appoint "an officer to administer the merit system."  Complaint ¶ 16,

at 4.[1]   According to the Plaintiffs, "[t]he City has not appointed or hired" such an officer.

Complaint ¶ 17, at 4.   "[M]oreover, the Merit System Ordinance states that the Mayor" shall

designate the CAO -- "the City's highest appointed official and the person authorized to

'reprimand, suspend, demote or discharge employees'" -- to administer that system.   Complaint ¶

18, at 4 (quoting MSO § 3-1-2(c)(3)).   "The City Personnel Board is neither fair nor neutral," but

instead, "whenever possible[, it] upholds and advances management policies and interests over

the rights of City employees.   In this case the City dictated the actions of the Personnel Board."

Complaint ¶ 19, at 4.

> [U]nder the administration of Mayor Richard Berry the Current Personnel Board
> and its Personnel Hearing Officers and the Labor Board all act under the direction
> of Mayor Berry and Robert Perry, without oversight from the City Council,
> collusively, and in violation of the City Charter and the rights of Plaintiffs and
> other City employees.

Complaint ¶ 20, at 5.

### 3.   Conflict Between Tapia and the City of Albuquerque .

Tapia's wrist was injured on the job.   See Complaint ¶ 21, at 5.   The Complaint does not

relay the circumstances of that injury.   "Since Ms. Tapia had been injured at work the City

claimed it had the right to assign her to any position, without regard for whether the position had

any relation to her work as a van driver."   Complaint ¶ 22, at 5.   "Following her on-the-job wrist

injury the Transit Department assigned Ms. Tapia to 'monitor' the public restrooms at the City's

Alvarado Transit Center.   While 'monitoring' at the ATC, in November, 2010, Ms. Tapia was

attacked by a homeless man who injured her shoulder."   Complaint ¶ 21, at 5.   "By early

---

[1] Although the Complaint does not explain what it means by "merit system," from what information the Complaint provides, the Court infers that the Complaint refers to the merit system for employment matters that Article X of the Charter of the City of Albuquerque contains.   Albuquerque City Charter, art. X.   The Merit System Ordinance is found in Albuquerque, N.M. Ordinances, §§ 3-1-1 to -28 ("MSO").

December, 2010, Transit officials had placed Ms. Tapia in the poorly heated Guard Shack at the

entrance to the Daytona Transit facility and left her to stay there all day with nothing to do."

Complaint ¶ 23, at 5.

> On December 27, 2010, counsel wrote to Transit Director Bruce Rizzieri and the
> Human Resources manager, to inquire about the City's justification for putting
> Ms. Tapia in the cold Guard Shack with nothing to do.  They did not respond.  On
> January 21, 2011, counsel wrote again to further question and object to the City's
> mistreatment of Ms. Tapia and to give notice of her tort claims.

Complaint ¶ 24, at 5.

> On February 15, 2011, the Transit Department scheduled a Pre-
> Determination Hearing (PDH) for February 24, 2011, charging that Ms. Tapia
> 'submitted a P-30 Request for Leave form with 68.270 hours of Absent Without
> Leave.'  Mr. Bird cancelled that 'hearing' after Ms. Tapia and her attorney
> appeared because, he said, he had forgotten to refer the case to the mediation
> office.

Complaint ¶ 25, at 4.  The hearing was rescheduled for March 10, 2010.  See Complaint ¶ 26, at

6.  When Tapia's attorney asked for documents to support the charges, no documents were

provided.  See Complaint ¶ 26, at 6.  The Transit Department asserted that Tapia "submitted a P-

30 Request for Leave form with 68.270 hours of Absent Without Leave.  This type of leave is

unauthorized leave and considered absent from work without authorization.  Your AW absences

totaling 68.270 hours have placed you in violation of City Rules and Regulations."  Complaint ¶

26, at 6 (source of quotation unidentified).   "Ms. Tapia had submitted the form on the

instructions of Transit's Personnel Manager.  Nonetheless, on March 18, 2011, [t]he Transit

Department gave Tapia a 3-day suspension."  Complaint ¶ 27, at 6.

> On April 18, 2011, the Transit Department gave [Tapia] another Notice,
> scheduling a pre-determination hearing for May 9, 2011.  Included in the
> allegations was the contention that on "April 11, 2011 Clarence Decker
> 'witnessed you in the Security Building at approx. 12:30 p.m.  At 3:00 p.m.,
> '(y)ou were not at your assigned work area.'"

- 5 -

Complaint ¶ 27, at 6 (source of quotation unidentified).

On April 21, 2011, another Notice scheduled a hearing for June 3, 2011. Among the allegations were that "On April 18-20, 2011 you did not show up for work or call in to be absent from work… [sic] Your AW absences totaling 24 hours have placed you in violation of City Rules and Regs."  This was apparently also based on a complaint by Clarence Decker about Jessica Tapia's 'absents and failure to call in.'"

Complaint ¶ 28, at 6-7 (source of quotation unidentified).  On May 18, 2011, in response to the

hearing held on May 9, 2011, the Transit Department suspended Tapia without pay for eight

work days, or sixty-four work hours, to be served from May 20, 2011 to May 31, 2011.  See

Complaint ¶  29, at 7.  On May 31, 2011, Maintenance Manager Dennis Stump gave Ms. Tapia

notice of another Pre-determination Hearing scheduled for Thursday June 9, 2011.  According to

the City's untrue account, Ms. Tapia had requested accommodation in October, 2010 'citing that

you are unable to drive at night due to your medical condition.'"   Complaint ¶ 30, at 31.

"Without her knowledge the City had apparently paid a private investigator to follow her outside

of work hours, with the result that she was accused of 'driving at night' and 'purchasing liquor at

a Walgreens establishment then attending what appeared to be a party.'"   Complaint ¶ 31, at 7

(source of quotation unidentified).

Also, according to the Plaintiffs' account, the City's

FMLA Coordinator *contacted your physician* to inquire if your medical condition had changed . . . physician stated you had not been under her care since the first part of April when she certified your FMLA for intermittent leave and that she did not have a medical explanation for why you have not been to work.

(Emphasis added.)

Complaint ¶ 32, at 7 (omission in Complaint).

"On June 8, 2011, Jessica Tapia received the 'results of predetermination hearing' that

'on April 18-20, 2011, you did not show up for work or call in to be absent from work.'  The Transit department imposed a 15-workday, 120 hour suspension without pay."  Complaint ¶ 33, at 7.  "Without further notice to Ms. Tapia or NMTU, the City terminated Ms. Tapia's employment."  Complaint ¶ 34, at 8.

"On August 2, 2011, the City's attorney, Paula Forney, drafted and issued a subpoena for Ms. Tapia's medical records.  Ms. Forney did that without informing Ms. Tapia or her attorney.  Ms. Forney did not seek or secure a release."  Complaint ¶ 40, at 9.  The subpoena, which Forney evidently issued to Dr. Wagner-Mogle, stated "that it was: '[f]or the medical records of patient, Jessica Tapia . . . requires you to appear for a deposition on August 10, 2011 at 10:00 a.m. . . . and bring with you: Any and all documents in your possession regarding Jessica Tapia . . . beginning 01/01/2010 to the present."  Complaint ¶ 41, at 9.  "In a letter accompanying the Subpoena and deposition notice, Ms. Forney stated that: 'You can avoid the deposition by copying and forwarding to this office all records requested prior to the deposition.  If we do not receive the records prior to the date of deposition, we will expect your appearance.'"  Complaint ¶ 42, at 9 (source of quotation not provided).  On August 4, 2011, Dr. Wagner-Mogle sent Tapia's records to Ms. Forney by facsimile transmission, without requesting or securing a release or other authorization, and without notifying Tapia.  See Complaint ¶ 43, at 9.  "On August 8, 2011, Ms. Forney wrote to counsel that she had received 'A phone call from Ms. Tapia's doctor acknowledging that she should not have sent Ms. Tapia's records without a release.'"  Complaint ¶ 44, at 10.  "Ms. Tapia objected to the unauthorized release of her medical records, but on September 9, 2011, Personnel Hearing Officer Patrick Bingham issued the subpoena for medical records requested by Ms. Forney and granted the City attorney permission to serve discovery on Ms. Tapia."  Complaint ¶ 45, at 10.

- 7 -

After the hearing officer allowed "the City unlimited 'discovery' (including Ms. Tapia's medical records), Ms. Forney propounded burdensome and offensive 'discovery requests' designed to embarrass Ms. Tapia and place pressure on the inexperienced NMTU officers who were attempting to represent her, rather than produce any actually useful information." Complaint ¶ 46, at 10(source of quotations not provided).  "The Hearing Officer signed an order dismissing Ms. Tapia's case, but the Personnel Board objected that Mr. Bingham's order did not give any reasons or include any 'findings.'  The Personnel Board remanded the case to the Personnel Hearing Officer to make findings and issue a 'correct' order."  Complaint ¶ 47, at 10. "Instead of the Hearing Officer making findings and issuing a correct corder [sic], Paula Forney wrote a set of 'findings and conclusions' dismissing Ms. Tapia's case."  Complaint ¶ 48, at 10. "The Hearing Officer merely changed the title of the document prepared by Ms. Forney and signed the 'Order' drafted by Ms. Forney, dismissing Ms. Tapia's Personnel Board case without a hearing.'"  Complaint ¶ 49, at 10.  "At its December 14, 2011, meeting the Personnel Board gave its rubber-stamp 'approval' of Ms. Forney's findings and conclusions."  Complaint ¶ 50, at 11.

> Counsel for Ms. Tapia subsequently filed a motion for sanctions against the City, Ms. Forney and the Personnel Hearing Officer for their violations of Ms. Tapia's right to privacy.  The Board members denounced Tapia's counsel for bringing the charges before the Personnel Board and the Board unanimously refused to consider the issue.

Complaint ¶ 51, at 11.

### 4.    Conflict Between Aragon and the City of Albuquerque.

"The City has held an extraordinary number of pre-disciplinary hearings in this case, spanning the time between the first such action on December 26, 2006, and the last on June 1, 2011."  Complaint ¶ 35, at 8 (footnote omitted).   The Complaint lists, without further

explanation, a number of "Results of Pre-Disciplinary He[ar]ings" and states that "in addition the City has held two investigations . . . and issued at least seven letters of investigation."  Complaint ¶ 35 n.1, at 8.

> The City has charged Ms. Aragon with very many infractions. On March 16, 2008, for example, the City charged Ms. Aragon with violating section 300, 301.1, 301.9, 302, 301.13, 401.11 (D1, E), 402.5(C), 902, 902.1 (C, D, G, J. [sic] L, M1, 2, 3) and Sec. 12.34 (Major Policy Violations/Gross Misconduct, Transit SOP).  Plaintiffs do not know what those charges are for or what happened to those charges.

Complaint ¶ 36, at 8.  "On May 17, 2011, Deputy Operations Manager Annette Paez ordered Ms. Aragon to return to work, but Ms. Aragon was unable to comply because of her medical condition."  Complaint ¶ 37, at 8.  "On June 1, 2011, Ms. Paez charged Ms. Aragon with violations of Section 300, 302, 402.5(c) and 902.1 (E. [sic] J, and M-3)."  Complaint ¶ 38, at 8. "Although the record indicates an increasing concern over attendance and use of sick leave, the City has never explained the reasons for its disciplinary actions against Ms. Aragon."  Complaint ¶ 39, at 9.

"On October 17, 2011, Mr. Lucero wrote to Ms. Wardlaw to request Vanessa Aragon's case and all other NMTU cases be stayed until the Union achieved the ability to represent the bargaining unit employees."  Complaint ¶ 52, at 11.  "The City refused to agree to a continuance, claiming that Mr. Lucero had waited too long to request it."  Complaint ¶ 53, at 11.  "Without any attempt to contact Ms. Aragon, the City's Personnel Hearing Officer wrongly concluded that: '. . . it is more likely than not that Employee was aware of the hearing and did not appear so as to support the request for a continuance.'"  Complaint ¶ 54, at 11 (omission in Complaint)(source of quotation not provided).

> According to the City's Personnel Hearing Officer, "Employee failed to establish good and sufficient cause for her untimely request for a continuance."

> The Hearing Officer therefore recommends that the Personnel Board deny Employee's request for a continuance.  The Employee having failed to appear or to otherwise prosecute her appeal, it is further recommended that the Personnel Board dismiss the appeal of Employee's termination.

Complaint ¶ 55, at 12 (source of block quotation not provided).

> Not knowing about the status of NMTU and its representational abilities and without inquiring or even asking Mr. Lucero, the Hearing Officer erroneously found that the request for a continuance was made because of "problems associated with the fact that NMTU was moving into new facilities."  In fact, there were no "new facilities" and Ms. Aragon was unaware of what was happening, but the Hearing Officer, acting in collusion with the City, recommended termination without a hearing anyway."

Complaint ¶ 56, at 12.

## PROCEDURAL BACKGROUND

The Court will discuss the procedural background in two parts.  First, the Court will discuss the Plaintiffs' Complaint and the Defendants' removal to federal court.  Second, the Court will discuss the proceedings that relate to the MTD.

### 1.     The Plaintiffs File their Complaint; the Defendants Remove to Federal Court.

The Plaintiffs filed their Complaint in state court, stating that they "bring their claims under 42 U.S.C.Sec. 1983 [sic], and the laws and Constitutions of the United States and the State of New Mexico."   Complaint ¶ 9, at 2-3.   The Plaintiffs allege six causes of action.   See Complaint ¶¶ 57-84, at 12-16.  Under "Count 1 Due Process and Equal Protection," the Plaintiffs assert that Tapia and Aragon, "[a]s classified, full-time, City employees . . . had legitimate expectations of continued employment absent just cause for disciplinary action.  They had the right to a full and fair hearing to challenge their termination."   Complaint ¶ 57, at 12. "Similarly," the Plaintiffs allege, "NMTU and its leadership had a due process right and an

- 10 -

obligation to represent employees in the bargaining unit at post-termination grievance hearings that are fundamentally fair and procedurally correct." Complaint ¶ 58, at 12. According to the Plaintiffs, the "Defendants denied the employees' rights and hearings and dismissed their cases on pretextual grounds," and, thereby, "the City Defendants have violated Plaintiffs' rights to due process and equal protection of the laws." Complaint ¶¶ 59-60, at 13.

Under "Count 2 Breach of Employment Contracts," the Plaintiffs allege that, "[a]s tenured public employees, Plaintiffs Tapia and Aragon were covered by a contract of employment that consisted of the Merit System Ordinance, the Personnel Rules and Regulations and applicable collective bargaining agreements." Complaint ¶ 62, at 13. The Plaintiffs contend that they "were contractually entitled to notice and an opportunity to be heard, and to be disciplined only for just cause." Complaint ¶ 62, at 13. The Plaintiffs submit that, thereby, the Defendants "have violated their contractual obligations and are liable for damages to be determined at trial." Complaint ¶ 64, at 13.

Under "Count 3 Violation of Right to Privacy," the Plaintiffs contend that Ms. "Forney used a misleading letter and an illegitimate subpoena that she issued herself to secure Jessica Tapia's medical records from Dr. Carmen Wagner-Mogle," and that Dr. "Wagner-Mogle sent Ms. Tapia's medical records to Ms. Forney without any knowledge or authorization by Ms. Tapia." Complaint ¶¶ 66-67, at 13-14. The Plaintiffs assert that "Dr. Wagner-Mogle communicated with Ms. Forney and other City representatives about Jessica Tapia and her medical condition and records on at least several occasions," but "never contacted or attempted to contact Ms. Tapia or her attorney." Complaint ¶ 68, at 14. The Plaintiffs state that "[t]he acts of Defendants, specifically Paula Forney, Dr. Carmen Wagner-Mogle and the Transit Department deliberately and willfully violated Jessica Tapia's right to privacy in her medical

records."  Complaint ¶ 69, at 14.  The Plaintiffs contend that the "Defendants also hired a private investigator and followed Ms. Tapia, seeking and securing information about her personal life and activities entirely unconnected with her work."  Complaint ¶ 70, at 14.  The Plaintiffs assert that the "Defendants are liable for their violations of Ms. Tapia's right to privacy."  Complaint ¶ 71, at 14.

Under "Count 4 Negligence," the Plaintiffs assert that, "[a]s described herein, Defendants have treated Jessica Tapia and Vanessa Aragon negligently and with deliberate indifference with respect to their employment."  Complaint ¶ 73, at 14.  "In addition," the Plaintiffs state, "Ms. Tapia sustained two injuries, the first resulting from operation of a wheelchair lift while on duty; the second of which was a result of her assignment to monitor the restroom facilities at the Alvarado Transit Center, a building managed and maintained by the City Transit Department."  Complaint ¶ 74, at 15.  The Plaintiffs assert that "Tapia has given notice of her tort claim to the City of Albuquerque."  Complaint ¶ 75, at 15.  The Plaintiffs maintain that "[t]he city and its Transit Department, as well as its Director, are liable for the damages proximately caused by their negligence in an amount to be determined at trial."  Complaint ¶ 76, at 15.

Under "Count 5 Conspiracy to Deny Constitutional Rights," the Plaintiffs assert that "[t]he City Defendants, aware of Plaintiffs' rights to due process and equal protection, acted deliberately to deny the right to a hearing, one of the most fundamental rights of public employees subjected to wrongful disciplinary actions."  Complaint ¶ 78, at 15.  "In particular," according to the Plaintiffs, "Paula Forney, the Personnel Hearing Officers, the Personnel Board, and Bruce Rizzieri and other City officials met, discussed, and arranged for the denial of Plaintiffs' due process and equal protection rights."  Complaint ¶ 79, at 15.

Under "Count 6 Unfair Labor Practices," the Plaintiffs state that, "[l]ong after the

submission of NMTU's majority petition for representation of the Transit drivers' bargaining unit in March, 2011, and the expiration of the Collective Bargaining Agreement on June 30, 2011, the City and Transit Department continued recognizing AFSCME as the exclusive bargaining and grievance representative."  Complaint ¶ 81, at 15-16.  According to the Plaintiffs,

> [t]he City and its Labor Board have ignored and opposed the legitimate representational interests of NMTU, discarded NMTU's prohibited practice complaints without hearings, insisted on an election when none was needed, and then did nothing to support or enable NMTU to represent employees after it prevailed in the election.

Complaint ¶ 82, at 16.  The Plaintiffs maintain that "[t]he City's misconduct and the Hearing Officers' and Personnel Board's lack of concern over -- and engagement in -- collusive tactics in this case, including biased hearing officers eager to dismiss rather than hear employee cases, and unethical and illegal conduct, clearly demonstrated the City's policy and practice with respect to the rights of its employees and the obligations of City management towards those employees."  Complaint ¶ 83, at 16.  The Plaintiffs assert that they "are entitled to compensatory, declaratory, and injunctive relief for the City's failure to comply with its laws, failure to recognize and hear employee grievances, and collusive and conspiratorial conduct with respect to these and other employees' rights and grievances."  Complaint ¶ 84, at 16.

The Plaintiffs ask for the following forms of relief:

A.   Declaratory, injunctive and compensatory relief for denial of fair hearings and the rights to due process and equal protection of law;

B.   Damages for breaches of contract;

C.   Declaratory, injunctive, and compensatory relief and exemplary and punitive damages for violation of Jessica Tapia's right to privacy.

D.   Damages for negligence with respect to Ms. Tapia's injuries;

E.   Declaratory, injunctive, and compensatory relief for unfair labor practices

and collusive misconduct between and among City officials and attorneys, the Personnel Board and its Personnel Hearing Officers and the Labor Board.

F.      Declaratory and injunctive relief requiring the City to hire or appoint a person to oversee, administer, and protect the Merit System and ensure a fair, neutral and effective personnel hearing process for City employees.

G.      Costs and attorneys' fees; and

H.      Such other and further relief as the Court deems just and proper.

Complaint ¶¶ A-H, at 16-17.

On March 4, 2013, the Defendants filed their Notice of Removal.  See Doc. 1.

On March 8, 2013, the City Defendants filed their Answer to Complaint for Violation of Statutory and Constitutional Rights, Breach of Contract, and Unfair and Prohibited Labor Practices, Affirmative Defenses and Counterclaim.  See Doc. 13 ("City Defendants' Answer"). The City Defendants raise two counterclaims: (i) malicious abuse of process, contending, in essence, that the Plaintiffs' claims are meritless and that they are abusing the legal process, see City Defendants' Answer ¶¶ 48-56, at 16-17; and (ii) prima facie tort, contending that the Plaintiffs have intentionally brought a meritless claim to harm the City of Albuquerque, see City Defendants' Answer ¶¶ 57-64, at 18-19.

On March 2013, Forney filed her Answer to Complaint for Violation of Statutory and Constitutional Rights, Breach of Contract, and Unfair and Prohibited Labor Practices by Defendant Paula Forney and Counterclaim.  See Doc. 15 ("Forney's Answer").  Forney raises counterclaims for malicious abuse of process and prima facie tort, largely for the same reasons that the City Defendants give.  See Forney's Answer ¶¶ 1-13, at 19-21.

2.      **The MTD.**

Ms. Forney moves the Court to dismiss the claims against her.      See MTD at 1.  She

- 14 -

asserts that the law entitles her to qualified immunity and that, because she served as an opposing party's counsel, she did not owe the Plaintiffs any duties.  See MTD at 1.  Accordingly, she asserts that the Complaint does not state a claim against her, and she asks the Court to dismiss the claims against her with prejudice.  See MTD at 1.  After reviewing the familiar standard for motions to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure, see MTD at 1-2, Ms. Forney sets out the following list of "material allegations" from the Complaint:

> 1. Plaintiff, Jessica Tapia ("Tapia"), was a full-time, classified City Employee employed as a City para-transit van driver until June 2011. (Complaint, ¶ 1).

> 2. Plaintiff, Vanessa Aragon ("Aragon"), was employed as a City bus driver until July 2011. (Complaint, ¶ 2).

> 3. Plaintiff New Mexico Transportation Union ("NMTU") was certified as the bargaining  representative union for City of Albuquerque bus and van drivers on October 5, 2011.  Plaintiff Ernest Lucero is its Chairman. (Complaint, ¶¶ 3, 12).

> 4. Both Tapia and Aragon brought grievance proceedings as a result of their termination from employment with the City of Albuquerque. They were represented in the grievance proceedings by NMTU. (Complaint, ¶ 15).

> 5. Although disputed by Paula Forney, for purposes of this Motion, the Complaint contains the following allegations as to Defendant, Paula Forney:

>> a. On August 2, 2011, Paula Forney drafted and issued a subpoena for Tapia's medical records from Defendant Dr. Wagner-Mogle without informing Tapia or securing a release.  (Complaint, ¶ 40).

>> b. On August 8, 2011, Paula Forney informed Tapia's counsel that she had received a telephone call from Tapia's doctor that the records should not have been sent without a release. (Complaint, ¶ 44).

>> c. After returning the records, Paula Forney asked the Personnel Hearing Officer to issue a subpoena for the records, affording Tapia an opportunity to object.  The Hearing Officer issued the subpoena and granted the City attorney permission to serve discovery on Tapia. (Complaint, ¶ 45).

>> d. Paula Forney propounded discovery requests to Tapia.

(Complaint, ¶ 46).

        e.  Paula Forney wrote a requested set of "findings and conclusions" for the Hearing Officer dismissing Tapia's case, which were adopted by the Hearing Officer without a hearing. (Complaint, ¶¶ 48, 49).

        f.  On December 14, 2011, the Personnel Board gave its "rubber stamp" approval of the Findings and Conclusions. (Complaint, ¶ 50).

        g.  Counsel for Tapia filed a motion for sanctions against Forney, the Hearing Officer and the City over the subpoena for Tapia's medical records, but the Personnel Board declined to consider the sanctions issue. (Complaint, ¶ 51).

     6. The Complaint contains no factual allegations of any conduct by Paula Forney in connection with the grievance of Aragon.

MTD ¶¶ 1-6, at 2-4.

With respect to the Plaintiffs' claims under 42 U.S.C. § 1983, Ms. Forney substantially relies on qualified immunity. See MTD at 4. After reviewing the familiar general legal standards for qualified immunity, see MTD at 4-5, Ms. Forney states that she worked for the City of Albuquerque, first as its employee and then as its contract attorney, and argues that, under the Supreme Court of the United States' decision in Filarsky v. Delia, 132 S. Ct. 1657 (2012), "a contract attorney is entitled to the same qualified immunity as an attorney employed by a governmental entity," MTD at 5. Ms. Forney continues:

    In Filarsky, [the] Supreme Court looked to the general principles of tort immunities and defenses applicable at common law, and the reasons the Court had afforded qualified immunity protection from suit under § 1983. See, e.g., Imbler v. Pachtman, 424 U.S. 409, 418 . . . . The Court determined that immunity under § 1983 should not vary depending on whether an individual working for the government does so as a permanent or full-time employee, or on some other basis. Filarsky, 132 S. Ct. at 1661-1665.

    In holding that a contract attorney is entitled to qualified immunity, the Court articulated several reasons for affording that immunity. First, the government interest in avoiding unwarranted timidity on the part of those engaged in the public's business -- which has been called "the most important special

- 16 -

government immunity-producing concern," [sic] -- is equally implicated regardless of whether the individual sued as a state actor works for the government full-time or on some other basis such as a contract. Filarsky, 107 S. Ct. at 1665 (citing Richardson v. McKnight, 521 U.S. 399, 409 . . . ). Second, affording immunity to those acting on the government's behalf serves to "ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service." Richardson, 521 U.S. at 408 . . . .

MTD at 6-7. Echoing these arguments, Ms. Forney contends that good policy reasons support extending qualified immunity to contract employees: acknowledging that government, "in need of specialized knowledge or expertise, may look outside its permanent workforce to secure the services of private individuals," she maintains that, given private individuals' freedom to choose other forms of employment, "the most talented candidates might decline public engagements if they did not receive the same immunity enjoyed by their public employee counterparts." MTD at 7.

In her third argument in favor of applying qualified immunity to her, she notes that, even if a private individual is performing a government duty, the public has an interest in ensuring that those individuals can carry out their duties without the distractions of litigation. See MTD at 7. She notes, moreover, that "distinguishing among those who carry out the public's business based on their particular relationship with the government creates significant line-drawing problems and can deprive state actors of the ability to reasonably anticipate when their conduct may give rise to liability for damages." MTD at 7 (citing Filarsky v. Delia, 132 S. Ct. at 1665-66; Anderson v. Creighton, 483 U.S. 635, 646 (1987)).

Accordingly, she asserts that Filarsky v. Delia entitles her to qualified immunity. See MTD at 7. Moreover, she asserts that, "even though the Complaint contains conclusory allegations of due process violations, the factual allegations . . . fail to establish any violation of a constitutional right by Paula Forney in her actions as attorney for the City of Albuquerque."

MTD at 7-8.  She asserts that, "[t]o the contrary, the allegations show that Paula Forney did no more than competently represent her client in the proceedings by propounding discovery, appearing for and representing the City at hearings, and drafting proposed findings and conclusions."  MTD at 8.   She also asserts that,

> [w]ith respect to the allegations involving the subpoena, the Complaint establishes that Tapia was ultimately afforded due process by being given the opportunity to object to production of her medical records, and it was the Hearing Officer's decision to issue the subpoena and permit discovery of the records. (Complaint, ¶ 45).  The issuance of the administrative subpoena for Tapia's medical records did not violate any constitutional right.  [See] Becker v. Kroll, 494 F.3d 904, 917-918 (10[th] Cir. 2007)(holding that issuance of administrative subpoena for medical
> records did not violate plaintiff's constitutional rights).

MTD at 8.   Accordingly, she asserts that, "[e]ven viewing the allegations in the light most favorable to Plaintiffs, the record clearly establishes that Tapia has failed to satisfy his [sic] heavy two-part burden and Paula Forney is entitled to qualified immunity."  MTD at 8.  She asks the Court to dismiss the § 1983 claims with prejudice.  See MTD at 8.  She also notes that, if she "is not a public actor entitled to qualified immunity, then, as a private actor, she cannot be held liable for any constitutional violations under 42 U.S.C. § 1983."  MTD at 8 n.1.

Ms. Forney then turns to the Plaintiffs' state law claims and argues that the Complaint does not state a claim against her, because she did not owe the Plaintiffs any legal duties.  See MTD at 8-9. Ms. Forney first states that, to her reading,      Counts 2, 4, and 6 of the Complaint are not directed against her; she argues that, if they are asserted against her, they fail to state a claim, because all of their claims "arise out of [her] actions as an attorney for the adverse party in personnel board proceedings and litigation," and, "as the opposing attorney, [she] had no duty to Plaintiffs."  MTD at 8-9.  She asserts that, because she had no such duty, the Complaint fails to state a claim against her.  See MTD at 9.  She asserts that, under New Mexico law, litigants have

no cause of action against opposing litigants' attorneys for conduct and statements in legal proceedings.  See MTD at 9 (citing Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, 106 N.M. 757, 750 P.2d 118; Gelinas v. Gabriel, 1987 N.M. App. Lexis 744, 106 N.M. 221, 741 P.2d 443).  According to Ms. Forney, "[a]n attorney has no duty to protect the interests of a non-client adverse party," because that party "is not the intended beneficiary of the attorney's services and the attorney's undivided loyalty belongs to the client."  MTD at 9.  She also points out that, under New Mexico law, "[a]n adverse party cannot justifiably rely on the opposing lawyer to protect him from harm."  MTD at 9 (citing Lebya v. Whitley, 1995-NMSC-066, 120 N.M. 768, 907 P.2d 172).  According to Ms. Forney, the facts that the Complaint alleges all focus on areas where she acted as the City of Albuquerque's attorney, and, in that capacity, she owed duties only to her client and not the Plaintiffs.  See MTD at 9-10.  She asserts that, "[a]s a matter of law, Plaintiffs cannot maintain any of the asserted claims against Defendant for her conduct in representing her Client against Plaintiffs.  Therefore, the claims asserted against Paula Forney fail to state a plausible claim for relief and should be dismissed."  MTD at 10.

Ms. Forney also argues that, to the extent that the NMTU and Lucero have sued her, "there is no basis for any claims by NMTU or Lucero against [her] and NMTU and Lucero lack standing to maintain the asserted claims."  MTD at 10.  After rehearsing the familiar requirements for standing under Article III of the Constitution of the United States of America, Ms. Forney asserts that NMTU and Lucero lack standing to sue her,

> because [they] allege no legally protected interest of theirs that has been invaded as a proximate result of any act or omission of Paula Forney.  NMTU and Lucero do not allege and did not have any contractual relationship with Paula Forney. Further, Paula Forney owed no legal duty to NMTU or Lucero.  Therefore, the claims by NMTU and Lucero fail to state a claim upon which relief can be

> granted against Paula Forney and the claims against Paula Forney should be
> dismissed.

MTD at 10-11.  Ms. Forney asks the Court to dismiss all claims against her with prejudice,

because the Complaint does not allege that she violated the Plaintiffs' constitutional rights;

because qualified immunity, therefore, insulates her from liability; and because she took any acts

of which the Plaintiffs complain as an opposing party's attorney, a capacity in which she owes

the Plaintiffs no legal duties.  See MTD at 11.  Ms. Forney notes that she asked opposing counsel

for concurrence, but opposing counsel did not respond.  See MTD at 11.

　　　　The Plaintiffs did not file a response.

　　　　The Court held a hearing on November 1, 2013.  See Transcript of Hearing, taken

November 1, 2013, filed November 7, 2013 (Doc. 63)("Tr.").  Ms. Forney began by reiterating

her qualified immunity argument: the Court asked her to clarify her position, and she stated that,

in Filarsky v. Delia, the Supreme Court extended qualified immunity to contract attorneys who

represent government entities.  See Tr. at 58:23-60:9 (Franke, Court).  The Court asked whether

it would go through the normal, two-pronged qualified immunity analysis; Ms. Forney submitted

that the Court could analyze the claim that way, but asserted that, because she raised this

objection in a motion to dismiss, the Court could decide the issue under Bell Atlantic Corp. v.

Twombly, 550 U.S. 544 (2007), "as to whether the allegations of the complaint plausibly

show . . . a violation of a clearly established constitutional right."  Tr. at 60:11-20 (Court,

Franke).  The Court asked Ms. Forney what she understood to be the allegations against her; Ms.

Forney stated:

> The complaint essentially sets out a series of actions by Ms. Forney, taken in her
> capacity as an attorney. These include conducting discovery, appearing before the
> Personnel Board, filing requested findings and conclusions on behalf of her client.
> The complaint is drafted very broadly.  All of the counts go against all defendants,

> and there is really nothing -- and this is part of the basis of our motion -- that
> articulates in any way specifically how Ms. Forney violated a constitutional right,
> much less a clearly established one.

Tr. at 60:21-61:7 (Court, Franke).  She argued that only the claim which relates to the subpoenas

which she sent to Dr. Wagner-Mogle could deal with the Constitution, and that both the

Complaint "and the record on the doctor's motion to dismiss show that, regardless of the validity

of the first subpoena that was issued, the matter was quickly remedied and an appropriate

subpoena was issued."  Tr. at 61:10-16 (Franke).[2]  In her view, the Complaint did not describe a

civil rights violation, but "simply procedural matters that occurred during the course of

litigation."  Tr. at 61:16-19 (Franke).  She contended that, because the Complaint does not

"articulate any plausible violation of any constitutional right by" her, "she is entitled to qualified

immunity."  Tr. at 61:20-23 (Franke).  Ms. Forney also reiterated her briefs' arguments that she

had no duty to the Plaintiffs, see Tr. at 61:24-62:10 (Franke), and that the Plaintiffs have not

alleged that she injured any legally protected right that the NMTU and Lucero held and thus lack

"standing to maintain any claims in this action," the Court should dismiss those claims, Tr. at

62:11-20 (Franke).

Ms. Forney also addressed the lack of a filed response: she noted that she filed the MTD

on May 3, 2013, and that counsel for the Plaintiffs asked for an extension of time to respond,

which was, in her view, "a clear demonstration of a recognition of the need to file a response to

this motion."  Tr. at 62:21-63:1 (Franke).  She pointed out that the Plaintiffs did not respond and

that she "waited beyond the given extension by an additional 12 days before we ever filed our

notice of completion on this.  There was no response by the time of the notice of completion, and

---

[2] Forney was referring to Dr. Wagner-Mogle's Motion to Dismiss, filed March 14, 2013 (Doc. 14).  The Court disposed of Dr. Wagner-Mogle's Motion to Dismiss in its Memorandum Opinion and Order, filed March 31, 2014 (Doc. 88).

there has been no response to date." Tr. at 62:2-6 (Franke).  She noted that some parties had,
earlier in the hearing, suggested that the Court should consider granting motions "based solely on
the fact that there is no written response," and noted that the Court need not have set a hearing,
but could have decided the MTD and other motions heard based on written filings.  Tr. at 63:7-
14 (Franke).  She stated, however, that she preferred the Court's approach to the MTD and other
motions -- that is, to reach their merits, rather than to decide them based solely on the absence of
a response -- and asserted that she

> would like the record to reflect that I believe the Court's determination of these
> motions on the merits, while taking into consideration the fact that there is no
> response raising any issue to the motions, still reaches the merits of the motions
> and a determination of the sufficiency of the motions to support dismissal.

Tr. at 63:15-23 (Franke).

After no other Defendant took the Court's invitation to speak, the Court invited the
Plaintiffs to respond.  See Tr. at 64:4-6 (Court).  The Plaintiffs asserted that it was appropriate to
address the motions on the merits.  See Tr. at 64:7-12 (Livingston).  They stated that it was not,
however, "fair or allowable to file a motion to dismiss along with a motion for summary
judgment in the same motion, attach 38 exhibits"; the Court briefly interrupted, intending to
remind Plaintiffs' counsel that the Court was holding argument on the MTD and not on the
separate motion to which the Plaintiffs' counsel referred, but the Plaintiffs' counsel stated that "I
know which motion we're talking about, but we're also talking about other motions, and this is
all accumulation."  Tr. at 64:9-16 (Livingston, Court).  The Plaintiffs' counsel reiterated his
frustration with the lack of a scheduling conference and with the other parties, given their
unwillingness to discuss the MTD or other motions with him; he asserted that the Defendants
"don't ask for consent before they file the motion," and argued that "the Court doesn't hold them

to that or anything else that is required in the interest of justice, not in the interest of technically allowing them to get their case dismissed, but in the interest of justice." Tr. at 64:16-65:2 (Livingston). He asserted that justice prevents Ms. Forney from representing Perry, Berry, Rizzieri, the City of Albuquerque, "and herself and file a counterclaim on all their behalfs [sic] and still claim immunity." Tr. at 65:3-6 (Livingston). He continued:

> That is ridiculous, Your Honor. She's entered the fray. She's joined the battle. She's made her affirmative defenses. She's made her answers. She's done everything she can to be offensive to my clients, and then says she's entitled to immunity.
>
> Well, that can't be, Your Honor. She can't file a counterclaim against them and then rest on her immunity and get out of the case somehow and leave her counterclaim valid."

Tr. at 65:6-13 (Livingston). The Plaintiffs asserted that the case is a "mess of pleadings exactly the way they're not supposed to be decided in the interest of justice in accordance with the" Federal Rules of Civil Procedure. Tr. at 65:15-17 (Livingston).

The Plaintiffs maintained that the counterclaim is an important fact -- in their view, Ms. Forney has filed nearly identical counterclaims in multiple cases, without regard to the facts or the clients. See Tr. at 65:18-21 (Livingston). They also assert, without explanation, that Ms. Forney

> said that they were trying to harass Mayor Berry's election campaign, but I'll bet you anything Mayor Berry doesn't know that. He hasn't given informed consent to the allegations raised by Ms. Forney in the complaints and in the pleadings here, and this is just dead wrong, Your Honor. It's not right to require us to go through hoops of responding to things that are so totally premature, don't lead to any effective resolution of the case, and only foretell years, months and years of delay in proceeding with the case on the merits.

Tr. at 65:22-66:6 (Livingston). The Plaintiffs underscored their desire to decide this case on its facts and on the merits, stating that, "once we've had a chance to discover what they've been

- 23 -

hiding, then it would be ripe for decision perhaps by summary judgment, perhaps with 38 exhibits, but not now, Your Honor." Tr. at 66:7-11 (Livingston). The Plaintiffs pointed out that this case is at a preliminary stage and that they had filed their action "in state court with state court pleading requirements"; they stated that the Defendants removed to federal court, "presumably with everyone's consent, although I don't believe there was anyone's consent sought. I think the lawyers just did this." Tr. at 66:12-16 (Livingston). They stated that, after removal, "we're stuck . . . arguing over every count and every issue as to whether there's sufficient law to support it when we don't even have an explanation of the facts." Tr. at 66:16-19 (Livingston). They stated:

> We need that discovery, we need that whole procedural issue that's a roadblock in this court that says that defendants can file motions that are dispositive; therefore, stop discovery, stop the proceedings, and that can happen for months and years before you can proceed with your case. That has to stop, Your Honor, and if that's being done by rule and if there are rules in effect here that are not written but are being interpreted by various people, then that's not right also, and we need some resolution of this and we need it to be in accordance with law.

Tr. at 66:21-67:5 (Livingston).

The Court invited Ms. Forney to respond. See Tr. at 67:8 (Court). Ms. Forney noted that the counterclaim was "for tortious interference with contractual relations . . . and prima facie tort, and as such, it's completely severable and distinct from the primary claims." Tr. at 67:9-14 (Franke). She stated that, "if all that stood between complete termination of this litigation was the counterclaim, I believe I'd certainly entertain dismissal of that counterclaim," but stated that the counter claim is "very distinct and can clearly be separated from the" MTD. Tr. at 67:14-18 (Franke). She further asserted that the MTD should justify dismissing each claim against her, for the three reasons she has given. See Tr. at 67:19-22 (Franke). She also underscored the MTD's point that the Complaint does not allege that Ms. Forney engaged in any conduct in connection

with Aragon. <u>See</u> Tr. at 67:22-68:2 (Franke).

The Court took the MTD under advisement. <u>See</u> Tr. at 68:9-10 (Court).

## <u>LAW REGARDING RULE(12)(b)(6)</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (quoting <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)(internal quotation marks omitted)(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief

- 25 -

above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that,

if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v.

Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at

678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complaint must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."  The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d 1242, 1247 (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING FAILURE TO RESPOND TO A MOTION

"Failure of a party to file and serve a response in opposition to a motion within the time

prescribed for doing so constitutes consent to grant the motion."  D.N.M.LR-Civ. 7.1(b).   The

court cannot, however, grant a motion to dismiss or a motion for summary judgment based solely

on plaintiff's failure to respond and must consider the merits of the motion.  See Issa v. Comp

USA, 354 F.3d 1174, 1177-78 (10th Cir. 2003)("[E]ven if a plaintiff does not file a response to a motion to dismiss for failure to state a claim, the district court must still examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted."); Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002)(holding that a district court cannot grant an unopposed motion for summary judgment unless the moving party has first met its burden of production and demonstrates it is legally entitled to judgment under rule 56).  The requirement that a court consider the merits before granting an unopposed motion to dismiss is "consistent with the purpose of Rule 12(b)(6) motions as the purpose of such motions is to test 'the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.'"   Issa v. Comp USA, 354 F.3d at 1177-78 (quoting Mobley v. McCormick, 40 F.3d at 340).  Similarly, when a party fails to respond to a motion for summary judgment, a district court can properly grant the motion only "if the motion demonstrates no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." Reed v. Bennett, 312 F.3d at 1196.  Failure to respond does "not relieve the court of its duty to make the specific determination required by Fed. R. Civ. P. 56(c)."  Reed v. Bennett, 312 F.3d at 1196.  Accordingly, although the local rules provide that a party's failure to respond to a motion for summary judgment or to a motion to dismiss for failure to state a claim is deemed consent to the Court granting the motion, the Court will nonetheless rule substantively on such motions and generally does not grant dispositive motions on procedural defaults alone.  See D.N.M.LR-Civ 7.1(b)("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."); Sawyer v. USAA Ins. Co., No. CIV 11-0523 JB/CG, 2012 WL 6005766, at *23 (D.N.M. Nov. 9, 2012)(Browning, J.)("It is important that Sawyer filed no written response to BCBSKC's motions and, under the

rules, is deemed to have consented to the Court granting the motion. . . .  The Court nonetheless carefully considered the merits of this motion and held a hearing, at which Sawyer presented no evidence.").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C.

§ 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens"),] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.      **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the

court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.   Individual Liability.

Under § 1983, "Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255.  Thus, government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events

that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983, and stated that fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange County Dep't of Prob., 115

F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment to the Constitution of the United States of America, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-Circuit Judge for the Third Circuit, now-associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 104 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.    Supervisory Liability.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).   Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."    Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-*26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in  Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

Whatever else can be said about Iqbal, and certainly much can be said, we

- 33 -

> conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Aschroft v. Iqbal</u>:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

<u>Dodds v. Richardson</u>, 614 F.3d at 1199-1200 (citing <u>Summum v. City of Ogden</u>, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in <u>Bd. of Cnty. Comm'rs v. Brown</u>, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff

- 34 -

of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

4.    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a judicial obligation to not only

preserve an area of individual freedom by limiting the reach of federal law and avoid the imposition of responsibility on a State for conduct it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)(internal quotations and citations omitted). The rights under the Fourth and Fourteenth Amendments to the Constitution of the United States of America at issue secure protection only against infringement through state action. See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments."). Under some circumstances, however, private parties' conduct may be deemed to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 937. "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. See West v. Atkins, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal Constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co., Inc. explained that the two prongs

- 36 -

merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing private parties' conduct. 457 U.S. at 937. The first prong of the test in Lugar v. Edmondson Oil Co., Inc. -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]" 457 U.S. at 940. The Supreme Court in Lugar v. Edmondson Oil Co., Inc. further instructed that the second prong, identification of a defendant as a state actor, may arise "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." 457 U.S. at 937.

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court determined that the plaintiff's allegation that private conduct unlawful under state law deprived the plaintiff of his property without due process failed to state a claim under § 1983. See 457 U.S. at 940. The Supreme Court also held that the plaintiff's claim alleging that the private parties had invoked a state statute maliciously or without valid grounds did not give rise to state action. See 457 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. See 457 U.S. at 940-41.

For a private individual to be acting under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. at 937.

- 37 -

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar, 457 U.S. at 936.  Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority.  See id. at 934.  Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished).[5]

### 1.      **Whether There is State Action by Private Actors is a Legal Determination Made by the Court.**

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality."  Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004).  According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, [see Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974),] requires the 'sifting [of] facts

---

[5] How v. City of Baxter Springs is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that How v. City of Baxter Springs,  Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished), Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), and, have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

and weighing [of] evidence." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)).  In Gilmore v. City of Montgomery, the Supreme Court found that, although it was the Supreme Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind."  417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies."  Adams v. Vandermark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(unpublished).  In Adams v. Vandermark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction from the United States District Court for the Eastern District of Michigan, instructing the jury on when to find state action.  The Sixth Circuit found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief."  1986 WL 16606, at *2.  The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined."  1986 WL 16606, at *2.  The Sixth Circuit found that the defendants

were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action.   1986 WL 16606, at *2-*3.

### 2.    Tests for Determining State Action by a Private Party.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-1203 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation." (internal quotation marks omitted)).

### a.    Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires.  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running a nursing facility.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.    Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457

U.S. 991, 993 (1982).   A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself."   Jackson v. Metro. Edison Co., 419 U.S. at 351.  "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . .  But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found."   Tulsa Professional Collection Servs, Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

c.   <strong><u>Symbiotic-Relationship Test</u>.</strong>

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity."   Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961).  "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity.  Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

d.   <strong><u>Joint-Action Test</u>.</strong>

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents."   Dennis v. Sparks, 449 U.S. 24, 27 (1980).  Courts look to "whether state officials and private parties have acted in concert in effecting a particular

deprivation of constitutional rights."  Gallagher v. Neil Young Freedom Concert, 49 F.3d at

1453.  "[I]f there is a substantial degree of cooperative action between state and private

officials . . . or if there is overt and significant state participation, in carrying out the deprivation

of the plaintiff's constitutional rights, state action is present."  Gallagher v. Neil Young Freedom

Concert, 49 F.3d at 1454 (internal quotation marks and citations omitted).  Joint participation can

also take the form of a conspiracy between public and private actors; in such cases, the plaintiff

must show that the public and private actors shared a common, unconstitutional goal.  See

Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000).  Even a

conspiracy claim requires a sufficient level of state involvement to constitute joint participation

in the unconstitutional actions.  See Soldal v. Cook County, 506 U.S. 56, 60 n.6 (1992).  The

Tenth Circuit has previously dismissed constitutional claims against a private individual where

the plaintiff did not give specific facts showing a conspiracy evidencing state action.  See

Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation

that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of

his constitutional and civil rights, no facts are stated indicating that [the defendant] did

anything . . .").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit surveyed several

instances in which courts have found action "under color of state law" where governmental and

private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that
> private citizens acted in concert with police officers in making arrests.  In both
> Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir 1987), and Lee v.
> Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who
> made complaints to police officers that resulted in arrests were not state actors.
> We found nothing in the record in either case from which we could infer that the
> allegedly unconstitutional arrests "resulted from any concerted action, whether

conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." Carey, 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard. In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." Id. at 1345.

49 F.3d at 1453-56. The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." 49 F.3d at 1453. The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate through affirmative action a private party's unconstitutional acts. See Soldal v. Cook County, 506 U.S. 56, 60 n.4 (1992).

**3.    The Influence of Police Involvement on Private Action as State Action.**

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability. See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (6th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra County, 588 F.2d 1322, 1327 (10th Cir. 1978)). In Yanaki v. Iomed, Inc., the plaintiffs argued that the

involvement of the police acting in concert with the defendants in the search of the plaintiffs'
residence converted the defendants' actions into conduct attributable to the state for the purposes
of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed]
to satisfy the first part of the [Lugar v. Edmondson Oil Co., Inc.] color of law test because the
conduct that Plaintiffs complain deprived them of their constitutional rights was caused by and
[could] only be attributed to the private Defendants."  415 F.3d at 1210.  The Tenth Circuit,
therefore, found it unnecessary to address whether the private defendants were state actors.  See
415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not
transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07
(10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that
self-help repossession of an automobile by a private party is not action under color of state law).

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty,
or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause
encompasses two distinct forms of protection: (i) procedural due process, which requires a state
to employ fair procedures when depriving a person of a protected interest; and (ii) substantive
due process, which guarantees that a state cannot deprive a person of a protected interest for
certain reasons.  See, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).  "Under
either form of protection, however, a person must have a protected interest in either life, liberty,
or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6
(D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in
determining whether an individual's procedural due-process rights were violated: (i) "'Did the
individual possess a protected property interest to which due process protection was

- 44 -

applicable?'"; and (ii) "'Was the individual afforded an appropriate level of process?'" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment." Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is 'created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.'" Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577 ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)); Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what

- 45 -

process is due.'"   Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing

Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a

deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing

appropriate to the nature of the case.'"   Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542

(citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)).  "[D]ue process

is flexible and calls [only] for such procedural protections as the particular situation demands."

Mathews v. Eldridge, 424 U.S. at 334 (internal quotation marks and brackets omitted).   The

Supreme Court has described

> the root requirement of the Due Process Clause as being that an individual be
> given an opportunity for a hearing before he is deprived of any significant
> property interest.  This principle requires some kind of a hearing prior to the
> discharge of an employee who has a constitutionally protected property interest in
> his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings.   In general, something less than a full evidentiary
> hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted)(citations and

internal quotation marks omitted).   The United States Court of Appeals for the Second Circuit

has stated:

> The Supreme Court . . . explained that procedural due process is a flexible
> standard that can vary in different circumstances depending on "'the private
> interest that will be affected by the official action'" as compared to "the
> Government's asserted interest, 'including the function involved' and the burdens
> the Government would face in providing greater process."   Hamdi v. Rumsfeld,
> 542 U.S. 507, ----, 124 S. Ct. 2633, 2646 . . . (2004)(quoting Mathews v.
> Eldridge, 424 U.S. at 335 . . . ).  A court must carefully balance these competing
> concerns, analyzing "'the risk of an erroneous deprivation' of the private interest
> if the process were reduced and the 'probable value, if any, of additional or

substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335 . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See also Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (internal quotation marks omitted)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil

War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled

on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics
> Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from
> government officials who have violated her constitutional or statutory rights.  But
> to ensure that fear of liability will not "unduly inhibit officials in the discharge of
> their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials
> may claim qualified immunity; so long as they have not violated a "clearly
> established" right, they are shielded from personal liability, Harlow v. Fitzgerald,
> 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the
> plaintiff's claim that a particular right exists.  If prior case law has not clearly
> settled the right, and so given officials fair notice of it, the court can simply
> dismiss the claim for money damages.  The court need never decide whether the
> plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the

plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or

statutory rights; and (ii) that the right was clearly established at the time of the alleged

- 48 -

misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

> **1.      Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of

- 49 -

Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: When (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[6] "Courts should think carefully before

---

[6] In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

_____

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights, and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

- 51 -

_____

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[7] The Tenth Circuit will remand a case

---

have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

[7] In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. 131 S.Ct. at 2032. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system depends so much on the nation respecting and accepting the courts' proceedings

to the district court for further consideration when the district court has given cursory treatment

to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d

at 1182.

---

and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S.Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S.Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S.Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S.Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S.Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S.Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

2.      **Clearly Established Rights in the Qualified Immunity Analysis.**

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.

- 55 -

2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in

our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  <u>See</u> <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

## <u>NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS</u>

A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent.  <u>See</u> N.M.R.A., Civ. UJI 13-801.  A person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused.  <u>See</u> N.M.R.A., Civ. UJI 13-822.  Incomplete performance is a breach of contract.  <u>See</u> <u>Cochrell v. Hiatt</u>, 97 N.M. 256, 258-59, 638 P.2d 1101, 1103-04 (Ct. App. 1981)(holding that, where the contract called for the roof to be restored to a "healthy" state and guaranteed the work for twenty-five years, because the roof leaked within the twenty-five year period, the defendant's performance was incomplete, and the defendant was in breach of the contract).  Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, causation, and damages."  <u>Abreu v. N.M. Children, Youth and Families Dep't</u>, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.)(citing <u>Camino Real Mobile Home Park P'ship v. Wolfe</u>, 1995-NMSC-013, 119 N.M. 436,

442, 891 P.2d 1190, 1196 (1995), overruled on other grounds by Sunnyland Farms, Inc. v.

Central N.M. Elec. Co-Op, Inc., 2013-NMSC-017, 301 P.3d 387)).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and
> binding contract; (2) the plaintiff's compliance with the contract and his
> performance of the obligations under it; (3) a general averment of the
> performance of any condition precedent; and (4) damages suffered as a result of
> defendant's breach.

McCasland v. Prather, 92 N.M. 192, 194, 585 P.2d 336, 338 (Ct. App. 1978).

Applying these principles in Armijo v. N.M. Dep't of Transp., No. CIV. 08-0336

JB/ACT, 2009 WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.), the Court found that a

plaintiffs' allegations failed to state a claim for breach of contract.  In support of the breach-of-

contract claim, the plaintiff asserted that "the Department would follow state employment

policies and procedure, and that the Department terminated him in breach of those policies

without just cause."  2009 WL 1329192, at *7.  The Court noted that the plaintiff did not

"indicate what contractual provisions or employment policies the Department breached," and did

not say "to what his employment contract entitles him or of what the Department deprived him."

2009 WL 1329192, at *7.  The Court found that there was "not enough to determine whether, if

taken as true, the Complaint's allegations would support claims for breach of contract."  2009

WL 1329192, at *8.  On the other hand, the Court has previously determined that a pro se

plaintiff sufficiently alleged that his counsel breached a contract for legal representation by

alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that

the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff.  See Archuleta

v. City of Roswell, No. CIV 10-1224 JB/RHS, 2012 WL 4950324, at **16-17 (D.N.M. Sept. 30,

2012)(Browning, J.).

"Additionally, in spite of the general bar on punitive damages for breach-of-contract

cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract." Anderson Living Trust v. ConocoPhillips Co., LLC, No. CIV 12-0040 JB/LFG, 2013 WL 3456913, at *42 (June 28, 2013)(Browning, J.). As the Supreme Court of New Mexico stated in Romero v. Mervyn's, 109 N.M. 249, 784 P.2d 991 (1989): "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights." 109 N.M. at 255, 784 P.2d at 998. Punitive damages are not available when a breaching party's conduct was "solely gross negligence. . . . In addition to, or in lieu of, such negligence there must be evidence of an 'evil motive' or a 'culpable mental state.'" Paiz v. State Farm Fire & Cas. Co., 118 N.M. 208, 211, 880 P.2d 300, 308 (1994). The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm." Paiz v. State Farm Fire & Cas. Co., 118 N.M. at 211, 880 P.2d at 308 (secondary quotations and citation omitted). A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or evil state of mind." Paiz v. State Farm Fire & Cas. Co., 118 N.M. at 211, 880 P.2d at 308 (secondary quotations and citation omitted). The New Mexico Civil Jury Instructions define the elements necessary for an award of punitive damages for a breach of contract as follows:

> If you find that _____ (*name of party making claim for punitive damages*) should recover compensation for damages, and if you further find that the conduct of _____ (*name of party whose conduct gives rise to a claim for punitive damages*) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then you may award punitive damages.

N.M.R.A., Civ. UJI 13-861.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States,

389 U.S. 347, 357 (1967)(footnotes omitted).

1.    *United States v. Jones*.

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car.  See 132 S. Ct. at 948.  On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  132 S. Ct. at 949.  Justice Scalia reasoned that the United States's conduct was a Fourth Amendment search, because the government trespassed on a constitutionally protected area.  See 132 S. Ct. at 949 ("The Fourth Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'  It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").  Such a physical intrusion, Justice Scalia opined, would have come within the Framers' intended definition of a "search": "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the

meaning of the Fourth Amendment when it was adopted."  132 S. Ct. at 949.  Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS device to track a Jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."  132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . .  Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all."  132 S. Ct. at 950.  Justice Scalia concluded, however, that the Supreme

Court "need not address the Government's contentions" in relation to the <u>Katz v. United States</u>

reasonable-expectation-of-privacy test analysis, because the trespass-based search approach,

which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the <u>Katz</u> formulation.
> At bottom, we must "assur[e] preservation of that degree of privacy against
> government that existed when the Fourth Amendment was adopted." <u>Kyllo[ v.
> United States</u>, 533 U.S. at 34]. As explained, for most of our history the Fourth
> Amendment was understood to embody a particular concern for government
> trespass upon the areas ("persons, houses, papers, and effects") it enumerates.
> <u>Katz</u> did not repudiate that understanding. Less than two years later the Court
> upheld defendants' contention that the Government could not introduce against
> them conversations between other people obtained by warrantless placement of
> electronic surveillance devices in their homes. The opinion rejected the dissent's
> contention that there was no Fourth Amendment violation "unless the
> conversational privacy of the homeowner himself is invaded." <u>Alderman v.
> United States</u>, 394 U.S. 165, 176 . . . (1969). "[W]e [do not] believe that <u>Katz</u>, by
> holding that the Fourth Amendment protects persons and their private
> conversations, was intended to withdraw any of the protection which the
> Amendment extends to the home . . . ." <u>Id.</u>, at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the

majority's opinion reflects an irreducible constitutional minimum: When the Government

physically invades personal property to gather information, a search occurs. The reaffirmation of

that principle suffices to decide this case." 132 S. Ct. at 955 (Sotomayor, J., concurring). She

continued:

> Of course, the Fourth Amendment is not concerned only with trespassory
> intrusions on property. <u>See</u>, <u>e.g.</u>, <u>Kyllo v. United States</u>, 533 U.S. [at] 31-33 . . . .
> Rather, even in the absence of a trespass, "a Fourth Amendment search occurs
> when the government violates a subjective expectation of privacy that society
> recognizes as reasonable." <u>Id.</u>, at 33; <u>see also</u> <u>Smith v. Maryland</u>, 442 U.S. 735,
> 740-741 . . . (1979); <u>Katz v. United States</u>, 389 U.S. [at] 361 . . . (Harlan, J.,
> concurring).

- 63 -

132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on

the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In
> cases of electronic or other novel modes of surveillance that do not depend upon a
> physical invasion on property, the majority opinion's trespassory test may provide
> little guidance. But "[s]ituations involving merely the transmission of electronic
> signals without trespass would remain subject to <u>Katz</u> analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion,

132 S. Ct. at 953).

    Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment

only, reasoning that, although he agreed with the result, given the use of twenty-first century

technology, he would have analyzed whether the government's long-term monitoring of the

defendant violated the <u>Katz v. United States</u> reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of
> unreasonable searches and seizures to a 21st-century surveillance technique, the
> use of a Global Positioning System (GPS) device to monitor a vehicle's
> movements for an extended period of time.  Ironically, the Court has chosen to
> decide this case based on 18th-century tort law.  By attaching a small GPS device
> to the underside of the vehicle that respondent drove, the law enforcement officers
> in this case engaged in conduct that might have provided grounds in 1791 for a
> suit for trespass to chattels.  And for this reason, the Court concludes, the
> installation and use of the GPS device constituted a search.  [132 S. Ct.] at 948-
> 949.
>
>     This holding, in my judgment, is unwise.  It strains the language of the
> Fourth Amendment; it has little if any support in current Fourth Amendment case
> law; and it is highly artificial.
>
>     I would analyze the question presented in this case by asking whether
> respondent's reasonable expectations of privacy were violated by the long-term
> monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).  Justice Alito first took issue with

what he called the majority's "questionable proposition that the[] two procedures [of attaching

and using a GPS device] cannot be separated for Fourth amendment purposes." 132 S. Ct. at 958. Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search." 132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect." 132 S. Ct at 958. Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment." 132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance. United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment). Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the United States attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search. 132 S. Ct. at 960-61. Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates. First, he asserted that the majority's analysis is irreconcilable with the element of the United States' conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the

device.  If the United States could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

    **2.**    ***Florida v. Jardines.***

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.  133 S. Ct. at 1417-18.  Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines. The Honorable Elena Kagan, Associate Justice, filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  133 S. Ct. at 1420 (Kagan, J., concurring).  Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In Florida v. Jardines, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement

Administration sent a surveillance team to Jardines' home.  See 133 S. Ct. at 1413.  Observing

nothing of note in the first fifteen minutes watching the home, two detectives approached the

home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs

by alerting the detectives with behavioral changes.  See 133 S. Ct. at 1413.  As the dog

approached Jardines' front porch, the dog "apparently sensed one of the odors he had been

trained to detect," and after tracking back and forth, sat at the base of the front door, "which is

the trained behavior upon discovering the odor's strongest point."  133 S. Ct. at 1413.  The dog's

handler then immediately left the porch, and told the other agents and officers at the scene that

there had been a positive alert for drugs, at which time the officers applied for and received a

search warrant for the residence, the execution of which revealed marijuana plants.  See 133 S.

Ct. at 1413.  Jardines was arrested for trafficking in marijuana and moved to suppress the

evidence based on an illegal search.  See 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search,

reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in
> an area belonging to Jardines and immediately surrounding his house -- in the
> curtilage of the house, which we have held enjoys protection as part of the home
> itself. And they gathered that information by physically entering and occupying
> the area to engage in conduct not explicitly or implicitly permitted by the
> homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some

precision the places and things encompassed by its protections': persons, houses, papers, and

effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth

Amendment does not cover every "investigation[] on private property; for example, an officer

may (subject to Katz) gather information in what we have called 'open fields' -- even if those

fields are privately owned -- because such fields are not enumerated in the Amendment's text."

133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally

protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15.

Justice Scalia then "turn[ed] to the question of whether it was accomplished through an

unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the
> home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213
> (1986)], an officer's leave to gather information is sharply circumscribed when he
> steps off those thoroughfares and enters the Fourth Amendment's protected areas.
> In permitting, for example, visual observation of the home from "public navigable
> airspace," we were careful to note that it was done "in a physically nonintrusive
> manner."  Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B.
> 1765), a case "undoubtedly familiar" to "every American statesman" at the time
> of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated
> by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general
> rule clearly: "[O]ur law holds the property of every man so sacred, that no man
> can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at
> 291.  As it is undisputed that the detectives had all four of their feet and all four of
> their companion's firmly planted on the constitutionally protected extension of
> Jardines' home, the only question is whether he had given his leave (even
> implicitly) for them to do so.  He had not.

133 S. Ct. at 1415.  Justice Scalia noted that, while society recognizes an implicit license which

"typically permits the visitor to approach the home by the front path, knock promptly, wait

briefly to be received, and then (absent invitation to linger longer) leave," he concluded that

"introducing a trained police dog to explore the area around the home in hopes of discovering

incriminating evidence is something else. There is no customary invitation to do that."  133 S.

Ct. at 1415-16 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere
> in the very act of hanging a knocker.  To find a visitor knocking on the door is
> routine (even if sometimes unwelcome); to spot that same visitor exploring the
> front path with a metal detector, or marching his bloodhound into the garden

before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited only to a particular area but also to a specific purpose.  Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.  Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in Katz."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in United States v. Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on constitutionally protected areas."  133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct. at 951-52).  Because the Supreme Court had already concluded that the conduct was a Fourth Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to consider whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz.  One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy.  That the

- 69 -

officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

Justice Kagan wrote a concurring opinion, noting: "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."   133 S. Ct. at 1418 (Kagan, J., concurring).   Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one."   133 S. Ct. at 1418 (Kagan, J., concurring).   This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of privacy; she argued that, like her analogy, the facts in Florida v. Jardines likewise involved a trespass and a violation of privacy expectations:

> That case is this case in every way that matters.   Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted.   The equipment they used was animal, not mineral.   But contra the dissent, see [133 S. Ct.] at 1420 (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).   According to Justice Kagan, had she written the majority opinion based on the Katz v. United States reasonable-expectations-of-privacy search test,

> [a] decision along those lines would have looked . . . well, much like this one.   It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"   [133 S. Ct.] at 1414 (quoting Silverman v. United States, 365 U.S. 505, 511 . . . (1961)).   It would have insisted on maintaining the "practical value" of that right by preventing

- 70 -

police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area.  [133 S. Ct.] at 1414-15 (quoting <u>California v. Ciraolo</u>, 476 U.S. [at] 213 . . . ).  And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there.  <u>See</u> [133 S. Ct.] at 1415-16, and n. 2-3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment case is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence."  133 S. Ct. at 1420 (Alito, J., dissenting).  Justice Alito noted that general trespass law permits a license to public members to use a walkway to approach a house's door, including strangers such as mailmen and solicitors, and the majority's conclusion that "the police officer in this case, Detective Bartelt, committed a trespass because he was accompanied during his otherwise lawful visit to the front door of respondent's house by his dog, Franky," is without a sound basis in trespass law.  133 S. Ct. at 1420-21 (Alito, J., dissenting).  Justice Alito also asserted that decision is inconsistent with the <u>Katz v. United States</u>' reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human."  <u>Florida v. Jardines</u>, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is

unfounded." 133 S. Ct. at 1421 (Alito, J., dissenting).  Justice Alito pointed out that the law of

trespass does not distinguish between visitors or reasons for the visit in granting an implied

license to approach a house's front door.  See 133 S. Ct. at 1421-22 (Alito, J., dissenting).  He

also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor

who adheres to these limitations is not necessarily required to ring the doorbell, knock on the

door, or attempt to speak with an occupant," and uses mail carriers as an example of such a

visitor.  133 S. Ct. at 1423 (Alito, J., dissenting).  Justice Alito pointed out that the implied

license also applies to law enforcement and cited to Kentucky v. King, 131 S. Ct. 1849 (2011), in

which the Supreme Court held that law enforcement officers approaching the front door of a

residence to conduct a "knock and talk" is not a Fourth Amendment search.  Florida v. Jardines,

133 S. Ct. at 1423 (Alito, J., concurring).  Given that "Detective Bartelt did not exceed the scope

of the license to approach respondent's front door," Justice Alito took issue with the majority's

conclusion "that Detective Bartelt went too far because he had the '*objectiv[e]* . . . *purpose* to

conduct a search.'"  133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original).  According to

Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that
> Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the
> entire body of common-law decisions, the Court has not found a single case
> holding that a visitor to the front door of a home commits a trespass if the visitor
> is accompanied by a dog on a leash.  On the contrary, the common law allowed
> even unleashed dogs to wander on private property without committing a trespass.
>
> The Court responds that "[i]t is not the dog that is the problem, but the
> behavior that here involved use of the dog."  But where is the support in the law
> of trespass for this proposition? Dogs' keen sense of smell has been used in law
> enforcement for centuries. The antiquity of this practice is evidenced by a Scottish
> law from 1318 that made it a crime to "disturb a tracking dog or the men coming
> with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to
> the front door of a home constituted a trespass, one would expect at least one case
> to have arisen during the past 800 years.  But the Court has found none.

- 72 -

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice Alito thus concluded: "For these reasons, the real law of trespass provides no support for the Court's holding today.  While the Court claims that its reasoning has 'ancient and durable roots,' its trespass rule is really a newly struck counterfeit."   133 S. Ct. at 1424 (Alito, J., dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see *Illinois v. Caballes*, . . . and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting).  Justice Kagan asserted that Detective Bartelt's use of Franky, the drug-sniffing dog, was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.  Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device.  The very argument now advanced by the concurrence appears in Justice Souter's Caballes dissent.  But the Court was not persuaded."   133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing Illinois v. Caballes, 543 U.S. at 409-10 and 413 n.3).  Justice Alito contended that "Kyllo is best understood as a decision about the use of new technology. . . .  A dog, however, is not a new form of 'technology' or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."  133 S. Ct. at 1425 (Alito, J., dissenting).  Justice Alito therefore concluded that the government's conduct

in Florida v. Jardines "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.  I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

### 3.    Standing.

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  E.g., United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").  Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing.  See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

- 74 -

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39. The Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

4.      **Whether a Fourth Amendment Search Occurred.**

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government, to collect information, violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

a.      **Trespass-Based Analysis.**

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but

- 77 -

there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5. The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000). Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . . But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court analyzed whether the Secret Service's digital scan of electronic information contained in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space. See 943 F. Supp. 2d at 1264-65. The Court noted that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area. 943 F. Supp. 2d at 1267-68.

When a law enforcement officer sees only the exterior of a credit

or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in <u>their</u> persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

> **b.** ***Katz v. United States*' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.**

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the <u>Katz v. United States</u> reasonable-expectation-of-privacy test is still good law."  <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242 (citing <u>Minnesota v. Carter</u>, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u> test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of

the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).8  In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis. Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  <u>See</u> <u>Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952).  The Court concluded in <u>United States v. Alabi</u> that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  2013 WL 1876791, at *35.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in <u>Maryland v. King</u>, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to <u>Katz v. United States</u> and pointing out that "we have

---

8 The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting). Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original). Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia J., dissenting). The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong. See Apodaca v. New Mexico Adult Probation and Parole, No. CIV 13-0113 JB/SMV, 2014 WL 712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

### c. *Katz v. United States*' Reasonable-Expectations-of-Privacy Analysis.

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. at 174). "A district court cannot suppress evidence unless

the movant proves that a search implicates <u>personal</u> Fourth Amendment interests." <u>United States v. Jones</u>, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'" <u>United States v. Miller</u>, 425 U.S. 435, 440 (1976)(<u>Hoffa v. United States</u>, 385 U.S. 293, 301-02 (1966)).[9]  The Tenth

---

[9] The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"  <u>Kerns v. Bd. of Comm'rs of Bernalillo Cnty.</u>, 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting <u>Katz. V. United States</u>, 389 U.S. at 351).  In support for this proposition, the Court relied on the majority's decision in <u>Katz v. United States</u>, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.  The petitioner has strenuously argued that the booth was a "constitutionally protected area."  The Government has maintained with equal vigor that it was not.  But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.  For the Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  <u>See</u> <u>Lewis v. United States</u>, 385 U.S. 206, 210 [1966]; <u>United States v. Lee</u>, 274 U.S. 559, 563 . . . (1927).  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.  <u>See Rios v. United States</u>, 364 U.S. 253 . . . [1960]; <u>Ex parte Jackson</u>, 96 U.S. 727, 733 . . . [1877].

<u>Katz v. United States</u>, 389 U.S. at 351-52.  The Supreme Court appears to have changed course in its two most recent opinions on Fourth Amendment searches.  In <u>Florida v. Jardines</u>, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of <u>a constitutionally protected area</u>.'" 133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting <u>United States v. Knotts</u>, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  <u>See United States v. Jones</u>, 132 S. Ct. at 951 ("<u>Katz</u> did not erode the principle 'that, when the Government does engage in physical intrusion of <u>a constitutionally protected area</u> in order to obtain information,

Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33. The Supreme Court thus articulated the Katz v.

---

that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'" (emphasis added)). The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Jones, 132 S. Ct. at 951. See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . ."). In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12. While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

- 84 -

i.     **Subjective Expectation of Privacy.**

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"   Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).   Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.   Under the Katz v. United States expectation-of-privacy test -- although perhaps not under United States v. Jones and Florida v. Jardines -- "[t]he Fourth Amendment protects people, not places.   What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."   Katz v. United States, 389 U.S. at 351.   The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.   In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.   For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.   Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment

freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5. Most recently, in Jones v. United States, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.10 Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted). Regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think what they post on the internet is or remains private. See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook

---

10 URL is the abbreviation for a "uniform resource locator, . . . also known as web address, [which] is a specific character string that constitutes a reference to a[n internet] resource." Uniform Resource Locator, Wikipedia.org, http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited Apr. 23, 2013).

profile had "no justifiable expectation that his 'friends' would keep his profile private").

> ii.     **Privacy Expectation that Society is Prepared to Recognize as Reasonable.**

Under the second step of <u>Katz v. United States</u>' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable."  <u>United States v. Ruiz</u>, 664 F.3d at 838.  The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."  <u>United States v. Jacobsen</u>, 466 U.S. 109, 122 (1984).  Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects.  See <u>California v. Ciraolo</u>, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting <u>Oliver v. United States</u>, 466 U.S. at 181-83).  This second factor of the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, <u>supra</u> §2.1(d), at 439 (quoting <u>Katz v. United States</u>, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while

no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the

luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. They then called the DEA and repacked the contents in the original packaging, before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of

privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."  United States v. Jacobsen, 466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.   This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
>
> . . . .
>
> Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[11]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at] governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'"  Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).  The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  Id., at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is

---

[11] The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

> categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants." 943 F. Supp. 2d at 1275. The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280. The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ." 943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." 943 F. Supp. 2d at 1287.

### 5. Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when

a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)). "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)). The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118). See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

- 93 -

As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)). The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate

convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.   This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.   The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).   Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."   515 U.S. at 654 (internal citations omitted).

### 6.   **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.   See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).   When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.   United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).   The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no 'implied or express duress or coercion.'"   United States v. Sanchez, 608 F.3d 685, 690 (10th Cir.

2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

      Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

      Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.

Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

### 7.    Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v. Gates, 462 U.S.213, 238 (1983)).   See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009). In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application."   United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . .").  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The Court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for

concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the Court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

### 8.    The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized."  Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)).  The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant.  See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Janus

Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).  The Tenth Circuit in Cassady v. Goering explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," Cassady v. Goering, 567 F.3d at 643 (emphasis in original).

**9.     Warrantless Searches of Homes.**

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"  United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent."  United States

v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480 U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).

### a.  Curtilage.

In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301.  Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).  Even partially enclosed backyards have been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same).

### b.  Consent.

A warrantless search is constitutional if consent is given for the search.  Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they

are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."  United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).  In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key.  See 173 F.3d at 766.

One strategy to gain consent to a search is a knock and talk, and the knock and talk itself is not a search.  "[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."  Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., dissenting).

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 131 S. Ct. 1849, 1862 (2011).   The Tenth Circuit has explained that reasonable suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."  United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006).  Police officers may approach a home, entering the curtilage surrounding that home that would be the normal route of access to the home, and knock, "precisely because that is 'no more than any private citizen might do,'"  United States v. Shuck, 713 F.3d 563, 568 (10th Cir. 2013)(quoting Florida v. Jardines, 133 S. Ct. at 1416)).

c.      **Exigent Circumstances.**

A warrantless search of a home can also be constitutional when there are exigent circumstances.  For exigent circumstances regarding safety to justify a warrantless search of a home: "(1) the officers [must have] had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must have been] reasonable." United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).  See United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986).  While officers do not need probable cause to establish that exigent circumstances existed, "there must be some reasonable basis, approaching probable cause," supporting the search of the area.  United States v. Smith, 797 F.2d at 840 (internal quotation marks omitted).

## LAW REGARDING THE RIGHT TO PRIVACY IN MEDICAL RECORDS

The Due Process Clause of the Fourteenth Amendment protects the right of privacy. See Flanagan v. Munger, 890 F.2d 1557, 1570 n.15 (10th Cir. 1989); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986).  The Tenth Circuit has recognized that the right to privacy protects government employees from their employers improperly attempting to obtain the private medical history or records.  See Lankford v. City of Hobart, 27 F.3d at 479.  Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss the manner in which a court should determine generally when a violation of the privacy right occurs.  See 27 F.3d at 479-80.  Flanagan v. Munger provides some instruction on this point.  In Flanagan v. Munger, the Tenth Circuit employed a balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy.  See 890 F.2d at 1570.  Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling

- 103 -

state interest; and (3) if disclosure can be made in the least intrusive manner." Flanagan v. Munger, 890 F.2d at 1570. The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personal information is protected." Flanagan v. Munger, 890 F.2d at 1570. See  Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material . . . ."). In Ortlieb v. Howery, 74 F. App'x 853, 854 (10th Cir. 2003)(unpublished), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her X-ray. See 74 F. App'x at 857. In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery noted that the plaintiff's broken leg was not confidential information, because the plaintiff had contacted her employer seeking extended medical leave given the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs." 74 F. App'x at 857. The Tenth Circuit also observed that, because the plaintiff had "supported her request for an indefinite extension of medical benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview." 74 F. App'x at 857. Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits." 74 F. App'x at 857.

In Kerns v. Board of Commissioners, 707 F. Supp. 2d 1190 (D.N.M. 2010)(Browning, J.), rev'd in part, vacated in part sub nom. Kerns v. Bader, 663 F. 3d 1173 (10th Cir. 2011), the

Court used the Tenth Circuit's balancing test from <u>Flanagan v. Munger</u> to determine whether a sheriff who obtained the plaintiff's medical records violated the plaintiff's privacy right under the Fourteenth Amendment, finding that (i) the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records, because he believed that the medical and mental health records were confidential and private; (ii) the sheriff's department had a compelling state interest in the records, because of its interest in enforcing 18 U.S.C. § 922(g)(4), which makes it unlawful for a person who has been "adjudicated as a mental defective" or who has been "committed to a mental institution" to possess firearms, and ensuring that the plaintiff did not fit that category; and (iii) the state could have achieved its objectives in a less intrusive manner by making a more particularized request for records, rather than requesting to "review all records." 707 F. Supp. 2d at 1256-57. Balancing these factors, the Court concluded that the plaintiff met its burden on summary judgment to demonstrate that the sheriff violated his constitutionally protected right to privacy. <u>See</u> 707 F. Supp. 2d at 1257. The Court noted that the sheriff had not relied on HIPAA when he requested the records; the law-enforcement exception in HIPAA allows HIPAA-covered entities to disclose protected healthcare information in six circumstances:

> (i) as required by law-court orders, subpoenas, warrants; (ii) to identify or locate a suspect, fugitive, material witness, or missing person; (iii) in response to a law-enforcement official's request for information about a victim or suspected victim of a crime; (iv) to alert law enforcement of a person's death, if the covered entity suspects that criminal activity caused the death; (v) when a covered entity believes that protected health information is evidence of a crime that occurred on its premises; and (vi) by a covered health-care provider in a medical emergency not occurring on its premises, when necessary to inform law enforcement about the commission and nature of a crime, the location of the crime or crime victims, and the perpetrator of the crime.

707 F. Supp. 2d at 1259 (citing 45 C.F.R. § 164.512). The Court said that "HIPAA restrains the 'health plan, health care clearinghouse, or healthcare provider' from disclosing protected medical

information, and does not restrain law-enforcement directly." 707 F. Supp. 2d at 1259 (quoting 45 C.F.R. § 164.104). The Court also concluded that the plaintiff established that his right to privacy in his medical records was clearly established at the time, precluding the sheriff from qualified immunity. See 707 F. Supp. 2d at 1259-61.

The majority of the panel in the Tenth Circuit did not agree with the Court that the plaintiff's Fourteenth Amendment rights were clearly established and reversed the Court without analyzing whether the sheriff had violated the plaintiff's constitutional rights. See Kerns v. Bader, 663 F.3d at 1183-84. Although the plaintiff cited several cases in which the Tenth Circuit "held that government officials violated plaintiffs' substantive due process privacy rights by accessing their records without public disclosure," the Tenth Circuit explained that those cases "involved another element not present here: the government officials involved accessed the plaintiffs' confidential information as part of an unlawful campaign of sexual harassment." 663 F.3d at 1186. The Tenth Circuit ordered the Court to enter summary judgment in favor of the sheriff, "only because [the plaintiff] has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005." 663 F.3d at 1187. The Honorable William J. Holloway, Jr., United States Circuit Judge for the Tenth Circuit, dissented, agreeing instead with the Court that the officer violated the plaintiff's "clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime *might* have occurred." 663 F.3d at 1197-98 (Holloway, J., dissenting)(emphasis in original).

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the

breach being a cause-in-fact and proximate cause of the plaintiff's damages.  See Coffey v. United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86).  "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v. Armstrong, 1983-NMSC-104, 100 N.M. 538, 541, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, 110 N.M. 457, 460, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of County Comm'rs, 1984-NMSC-079, 101 N.M. 671, 672, 687 P.2d 728, 729.  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant."  Schear v. Bd. of County Comm'rs, 101 N.M. at 672, 687 P.2d at 729.  "Whether a duty exists is a question of law for the courts to decide."  Schear v. Bd. of County Comm'rs, 101 N.M. at 672, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, 107 N.M. 48, 51, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability alone does not end the inquiry into whether the defendant owed a duty to the plaintiff.  See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186.  The New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v. Quality Pontiac, 134 N.M. at 49, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  Grover v. Stechel, 2002-NMCA-049, 132 N.M. 140, 143, 45 P.3d 80, 84.  "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."  Grover v. Stechel, 132 N.M. at 143, 45 P.3d at 84.  "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, 117 N.M. 623, 626, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 134 N.M. at 56, 73 P.3d at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time,

which in combination with it, causes the injury." Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING CIVIL CONSPIRACY

"A civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."  Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 140 N.M. 41, 139 P.3d 201 (internal quotations and citations omitted), overruled on other grounds by Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶ 11, 146 N.M. 274, 208 P.3d 919, 922 .  The purpose of a civil conspiracy claim is to "impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members."  Seeds v. Lucero, 2005-NMCA-067, ¶ 12, 137 N.M. 589, 113 P.3d 859, 862 (internal quotations and citations omitted), cert. denied, 2005-NMCERT-5, 137 N.M. 522, 113 P.3d 345.  In Seeds v. Lucero, the Court of Appeals of New Mexico stated the elements of a civil conspiracy and compared a civil conspiracy to a criminal conspiracy:

> Civil conspiracy consists of showing that a conspiracy between two or more individuals existed; that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and that the plaintiff was damaged as a result of such acts.  Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators.  Without an actionable civil case against one of the conspirators, however, an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense.

Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 137 N.M. 589, 113 P.3d 859 (internal quotations and citations omitted).  "[A]n agreement by itself, without an independent, unlawful act, is not an improper means."  Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 140 N.M. 41, 139 P.3d at 207.  Applying these principles, in Archuleta v. City of

Roswell, the Court found that a plaintiff failed to state a plausible claim of civil conspiracy to commit assault, because he did not allege in his complaint any specific act that the defendants supposedly carried out with the purpose of placing him in a position of immediate apprehension of harm.  See 898 F. Supp. 2d at 1255.  In Pedroza v. Lomas Auto Mall, Inc., No. CIV 07-0591 JB/RHS, 2009 WL 1919970 (D.N.M. May 26, 2009)(Browning, J.), the Court determined that plaintiffs had stated a plausible claim for civil conspiracy against an insurance company in connection with automobile dealers regarding misrepresentation of a vehicle's title, based on evidence that the insurance company submitted a misleading repair estimate and misleadingly informed the New Mexico Motor Vehicle Department that the vehicle, which should have received a salvage title, qualified for a clean title.  See 2009 WL 1919970, at **2-3.

## ANALYSIS

The Court will grant the MTD.  Because the Plaintiffs have not responded to Ms. Forney's assertion of qualified immunity, they have not carried their heavy burden to demonstrate that she is not entitled to qualified immunity.  Moreover, as to the federal claims, the Court reaches the same result on the merits, for substantially the reasons that Ms. Forney has given.

## I.   THE COURT AGREES THAT COUNTS 2, 4, AND 6 ARE NOT DIRECTED AGAINST MS. FORNEY.

Upon reviewing the Complaint as a whole, the Court agrees with Ms. Forney that Counts 2, 4, and 6 are not directed against her, but against other defendants.  To the extent that the Plaintiffs intended to assert those claims against Ms. Forney, the Court dismisses them for failure to state a claim.

Count 2 reads:

## COUNT 2

### BREACH OF EMPLOYMENT CONTRACTS

61.   Each and every allegation in the preceding paragraphs is incorporated as if set out herein.

62.   As tenured public employees, Plaintiffs Tapia and Aragon were covered by a contract of employment that consisted of the Merit System Ordinance, the Personnel Rules and Regulations and applicable collective bargaining agreements.

63.   Plaintiffs were contractually entitled to notice and an opportunity to be heard, and to be disciplined only for just cause.

64.   By their acts and omissions described herein, Defendants have violated their contractual obligations and are liable for damages to be determined at trial.

Complaint ¶¶ 61-64, at 13.   No allegation in the Complaint ties Ms. Forney to this contract claim; she worked for the entity that employed Tapia and Aragon, but the Complaint does not allege that she had a contract with Tapia or Aragon.  Accordingly, Count 2 does not state a claim against Ms. Forney on which the Court could grant relief.

Count 4 reads:

## COUNT 4

### NEGLIGENCE

72.   Each and every allegation in the preceding paragraphs is incorporated as if set out herein.

73.   As described herein, Defendants have treated Jessica Tapia and Vanessa Aragon negligently and with deliberate indifference with respect to their employment.

74.   In addition, Ms. Tapia sustained two injuries, the first resulting from operation of a wheelchair lift while on duty; the second of which was a result of her assignment to monitor the restroom facilities at the Alvarado Transit Center, a building managed and maintained by the City Transit Department.

- 111 -

75.     Ms. Tapia has given notice of her tort claim to the City of Albuquerque.

76.     The City and its Transit Department, as well as its Director, are liable for the damages proximately caused by their negligence in an amount to be determined at trial.

Complaint ¶¶ 72-76, at 14-15.  The Plaintiffs have failed to allege basic elements of a negligence claim: the existence and contours of the duty that Ms. Forney owed the Plaintiffs, and the way Ms. Forney breached that duty.  Moreover, as Ms. Forney points out, she acted as an opposing party's attorney, and "[a]n attorney has no duty . . . to protect the interests of a non-client adverse party for the obvious reasons that the adverse party is not the intended beneficiary of the attorney's services and that the attorney's undivided loyalty belongs to the client."  Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 13.  Finally, Count 4 does not explain how Ms. Forney acted unreasonably.  The Court does not, therefore, read Count 4 to assert a claim against Ms. Forney.  Accordingly, Count 4 does not state a claim on which the Court could grant relief.

Count 6 reads:

## COUNT 6

## UNFAIR LABOR PRACTICES

80.     Each and every allegation in the preceding paragraphs is incorporated as if set out herein.

81.     Long after the submission of NMTU's majority petition for the representation of the Transit drivers' bargaining unit in March, 2011, and the expiration of the Collective Bargaining Agreement on June 30, 2011, the City and Transit Department continued recognizing AFSCME as the exclusive bargaining and grievance representative.

82.     The City and its Labor Board have ignored and opposed the legitimate representational interests of NMTU, discarded NMTU's prohibited practice complaints without hearings, insisted on an election when none was

needed, and then did nothing to support or enable NMTU to represent employees after it prevailed in the election.

83.    The City's misconduct and the Hearing Officers' and Personnel Board's lack of concern over -- and engagement in -- collusive tactics in this case, including biased hearing officers eager to dismiss rather than hear employee cases, and unethical and illegal conduct, clearly demonstrated the City's policy and practice with respect to the rights of its employees and the obligations of City management towards those employees.

84.    Plaintiffs are entitled to compensatory, declaratory, and injunctive relief for the City's failure to comply with its laws, failure to recognize and hear employee grievances, and collusive and conspiratorial conduct with respect to these and other employees' rights and grievances.

Complaint ¶¶ 80-84, at 15-16.  This claim does not mention Ms. Forney, and its allegations do not, evidently, relate to her.  Accordingly, Count 6 does not state a claim against Ms. Forney on which the Court could grant relief.

## II.    COUNTS 1, 3, AND 5 DO NOT STATE A CLAIM FOR RELIEF AGAINST FORNEY.

The Court will grant the MTD as to Counts 1, 3, and 5.  None of these Counts states a claim against Ms. Forney on which the Court could grant relief.

Count 1 reads:

### COUNT 1

### DUE PROCESS AND EQUAL PROTECTION

57.    As classified, full-time, City employees Jessica Tapia and Vanessa Aragon had legitimate expectations of continued employment absent just cause for disciplinary action.  They had the right to a full and fair hearing to challenge their terminations.

58.    Similarly, NMTU and its leadership had a due process right and an obligation to represent employees in the bargaining unit at post-termination grievance hearings that are fundamentally fair and procedurally correct.

59.    Defendants denied the employees' rights to hearings and dismissed their cases on pretextual grounds.

      60.    By their acts and omissions described herein, the City Defendants have violated Plaintiffs' rights to due process and equal protection of the laws.

Complaint ¶¶ 57-60, at 12-13.

The Complaint's allegations do not recite any recognized equal-protection claim. "Generally, to state a claim under § 1983 for violation of the equal protection clause, the plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals that are not in that class." Aragon v. San Jose Ditch Ass'n, No. CIV 10-0563 JB/RHS, 2011 WL 6013284, at *13 (D.N.M. Nov. 22, 2011)(Browning, J.). No such allegations appear in the Complaint. Further, although Ms. Forney did not employ the Plaintiffs, it appears that they are bringing a claim against her as part of the city for losing their job with the City of Albuquerque. "To state an equal-protection claim against a municipality in the employment context, the plaintiff must show that the defendant's conduct, taken under color of law: (i) constitutes an adverse employment action; (ii) was motivated by a discriminatory intent; and (iii) was pursuant to the defendant's policy or custom." Hunt v. Central Consol. School Dist., 951 F. Supp. 2d 1136, 1186 (D.N.M. 2013)(Browning, J.). Count 1 contains no allegation of discriminatory intent or the existence of policy or custom. Moreover, as to Aragon and Tapia, there is no allegation of a "class of one" case, nor could there be: the Supreme Court has held that "the class-of-one theory of equal protection does not apply in the public employment context." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 598 (2008). Finally, even if this is not a public employment complaint, the Plaintiffs have not alleged all the elements of a class-of-one equal-protection claim. The Tenth Circuit has explained:

    To prevail on this theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently. Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1210 (10th Cir. 2006). A plaintiff

> must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," id. at 1211, and "wholly unrelated to any legitimate state activity," Mimics, Inc. [v. Vill. of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005)] (quotation omitted). This standard is objective -- if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations.  Moreover, no facts alleged would support an equal-protection claim.

Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011).  Accordingly, the

Court will dismiss the equal-protection claim.

The equal-protection claim and the due-process claim fail for a different reason: the

Plaintiffs have not identified what exactly Ms. Forney, in particular, did to violate their rights.

The Plaintiffs' blanket invocation of "Defendants" and "City Defendants," without identifying

specific people doing specific things, is insufficient to state a claim.  As the Tenth Circuit has

explained,

> [i]n § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities. Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.

Robbins v. Oklahoma, 519 F.3d at 1249-50 (emphasis in original).  In Robbins v. Oklahoma, the

Tenth Circuit concluded that a complaint failed to satisfy rule 8's fair notice requirement,

because, "[g]iven the complaint's use of either the collective term 'Defendants' or a list of the

defendants named individually but with no distinction as to what acts are attributable to whom, it

[was] impossible for any of these individuals to ascertain what particular unconstitutional acts

they are alleged to have committed."  519 F.3d at 1250.  The same reasoning applies here: that

the reader cannot identify what allegedly illegal things the Plaintiffs accuse Ms. Forney of doing

justifies dismissing Count 1 for failure to state a claim.

Count 3 reads as follows:

## COUNT 3

## VIOLATION OF RIGHT TO PRIVACY

      65.    Each and every allegation in the preceding paragraphs is incorporated as if set out herein.

      66.    Ms. Forney used a misleading letter and an illegitimate subpoena that she issued herself to secure Jessica Tapia's medical records from Dr. Carmen Wagner-Mogle.

      67.    Dr. Carmen Wagner-Mogle sent Ms. Tapia's medical records to Ms. Forney without any knowledge or authorization by Ms. Tapia.

      68.    Dr. Wagner-Mogle communicated with Ms. Forney and other City representatives about Jessica Tapia and her medical condition and records on at least several occasions.  In contrast, she never contacted or attempted to contact Ms. Tapia or her attorney.

      69.    The acts of Defendants, specifically Paula Forney, Dr. Carmen Wagner-Mogle and the Transit Department deliberately and willfully violated Jessica Tapia's right to privacy in her medical records.

      70.    Defendants also hired a private investigator and followed Ms. Tapia, seeking and securing information about her personal life and activities entirely unconnected with her work.

      71.    Defendants are liable for their violations of Ms. Tapia's right to privacy.

Complaint ¶¶ 65-71, at 13-14.  The Complaint does not explain the source of the right to privacy -- that is, whether it arises under the Fourth Amendment or the Fourteenth Amendment.

Stripped of the conclusory allegations, as against Ms. Forney, the upshot of this claim appears to be that she subpoenaed Tapia's medical records, and that Ms. Forney and other City representatives received information about her medical condition and records from Dr. Wagner-Mogle.  Tapia has cited no authority that holds that such acts violate any constitutional provision.  Moreover, the Court has looked, and has found none -- much less cases from the Supreme Court

or from the Tenth Circuit, as qualified immunity would require.  Indeed, the Tenth Circuit found in <u>Kerns v. Bader</u> that a similar interest was not clearly established, <u>see</u> 663 F.3d at 1184-85, and nothing has changed since that time.

The Complaint does not explain what made the subpoena "illegitimate."  During a portion of the hearing on a different motion, the Court asked Tapia to explain her position:

> THE COURT: And what made the subpoena invalid?
>
> MR. LIVINGSTON: The subpoena was invalid because the rules of the Personnel Board do not allow an attorney to issue a subpoena.  They require that the subpoena be issued by the hearing officer of the City of Albuquerque, the personnel hearing officer, if there is a subpoena.  Ms. Forney knew that.  She had had experience with that in the past, but she did it anyway, and so the fact is --
>
> THE COURT: Well, subpoenas -- subpoenas are actually issued by the court, but of course, every law -- lawyer has a stack of them at their office that -- that they issue.  I mean, how is that practice any different than -- than the practice in federal court, for example?
>
> MR. LIVINGSTON: Your Honor, I've already -- I've already done a motion to sanction Ms. Forney.  We've already had rulings on it.  If the Court wants me to go back and tell the Court how it's different, I can tell the Court how it's different, because there are different rules that apply to certain administrative subpoenas, and there's no doubt that they were violated by Ms. Forney.

Tr. at 36:8-37:3 (Court, Livingston).  Tapia did not follow through on her offer to explain the subpoena rules that Ms. Forney, in her view, violated; moreover, she did not explain how that action, assuming it is true, violated the constitution.  <u>See</u> Tr. at 37:3-40:13 (Court, Livingston).

No party briefed the alleged procedural defect -- probably because the Complaint does not identify that defect, and because the Plaintiffs did not respond to the MTD.  The MTD does not address the subpoena's propriety.  The Court, therefore, lacks any argument that would probe this issue.  The Court observes, however, that, although the MSO empowers Personnel Hearing Officers to subpoena witnesses, its text does not prohibit attorneys, as officers of the court, from

filling out a blank subpoena form and issuing subpoenas.  The MSO provides:

> (H) The Personnel Hearing Officers have the power to administer oaths, subpoena witnesses and compel the production of documents pertinent to any hearing authorized by this article.  As a condition of employment, employees may be required to appear as witnesses in hearings.  Refusal to testify in an appeal hearing under this article is grounds for disciplinary action.  An employee who files an appeal and refuses to appear or participate in the appeal process at any formal stage forfeits any further right to continue that appeal.

MSO § 3-4-25(H).  Tapia cites no authority for the proposition that the MSO prohibits attorneys, as officers of the court, from issuing subpoenas, and the Court has found none.

Moreover, even if the subpoena were procedurally invalid under the MSO, Ms. Forney did not violate a clearly established constitutionally protected right by issuing it.  Although the Fourth Amendment constrains governments' use of subpoenas in their investigative capacities, see Becker v. Kroll, 494 F.3d 904, 916-17 (10th Cir. 2007), the Plaintiffs have cited no authority for the proposition that when, as a part of discovery in run-of-the-mill civil litigation, a government attorney has a court issue a subpoena with procedural defects, the state-action doctrine and the Fourth Amendment elevate the subpoena's defects from a discovery dispute to a problem of constitutional dimension.  If the opposing party objects to a subpoena's breadth or to the manner in which it issued, there is a solution: ask the tribunal -- which issued the subpoena -- to narrow the subpoena's reach or to correct the defect.[12]

With these principles in mind, the Court concludes that the subpoena did not violate the

---

[12] The Court realizes that the Plaintiffs allege that Ms. Forney did not serve the subpoena on the Plaintiffs and their counsel.  While such conduct may be unethical or might violate procedural rules, see State v. Eder, 1985-NMCA-076, ¶ 5, 103 N.M. 211, 213, 704 P.2d 465, 467 (noting that, in a criminal case, "[t]o the extent that an unknowing witness may feel compelled to attend or produce documents," pursuant to an improper subpoena, "the practice amounts to perpetrating a deceit on the witness" under NMRA Rule 16-804(C)), it may not be unconstitutional.  The Plaintiffs do not cite authority that would elevate the allegedly unethical conduct to a violation of the Fourth Amendment or the Fourteenth Amendment.

Fourth or the Fourteenth Amendments.  According to the Complaint, the subpoena that Ms.

Forney sent asked Dr. Wagner-Mogle to provide "[a]ny and all documents in your possession

regarding Jessica Tapia . . . beginning 01/01/2010 to the present."  Complaint ¶ 41, at 9.  The

Plaintiffs have not explained how this relatively routine request violated the Fourth or Fourteenth

Amendments.[13]  Tapia has provided no authority for the proposition that a state actor violates the

Fourth or the Fourteenth Amendment when it, he, or she subpoenas medical records for use in

defending a suit that grew out of a workplace investigation, or when it uses those records in that

---

[13] The Court also notes a more fundamental issue in Fourth Amendment jurisprudence: whether one has a reasonable expectation of privacy in medical records that a third-party care provider possesses.  The Tenth Circuit explained in <u>Kerns v. Bader</u>:

> Under [the third party] doctrine, "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities, even if the information is revealed [to the third party] on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."  <u>United States v. Miller</u>, 425 U.S. 435, 443 . . . (1976).  The Supreme Court has already applied third party doctrine to financial information, holding that the government may seek without a warrant confidential information clients have entrusted to their banks for safe keeping.  <u>Id.</u>  And at least some courts have indicated the same analysis applies to personal medical records entrusted by patients to hospitals or care providers -- allowing law enforcement to seek without a warrant medical records held by third parties.  <u>See</u> Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.7(d)(4th ed. 2004)(collecting authority). While there's certainly room to debate whether and how third party doctrine should apply to medical records, <u>see</u>, <u>e.g.</u>, Poornima L. Ravishankar, Comment, <u>Planned Parenthood is Not a Bank: Closing the Clinic Doors to the Fourth Amendment Third Party Doctrine</u>, 34 Seton Hall L. Rev. 1093 (2004); <u>United States v. Warshak</u>, 631 F.3d 266 (6th Cir. 2010)(declining to extend <u>Miller</u> to ISP records), and while we in no way prejudge these questions, the fact that a live (and heated) debate exists on them is more than enough to preclude us from saying that the Sheriff violated clearly established law when he sought records held by a third party care provider.

<u>Kerns v. Bader</u>, 663 F.3d at 1184-85.  The Tenth Circuit has not remedied this uncertainty since it decided <u>Kerns v. Bader</u>, and, given the adversarial breakdown in this case and the absence of any briefing on the topic, the Court cannot say that the law is clearly established the way that the Plaintiffs suggest.

defense.  Further, the Court is aware of no such authority.  The bottom line is that neither the Fourth Amendment nor the Fourteenth Amendment transforms the discovery dispute in this case into a problem of constitutional magnitude.  Moreover, the Tenth Circuit in <u>Kerns v. Bader</u> held that a similar privacy right in medical records was not clearly established, <u>see</u>, 663 F.3d at 1184-87, and nothing has changed in the interim.

Accordingly, the Court dismisses Count 3 as against Ms. Forney.

Count 5 reads:

## COUNT 5

## CONSPIRACY TO DENY CONSTITUTIONAL RIGHTS

77.    Each and every allegation in the preceding paragraphs is incorporated as if set out herein.

78.    The City Defendants, aware of Plaintiffs' rights to due process and equal protection, acted deliberately to deny the right to a hearing, one of the most fundamental rights of public employees subjected to wrongful disciplinary actions.

79.    In particular, Paula Forney, the Personnel Hearing Officers, the Personnel Board, and Bruce Rizzieri and other City officials met, discussed, and arranged for the denial of Plaintiffs' due process and equal protection rights.

Complaint ¶¶ 77-79, at 15.

Count 5 is largely moot.  In its Memorandum Opinion and Order, filed March 31, 2014 (Doc. 90), the Court granted the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment Dismissing Complaint in its Entirety, filed March 29, 2013 (Doc. 28), and concluded that none of the City Defendants violated the constitution.  In this Memorandum Opinion and Order, the Court has concluded that Ms. Forney did not violate the constitution.  Further, the claim does not, as the Tenth Circuit requires, "allege specific facts showing an agreement and concerted action amongst the defendants."  <u>Tonkovich v. Kansas Bd. of Regents</u>, 156 F.3d at

533.  This claim amounts to nothing more than "[c]onclusory allegations of conspiracy," which "are insufficient to state a valid § 1983 claim."  Tonkovich v. Kansas Bd. of Regents, 156 F.3d at 533 (internal quotation marks omitted).  See Iqbal v. Ashcroft, 445 U.S. at 681 ("[T]he conclusory nature of respondent's allegations . . . disentitles them to the presumption of truth.").

    The Complaint also does not state a claim for civil conspiracy under New Mexico law. As the Court of Appeals of New Mexico has explained,

> [c]ivil conspiracy consists of showing that a conspiracy between two or more individuals existed; that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and that the plaintiff was damaged as a result of such acts.  Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators.  Without an actionable civil case against one of the conspirators, however, an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense.

Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 137 N.M. 589, 113 P.3d 859 (internal quotation marks and citations omitted).   Aside from the conclusory allegations that Rizzieri, Ms. Forney, and others met and arranged to deny the Plaintiffs' constitutional rights -- allegations of which the Court has already disposed -- the Complaint does not allege a wrongful act done pursuant to the conspiracy, as New Mexico law requires.  Accordingly, the Court grants the MTD as to Count 5.[14]

_____

[14] Ms. Forney asserts an additional basis for dismissing NMTU's and Lucero's claims against her: NMTU and Lucero lack Article III standing to assert claims against her, because they "allege no legally protected interest of theirs that has been invaded as a proximate result of any act or omission of Paula Forney."  MTD at 10-11.  See Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d 1228, 1249-50 (D.N.M. 2011)(Browning, J.)(discussing basic standing doctrine as the Supreme Court described it in Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-61 (1992)).  If she is talking about Article III and constitutional standing, the Court believes that NMTU and Lucero have constitutional standing and the Court has jurisdiction.  To the extent that Forney intended to object to the Plaintiffs' "standing" to sue her, in the jurisdictional sense, the Court disagrees.  The Court does not read Counts 2, 4, and 6 to assert a claim against Ms. Forney -- not as a matter of standing, but because the Counts do not purport to assert a claim

## III.    THE PLAINTIFFS HAVE NOT SHOWN THAT MS. FORNEY VIOLATED THEIR CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

The second prong of qualified immunity also insulates Ms. Forney from liability.  The Court has, for the reasons it has explained, concluded that Ms. Forney has not violated the Plaintiffs' constitutional rights.  It necessarily follows that the Plaintiffs did not demonstrate that Ms. Forney violated their clearly established constitutional rights.  Accordingly, the Court finds that qualified immunity insulates Ms. Forney from liability for the Plaintiffs' Constitutional claims.[15]

---

against her.  Count 3 deals with Tapia's claims against Forney, and does not implicate NMTU and Lucero.  In Counts 1 and 5, NMTU and Lucero assert that they had a right to represent workers; allege that the Defendants, including Forney, injured that right and conspired to injure that right; and seek a judicial decision that would redress those injuries.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (setting out the "three elements" of "the irreducible constitutional minimum of standing": injury, causation, and redressability).  NMTU and Lucero satisfy alleged injury and causation, and the Court could award damages to redress harm; thus, while NMTU and Lucero may not have a claim, their alleged injuries give them sufficient standing.  Accordingly, although the Court dismisses these Counts, it dismisses them because they fail to state a claim and not because they fail to satisfy the minimal requirements of standing.

In light of the rest of the MTD, this standing argument is confusing: Ms. Forney asserts that this defect means that "the claims by NMTU and Lucero fail to state a claim upon which relief can be granted against Paula Forney," MTD at 10 -- which does not make sense, if she is alleging Article III standing, because Article III standing is a jurisdictional doctrine and not a failure-to-state-a-claim doctrine.   Moreover, the MTD discusses the standards only under rule (12)(b)(6), and never mentions the proper vehicle for jurisdictional problems -- rule (12)(b)(1) -- or the word jurisdiction.  See MTD at 1-2.  What is more, Ms. Forney asks the Court to dismiss all claims against her "with prejudice," MTD at 11.  If the Plaintiffs lacked standing to sue Ms. Forney, the Court could not dismiss the claims against her with prejudice, because a subject-matter jurisdictional dismissal is necessarily without prejudice.  See Morrison v. YTB Intern., Inc., 649 F.3d 533, 535 (7th Cir. 2011)(Easterbrook, C.J.)(explaining that dismissing a claim on the basis of standing is appropriate "under Rule 12(b)(1) rather than 12(b)(6), and without prejudice").  Thus, it may be she is alleging some level of common-law or statutory standing objection, in which case rule 12(b)(6) would be an appropriate vehicle to raise the issue.  Thus, it is unclear whether she is even raising an Article III issue, but to the extent she is, the Court concludes rejects it and exercises to dismiss the claims on the merits.

[15] The Plaintiffs do not dispute -- nor could they -- that Filarsky v. Delia, 132 S. Ct. 1657,

At the hearing, the Plaintiffs' counsel stated that, after removal, the Plaintiffs were "stuck . . . arguing over every count and every issue as to whether there's sufficient law to support it when we don't even have an explanation of the facts."   Tr. at 66:16-19 (Livingston)(emphasis added).[16]  It is the Plaintiffs' responsibility to, in the Complaint, explain the facts in a way that explains which Defendants did what, where, when, and to whom -- ideally in chronological order -- and to tether those factual allegations to the elements of a claim that the law recognizes.  The Plaintiffs evidently believe that the Court should allow claims to proceed to discovery based only on spare speculative and conclusory allegations and labels that do not tell a coherent story and do not tether that story to the elements of legal claims.[17]  The federal pleading standards do not permit that approach.

Count 1, "Due Process and Equal Protection," illustrates the Complaint's weaknesses. The legal standards that govern due-process claims differ fundamentally from the legal standards that govern equal-protection claims; blending them into one "count" does not make sense. Another example is Count 4, "Negligence."  Torts professors hammer the basic elements of a negligence claim -- that the defendant owed the plaintiff a duty, that the defendant breached that duty, that the defendant's breach of that duty caused damage to the plaintiff, and that the plaintiff

extended qualified immunity to Forney.

[16] During the hearing, the Plaintiffs mentioned, as an aside, that the case was filed in state court under state-court pleading requirements.  The Plaintiffs did not argue that state pleading requirements should continue to govern, nor could they: under rule 81(c)(1) of the Federal Rules of Civil Procedure, those "rules apply to a civil action after it is removed from a state court." Fed. R. Civ. P. 81(c)(1).

[17] One possible explanation for the confusion is that the counsel brought claims arising out of distinct events in the same Complaint.  It is difficult to coherently tell, in one document, three distinct stories -- that is, Tapia's, Aragon's, and NMTU and Lucero's stories.  As difficult as it is to tell those stories, it is even more difficult to understand them, especially when they are blended together.

has suffered damages -- into most law students in their first year of law school.  Those elements are essentially absent from Count 4.  In sum, then, the Plaintiffs have not told a coherent, linear story, and they have not attached that story to claims that the law recognizes.

Rule 12(b)(6) serves an important gatekeeping function: before a plaintiff can impose on a defendant the burdens of discovery, a plaintiff must, in his or her complaint, tell a coherent story and explain how, if the plaintiff establishes that story, the law entitles him or her to relief from the defendant.  Motions to dismiss for failure to state a claim exist, in part, to prevent plaintiffs from using the costs and delays of discovery to extort a nuisance settlement for meritless claims.  Parties best serve their interests and the interests of justice when they comply with the rules of the system, rather than struggle against them.

**IT IS ORDERED** that the Motion to Dismiss by Defendant Paula Forney, filed May 3, 2013 (Doc. 43), is granted.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Paul Livingston
Placitas, New Mexico

   *Attorney for the Plaintiffs and Counter-Defendants Jessica Tapia, Vanessa Aragon, New Mexico Transportation Union, and Ernest Lucero*

- 124 -

Rebecca E. Wardlaw
  Managing Assistant City Attorney
Samantha M. Hults
Steve D. Nichols
  Assistant City Attorneys
Albuquerque, New Mexico

--and--

Stephen G. French
Paula I. Forney
Erika E. Anderson
French & Associates, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants and Counter-Claimants City of Albuquerque, Richard Berry,*
      *Robert J. Perry, and Bruce Rizzieri*

Debra J. Moulton
Deborah D. Wells
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant City Personnel Board*

Alfred L. Green , Jr.
Emily A. Franke
Neil R. Blake
Butt Thornton & Baehr, P. C.
Albuquerque, New Mexico

    *Attorneys for Defendant Paula Forney*

Lynn S. Sharp
Christopher Lee Moander
Charles P. List
Sharp Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Carmen Wagner-Mogle M.D.*